Slip Op. 15-31

UNITED STATES COURT OF INTERNATIONAL TRADE

---

ZHAOQING TIFO NEW FIBRE CO., LTD.,          :

                           *Plaintiff,*          :

        v.          :

UNITED STATES,          :

                           *Defendant,*          :          Court No. 13-00044

        and          :

DAK AMERICAS LLC,          :

                           *Defendant-Intervenor.*          :

---

[Granting Plaintiff's Motion for Judgment on the Agency Record]

Dated:  April 9, 2015

    Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff.  With him on the briefs were J. Kevin Horgan and John J. Kenkel.

    Ryan M. Majerus, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., argued for Defendant.  With him on the briefs were Benjamin C. Mizer, Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch.  Of counsel on the briefs was Shana Hofstetter, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

    David C. Smith, Kelley Drye & Warren LLP, of Washington D.C., argued for Defendant-Intervenor.  With him on the briefs were Paul C. Rosenthal and Benjamin Blase Caryl.

# OPINION

RIDGWAY, JUDGE:

    In this action, Plaintiff Zhaoqing Tifo New Fibre Co., Ltd. ("Zhaoqing Tifo") – a Chinese

producer and exporter of polyester staple fiber – contests the final results of the U.S. Department

of Commerce's fourth administrative review of the antidumping duty order covering polyester

staple fiber from the People's Republic of China.  *See* Certain Polyester Staple Fiber From the

People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010-

2011, 78 Fed. Reg. 2366 (Jan. 11, 2013) ("Final Results"); Issues and Decision Memorandum for

the Final Results of the 2010-2011 Administrative Review (Jan. 4, 2013) (Pub. Doc. No. 108)

("Issues & Decision Memorandum").[1]

Pending before the Court is Plaintiff's Motion for Judgment on the Agency Record, in

which Zhaoqing Tifo contends that the antidumping margin calculated by Commerce in the Final

Results "double counts" certain energy costs and is therefore too high.  *See generally* Plaintiff's

Rule 56.2 Memorandum Re Counts I-IV of the Complaint in Support of Judgment on the Agency

Record ("Pl.'s Brief"); Plaintiff's Rule 56.2 Reply Brief ("Pl.'s Reply Brief").

The Government opposes Zhaoqing Tifo's motion, arguing that the company failed to

exhaust its administrative remedies, and that, in any event, Commerce's treatment of energy costs

in the Final Results is supported by substantial evidence and otherwise in accordance with law.

The Government thus maintains that Commerce's determination should be sustained.  *See*

*generally*, *e.g.*, Defendant's Response to Plaintiff's Rule 56.2 Motion for Judgment Upon the

Agency Record ("Def.'s Response Brief").  Notably, the Government does not directly address the

---

[1]Because the administrative record in this action includes confidential (*i.e.*, business
proprietary) information, there are two versions of the record – the public version and the
confidential version.  Only documents from the public version of the record, which have all
confidential information redacted, are cited herein.  Moreover, all cited documents were filed
through IA ACCESS, an electronic filing system that Commerce began using during the course of
the administrative review at issue, as a replacement for the agency's older Central Records Unit
(CRU) system.  All documents are cited as "Pub. Doc. No. ____."

merits of Zhaoqing Tifo's claim that the treatment of energy costs in the Final Results led to double counting.  *Id*.  Like the Government, the Defendant-Intervenor – DAK Americas LLC (the "Domestic Producer") – similarly contends that Zhaoqing Tifo's motion is barred by the doctrine of exhaustion, and, moreover, asserts that there is no double counting.  *See generally*, *e.g.*, Defendant-Intervenor's Response Brief in Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Def.-Int.'s Response Brief").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[2]  For the reasons set forth below, Zhaoqing Tifo's Motion for Judgment on the Agency Record must be granted and this matter remanded to Commerce for further consideration.

## I.  Background

Dumping occurs when merchandise is imported into the United States and sold at a price lower than its "normal value," resulting in material injury (or the threat of material injury) to the U.S. industry.  *See* 19 U.S.C. §§ 1673, 1677(34), 1677b(a).  The difference between the normal value of the merchandise and the U.S. price is the "dumping margin."  *See* 19 U.S.C. § 1677(35). When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping margin are imposed to offset the dumping.  *See* 19 U.S.C. § 1673; *see generally* Dorbest Ltd. v. United States, 604 F.3d 1363, 1367 (Fed. Cir. 2010).

Normal value generally is calculated using either the price in the exporting market (*i.e.*, the price in the "home market" where the goods are produced) or the cost of production of the goods,

---

[2]All citations to statutes herein are to the 2006 edition of the United States Code.  The pertinent statutory text remained the same at all times relevant herein.

when the exporting country is a market economy country.  *See* 19 U.S.C. § 1677b.[3]  However,

where – as here – the exporting country has a non-market economy, there is often concern that the

factors of production (inputs) that are consumed in producing the merchandise at issue are under

state control, and that home market sales therefore may not be reliable indicators of normal value.

*See* 19 U.S.C. § 1677(18)(A); *see generally* <u>Dorbest</u>, 604 F.3d at 1367.

In cases such as this, where Commerce concludes that concerns about the sufficiency or

reliability of the available data do not permit the normal value of the merchandise to be determined

in the typical manner, Commerce identifies one or more market economy countries to serve as a

"surrogate" and then "determine[s] the normal value of the subject merchandise on the basis of the

value of the factors of production" in the relevant surrogate country or countries,[4] including "an

amount for general expenses and profit plus the cost of containers, coverings, and other expenses."

*See* 19 U.S.C. § 1677b(c)(1), (4).  This surrogate value analysis is designed to determine a

producer's costs of production as if the producer operated in a hypothetical market economy.  *See*,

*e.g.*, <u>Downhole Pipe & Equipment, L.P. v. United States</u>, 776 F.3d 1369, 1375 (Fed. Cir. 2015)

(explaining that "Commerce 'attempt[s] to construct a hypothetical market value of [a] product'

in the nonmarket economy" at issue (quoting <u>Nation Ford Chemical Co. v. United States</u>, 166 F.3d

1373, 1375 (Fed. Cir. 1999))).

---

[3]In addition, in certain market economy cases, Commerce may calculate normal value using the price in a third country (*i.e.*, a country other than the exporting country or the United States).  *See* 19 U.S.C. § 1677b(a)(1)(B)(ii); <u>RHP Bearings Ltd. v. United States</u>, 288 F.3d 1334, 1338 (Fed. Cir. 2002) (discussing 19 U.S.C. § 1677b(a)(1)(B)(ii), (C)).

[4]Commerce typically values all factors of production using a single surrogate country.  19 C.F.R. § 351.408(c)(2) (2010); <u>Dorbest</u>, 604 F.3d at 1368.

Factors of production to be valued "include, but are not limited to – (A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." *See* 19 U.S.C. § 1677b(c)(3); *see generally* Dorbest, 604 F.3d at 1367-68.   However, valuing the factors of production consumed in producing subject merchandise does not capture certain items such as (1) manufacturing/factory overhead, (2) selling, general, and administrative expenses ("SG&A"), and (3) profit.   Commerce calculates those surrogate values using ratios – known as "surrogate financial ratios" – that the agency derives from the financial statements of one or more companies that produce identical (or at least comparable) merchandise in the relevant surrogate market economy country. *See* 19 C.F.R. § 351.408(c)(4) (2010)[5]; 19 U.S.C. § 1677b(c)(1); Dorbest, 604 F.3d at 1368.   The central issue in the pending motion is whether – as Zhaoqing Tifo alleges – certain energy costs are embedded in the surrogate financial ratios that Commerce used in the Final Results here that are also (in effect) captured elsewhere in the agency's antidumping calculations, resulting in the double counting of energy costs (and thus inflating Zhaoqing Tifo's antidumping margin).[6]

---

[5]All references to regulations are to the 2010 edition of the Code of Federal Regulations. The pertinent text of the regulations cited remained the same at all times relevant herein.

[6]"An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)); *see also* Ningbo Dafa Chemical Fiber Co. v. United States, 580 F.3d 1247, 1257 (Fed. Cir. 2009) (highlighting Commerce's obligation to "establish[] antidumping margins as accurately as possible" (quoting Shakeproof)); Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (summarizing Court's "reason[ing] that the purpose of the statutory provisions is to determine antidumping margins 'as accurately as possible'" (quoting Lasko)); Lasko Metal Products, Inc. v. United States, 43 F.3d 1442, 1446 (Fed.

The underlying antidumping order in this case, which dates back to 2007, covers polyester staple fiber from the People's Republic of China ("PRC"), a product generally used as stuffing in sleeping bags, mattresses, ski jackets, comforters, cushions, pillows, and furniture.  *See* Notice of Antidumping Duty Order:  Certain Polyester Staple Fiber from the People's Republic of China, 72 Fed. Reg. 30,545, 30,546 (June 1, 2007).  The case at bar involves the fourth administrative review of that antidumping duty order.[7]  The period of review is June 1, 2010 through May 31, 2011.

---

Cir. 1994) (quoting Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1191 (Fed. Cir. 1993) for proposition that "statutory purpose 'is to facilitate the determination of dumping margins as accurately as possible . . .'"; quoting Rhone Poulenc, 899 F.2d at 1191 for proposition that the antidumping statute "sets forth procedures in an effort to determine margins 'as accurately as possible'").

Accordingly, the caselaw holds that, as a general rule, double counting is not permitted in antidumping margin calculations, because it is distortive, rendering margins less accurate.  *See*, *e.g.*, DuPont Teijin Films China Ltd. v. United States, 38 CIT ____, ____, 7 F. Supp. 3d 1338, 1345-46 (2014) (ruling that "double counting should be avoided, as it does not provide a fair price comparison"); Geum Poong Corp. v. United States, 26 CIT 322, 326-28, 193 F. Supp. 2d 1363, 1369-71 (2002) (remanding matter to agency for reconsideration of double counting, explaining that "[c]ounting potentially anomalous profit rates twice . . . would give a misleading picture of the profit experience of other . . . producers of goods in the same general category as the subject merchandise"); Holmes Products Corp. v. United States, 16 CIT 628, 632, 795 F. Supp. 1205, 1207-08 (1992) (holding that "[d]ouble-counting is to be avoided"); *see also* Pl.'s Brief at 22 n.5 (collecting cases on double counting).  Commerce's administrative determinations are to the same general effect.  *See*, *e.g.*, Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Multilayered Wood Flooring from the People's Republic of China (Oct. 11, 2011) at 20 (Comment 2) (stating that "[i]t is [Commerce's] longstanding practice to avoid double-counting costs where the requisite data are available to do so" (emphasis omitted) (citation omitted)).

[7]Antidumping duty investigations (*i.e.*, "original" investigations) determine in the first instance "whether the elements necessary for the imposition of [an antidumping] duty . . . exist." 19 U.S.C. § 1673a.  The statute also provides for periodic (typically, annual) administrative reviews of antidumping duty orders (at the request of an interested party), to update the applicable antidumping duty rate.  *See* 19 U.S.C. § 1675; Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1047 (Fed. Cir. 2012).

Zhaoqing Tifo itself requested this administrative review, because, the company explains, "all the rates of the mandatory respondents earned in the first through the third administrative review were *de minimis* and the 4.44% rate assigned to Zhaoqing Tifo as a 'separate rate' exporter was a hindrance to [the company's] sales" of polyester staple fiber. Pl.'s Brief at 2-3. "Indeed," Zhaoqing Tifo states, "the three largest producer/exporters of recycled [polyester staple fiber] have been excluded from the [Antidumping Duty] Order." *Id*. at 3. Like those three producers, Zhaoqing Tifo recycles bottles made from polyester staple fiber (*e.g.*, water and soda bottles) by chipping, cleaning, drying, and extruding them into polyester staple fiber. *Id*.

In all four prior segments of this proceeding – that is, in the original antidumping duty investigation that led to the Antidumping Duty Order here and in the first three administrative reviews of that Order, Commerce selected India as the surrogate country and relied on Indian financial statements to calculate surrogate financial ratios. Plaintiff's Supplemental Brief Regarding Exhaustion of Administrative Remedies at 3 ("Pl.'s Supp. Brief"). Because financial statements in India are relatively detailed, Commerce was able to segregate (*i.e.*, isolate) the energy costs that were reflected in the financial statements and to exclude them from the surrogate financial ratios calculated by the agency. *Id*. Commerce then separately valued Zhaoqing Tifo's energy costs – including electricity, water, and coal – in the factors of production database. *Id*.[8] This methodology avoided any potential double counting.

---

[8]Zhaoqing Tifo uses "simple steam coal" to heat water as part of its production process. *See* Issues & Decision Memorandum at 3 (Comment 1). Consistent with the practice of the parties in their briefs, the terms "coal" and "steam coal" are used interchangeably herein.

In this fourth administrative review, Commerce advised the parties that it "intend[ed] to issue its surrogate country selection prior to or in" the agency's Preliminary Results. *See* Commerce's Memorandum to All Interested Parties at 2 (Nov. 9, 2011) (Pub. Doc. No. 27) ("Commerce's Memorandum on Surrogate Country Selection"). India did not appear on the "non-exhaustive list of six countries" that Commerce provided to the parties for consideration as potential surrogates. *Id*. at 1.[9] Commerce solicited the parties' views as to the appropriate surrogate country, establishing a firm deadline for the filing of such views. At the same time, Commerce also set a second deadline (which was one month after the first deadline) for the parties' submission of any "publicly available information to value factors of production for consideration for purposes of [Commerce's Preliminary Determination]." *See id*. at 2; Certain Polyester Staple Fiber From the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review, 77 Fed. Reg. 39,990, 39,991-92 (July 6, 2012) ("Preliminary Results") (summarizing Commerce's Memorandum on Surrogate Country Selection).

On the deadline specified by Commerce, Zhaoqing Tifo submitted its views concerning the selection of an appropriate surrogate country, advocating for Thailand. Preliminary Results, 77 Fed. Reg. at 39,991.[10] The deadline came and went, however, and the Domestic Producer filed

---

[9]At the time, Commerce had begun to move away from the use of India as the surrogate country, concerned that India and the PRC are not at sufficiently comparable levels of economic development. *See* Defendant's Response to Plaintiff's Supplemental Brief at 2 ("Def.'s Supp. Response Brief"); Issues & Decision Memorandum at 4, 7-8 (Comment 1); Commerce's Memorandum on Surrogate Country Selection at 1 (listing six countries, including Thailand and Indonesia, determined to be at level of economic development comparable to PRC).

[10]It is worth noting that the section of the Preliminary Results devoted to "Surrogate Country" makes no reference to Zhaoqing Tifo's December 9, 2011 submission – the sole timely filing that Commerce received in response to the agency's request for parties' views concerning

nothing. *Id.* On Commerce's second deadline (one month thereafter), Zhaoqing Tifo submitted

extensive, detailed data concerning the valuation of factors of production, assuming the selection

of Thailand as the surrogate country (particularly in the absence of any suggestion of any other

country by the Domestic Producer). *Id.* That second deadline passed and, again, the Domestic

Producer filed nothing. *Id.*

Not until 10 days after Commerce's second deadline did the Domestic Producer file

comments setting forth (for the first time, in comments that the Domestic Producer styled as

"rebuttal") its views that Commerce should select Indonesia as the surrogate country – a full 41

days past Commerce's specified deadline for the parties' submission of such views. *See* Domestic

Producer's Submission of Surrogate Value Data for Preliminary Results (Cover Letter) at 3 (Jan.

19, 2012) (Pub. Doc. No. 43); Preliminary Results, 77 Fed. Reg. at 39,991-92 (referring to

Domestic Producer's submission); Commerce's Memorandum on Surrogate Country Selection at

2 (directing parties to file "comments, if any, on surrogate country selection . . . *no later than*

*December 9, 2011*"). With those views, the Domestic Producer also submitted surrogate value

data that assumed Commerce's selection of Indonesia as the surrogate country – 10 days after the

deadline specified by Commerce for the submission of such data for consideration for inclusion in

the Preliminary Results. *See* Domestic Producer's Submission of Surrogate Value Data for

---

the selection of an appropriate surrogate country. Instead, that section of the Preliminary Results
refers only to Zhaoqing Tifo's January 9, 2012 submission of data concerning the valuation of
factors of production (submitted on the deadline specified by Commerce for the parties' filing of
such information) and to the Domestic Producer's data, which were filed 10 days after that
deadline. *Compare* Preliminary Results, 77 Fed. Reg. at 39,992 (section captioned "Surrogate
Country"), *with id.*, 77 Fed. Reg. at 39,991 (section captioned "Surrogate Country and Surrogate
Value Data").

Preliminary Results (Parts 1-2) at Atts. 1-2 (Jan. 19, 2012) (Pub. Doc. Nos. 44-45); Preliminary

Results, 77 Fed. Reg. at 39,991-92 (referring to Domestic Producer's submission); Commerce's

Memorandum on Surrogate Country Selection at 2 (requiring all comments and surrogate value

data for consideration in the Preliminary Results to be filed "*no later than January 9, 2012*").[11]

In the Preliminary Results, Commerce – for the first time in any segment of this proceeding

– selected Indonesia as the surrogate country, as advocated by the Domestic Producer in the

comments that it filed with Commerce.  Preliminary Results, 77 Fed. Reg. at 39,992-93.[12]  To

derive surrogate financial ratios, the Preliminary Results relied on the financial statements of P.T.

Asia Pacific, an Indonesian producer of polyester staple fiber.  *Id*., 77 Fed. Reg. at 39,992, 39,995.

Commerce based that decision in part on its understanding at that time that P.T. Asia Pacific

"share[d] the same level of integration as Zhaoqing Tifo."  *Id*., 77 Fed. Reg. at 39,992.

P.T. Asia Pacific's financial statements are relatively detailed, and include separate line

items for that company's energy inputs.  Pl.'s Brief at 5; *see also* Petitioner's Rebuttal Brief at 13-

---

[11]In its submission on surrogate country selection and surrogate value data, the Domestic
Producer acknowledged that – due to the timing of the submission – Commerce was not obligated
to consider the proffered information in preparing the agency's Preliminary Results.  Domestic
Producer's Submission of Surrogate Value Data for Preliminary Results (Cover Letter) at 3 n.7.
The Domestic Producer did not explain why it failed to file its views urging Commerce to select
Indonesia as the surrogate country on or before the firm deadline that the agency had established
for the submission of such views.  Nor did the Domestic Producer explain why it had not submitted
its surrogate value data on or before the deadline that Commerce set for the submission of such
data to permit it to be considered for purposes of the Preliminary Results.

[12]Zhaoqing Tifo has not contested Commerce's selection of Indonesia as the surrogate
country for this review.  However, in making its case on exhaustion of administrative remedies,
Zhaoqing Tifo has sought to spell out the practical and procedural repercussions of the Domestic
Producer's untimely submission of its views on surrogate country selection.  *See* n.25, *infra*.

14 (Pub. Doc. No. 101) ("Domestic Producer's Administrative Rebuttal Brief").   Commerce

therefore excluded all energy costs from the surrogate financial ratios for purposes of the

Preliminary Results, and valued all of Zhaoqing Tifo's energy inputs – coal, electricity, and water

– in the factors of production database, with no concerns about double counting.  Pl.'s Brief at 5.

The Preliminary Results addressed Commerce's determinations concerning surrogate values not

only for coal, electricity, and water, but also for a wide range of other factors of production,

including such items as inland freight and brokerage and handling.  *See generally* Preliminary

Results, 77 Fed. Reg. at 39,994-95.

Following Commerce's publication of the Preliminary Results,[13] Zhaoqing Tifo filed an

administrative case brief with the agency.  *See* Case Brief of Zhaoqing Tifo New Fibre Co., Ltd.

(Pub. Doc. No. 94) ("Zhaoqing Tifo's Administrative Case Brief"); Final Results, 78 Fed. Reg. at

2366.  In that brief, Zhaoqing Tifo explained that the operations of P.T. Asia Pacific were much

more highly integrated than those of Zhaoqing Tifo, and that it was therefore not appropriate for

Commerce to rely on P.T. Asia Pacific's financial statements in calculating surrogate financial

ratios for this administrative review.  Zhaoqing Tifo argued that Commerce instead should rely on

the financial statements of a different Indonesian producer of polyester staple fiber, P.T. Tifico

Fiber Indonesia Tbk ("P.T. Tifico"), which Zhaoqing Tifo had placed on the administrative record.

---

[13]In the Preliminary Results, Commerce stated that Zhaoqing Tifo's dumping margin was 0.21% (*i.e.*, *de minimis*).  Preliminary Results, 77 Fed. Reg. at 39,996.  However, that figure was in error.  Following publication of the Preliminary Results, the Domestic Producer submitted ministerial error comments, pointing out that Commerce had inadvertently calculated the per-unit rate (when it should have calculated the *ad valorem* rate) and that the correct dumping margin was 15.09%.  Commerce agreed, and reflected the correction when it issued the Final Results.  *See* Issues & Decision Memorandum at 16 (Comment 6); Def.'s Response Brief at 3 n.1.

Zhaoqing Tifo explained that P.T. Tifico – like Zhaoqing Tifo – is not fully integrated.  *See generally* Zhaoqing Tifo's Administrative Case Brief at 3, 15.

Attached to its administrative case brief were Zhaoqing Tifo's proposed calculations of surrogate financial ratios derived from the financial statements of P.T. Tifico.  *See* Zhaoqing Tifo's Administrative Case Brief at 20; *id*. at Exh. 3.  In the presentation of the proposed surrogate financial ratios, Zhaoqing Tifo left the "Energy" column blank, reflecting the fact that – unlike the financial statements of P.T. Asia Pacific – P.T. Tifico's financial statements do not include specific line items for energy inputs.  *See* Zhaoqing Tifo's Administrative Case Brief at Exh. 3; *see also* Pl.'s Supp. Brief at 11-12 (captioned "Zhaoqing Tifo Presented A Financial Calculation With No Energy Factors, Implying That If The Department Included Them As [Factors of Production] They Would Be Double Counted"); Plaintiff's Supplemental Response Brief Regarding Exhaustion of Administrative Remedies at 5, 8 ("Pl.'s Supp. Response Brief") (similar).

Besides contesting the financial statements used to derive the surrogate financial ratios, Zhaoqing Tifo's administrative case brief also challenged the surrogate values for coal and for water that Commerce used in calculating the Preliminary Results.  In particular, on the assumption that Commerce would continue to rely on P.T. Asia Pacific's financial statements in the Final Results and thus would also continue to include coal in the factors of production database (as Commerce did in the Preliminary Results), Zhaoqing Tifo argued that Commerce should abandon the Indonesian import statistics that were used to value coal in the Preliminary Results and instead should use domestic values – specifically, coal prices from the Indonesian Ministry of Energy and Mineral Resources for the grade of coal that Zhaoqing Tifo uses in its operations.  Zhaoqing Tifo's Administrative Case Brief at 2, 7-15.  Zhaoqing Tifo further advocated that the water costs for a

single municipality (which were used in the Preliminary Results) should be replaced with averaged

water rates including data for additional municipalities.  *Id*. at 3, 23.[14]

Although the Domestic Producer did not file an administrative case brief, it did file a

rebuttal brief responding to Zhaoqing Tifo's brief.  *See generally* Domestic Producer's

Administrative Rebuttal Brief; Final Results, 78 Fed. Reg. at 2366.  The Domestic Producer argued

that, in calculating surrogate financial ratios, Commerce's Final Results should continue to rely on

the financial statements of P.T. Asia Pacific that were used in the Preliminary Results.  *See*

Domestic Producer's Administrative Rebuttal Brief at 13-14.  The Domestic Producer

characterized any differences between the levels of integration of Zhaoqing Tifo and P.T. Asia

Pacific as "trivial."  *Id*. at 13.

More importantly for purposes of the pending motion, in the rebuttal brief that it filed with

Commerce, the Domestic Producer underscored the fact that the financial statements of P.T. Tifico

are much less "complete and detailed" than those of P.T. Asia Pacific – a concern that the Domestic

Producer characterized as "more critical" than any differences in the relative levels of integration

of the companies' operations.  Domestic Producer's Administrative Rebuttal Brief at 13-14.  In

particular, the Domestic Producer emphasized that P.T. Tifico's financial statements "include[] *no*

*separate breakout* of [P.T. Tifico's] energy costs."  *Id*. (emphasis in the original); *see also id*. at 1

(stating that P.T. Tifico "is a less suitable surrogate because its financial data are less detailed").

---

[14]In addition to the selection of financial statements used to derive surrogate financial
ratios, and the surrogate values for coal and water, Zhaoqing Tifo's administrative case brief also
addressed Commerce's "zeroing" practice and contested the Preliminary Results' treatment of
inland freight costs, and brokerage and handling costs.  *See generally* Zhaoqing Tifo's
Administrative Case Brief at 3-4, 20-28.  However, none of those issues has any bearing on the
pending motion.

Criticizing Zhaoqing Tifo for assertedly "ignor[ing] the lack of . . . *electricity*, *water or any other energy-specific data*" in P.T. Tifico's financial statements, the Domestic Producer underscored that those financial statements "have a major element missing, namely the cost of goods sold has *no breakout for electricity*, *water or other energy factors*." Domestic Producer's Administrative Rebuttal Brief at 14 (emphases added). The Domestic Producer further expressly cautioned Commerce that – if the agency were to decide to rely on P.T. Tifico's financial statements for purposes of the Final Results – the agency would be required to "place *all potential energy costs* into the [manufacturing/factory] overhead numerator" in the surrogate financial ratios and to "turn off *all company-specific energy and water consumption factors*" (*i.e.*, to remove all "energy and water consumption factors" from Zhaoqing Tifo's factors of production database), "in order to capture all costs while also preventing double-counting." *Id.* (emphases added); *see also* Issues & Decision Memorandum at 9 (restating, almost *verbatim*, Domestic Producer's points concerning the absence of any line items for "electricity, water, [and] other energy factors" in P.T. Tifico's financial statements and related need for Commerce to remove "all company-specific energy and water consumption factors" from factors of production database, in order to "prevent[] double-counting").

The Domestic Producer similarly addressed the other claims in Zhaoqing Tifo's administrative case brief. As to the valuation of coal, for example, the Domestic Producer argued that Commerce's Preliminary Results properly relied on import data, disputing Zhaoqing Tifo's attacks on the accuracy and reliability of those data and questioning the domestic price data that Zhaoqing Tifo proffered. Domestic Producer's Administrative Rebuttal Brief at 1-13. The

Domestic Producer also opposed Zhaoqing Tifo's assertions that the Final Results should use a more broad-based set of data to value water.  *Id*. at 17.

In the Final Results, Commerce made a change from the Preliminary Results (which had relied on the financial statements of P.T. Asia Pacific) and instead derived the surrogate financial ratios using the financial statements of P.T. Tifico.  Final Results, 78 Fed. Reg. at 2367; *see generally* Issues & Decision Memorandum at 8-11 (Comment 2).  Persuaded by Zhaoqing Tifo's administrative case brief, Commerce concluded that "P.T. Tifico's less integrated and less complex production operations are more comparable to Zhaoqing Tifo's than those of P.T. Asia Pacific." *Id*. at 10.  Commerce therefore determined that, for purposes of the Final Results, the financial statements of P.T. Tifico "represent[] the best available information."  *Id*. at 11.[15]

However, acknowledging the legitimacy of the Domestic Producer's concerns about the lack of detail in P.T. Tifico's financial statements, Commerce's Issues and Decision Memorandum pointedly observed that "P.T. Tifico's financial statement *does not break out energy* [*costs*]." Issues & Decision Memorandum at 14 (Comment 4) (emphasis added); *see also id*. at 11 (stating that "P.T. Tifico's financial statement does not include a separate breakout of its costs for electricity and water").  Accordingly, "in order to prevent double counting," the Final Results "placed all electricity and water costs into the [manufacturing/factory] overhead numerator" (*i.e.*, included electricity and water in the surrogate financial ratios) and removed from the factors of production database the "electricity and water consumption factors" that the agency had included

---

[15]The Domestic Producer did not appeal Commerce's selection of P.T. Tifico's financial statements as the basis for the surrogate financial ratios used in the Final Results in this review.

in the database for purposes of the Preliminary Results.  *Id.*; *see also* Final Results, 78 Fed. Reg. at 2367 (stating that Commerce "did not separately value electricity and water in the final margin program because these factors of production are already captured in the surrogate financial ratios").

Commerce was silent as to any potential double counting of the "other energy factors" (beyond water and electricity) to which the Domestic Producer's rebuttal brief referred.  Despite the fact that P.T. Tifico's financial statements do not include line items for electricity, water, or any other sources of energy (such as the natural gas that P.T. Tifico uses),[16] and even though the Issues and Decision Memorandum made specific mention of the risk of double counting energy

---

[16]Apparently P.T. Tifico – like P.T. Asia Pacific – uses natural gas, rather than coal, as energy in its production of polyester staple fiber.  *See, e.g.*, Def.-Int.'s Response Brief at 22-23 & nn.63 & 64 (referring to, respectively, documentation concerning P.T. Asia Pacific's use of natural gas and P.T. Tifico's gas purchase and sale agreement); *see also* Commerce's Preliminary Surrogate Value Memorandum at Att. 18 (July 5, 2012) (Pub. Doc. No. 60) (documenting consumption of electricity and gas by P.T. Asia Pacific; listing "Electricity and Gas" as "Manufacturing Expense," based on P.T. Asia Pacific's financial statements); Domestic Producer's Submission of Surrogate Value Data for Preliminary Results (Part 1) at Att. 1 (Jan. 19, 2012) (Pub. Doc. No. 44) (documenting consumption of electricity and gas by P.T. Asia Pacific; in Notes to Consolidated Financial Statements of P.T. Asia Pacific, at pp. 93-94, listing "Electricity and gas" as "Manufacturing Expenses" and stating that "electricity and gas expenses were paid to PT Wismakarya Prasetya"); Zhaoqing Tifo's Submission of Surrogate Value Data for Final Results (Part 8) at Exh. SV-14 (Aug. 8, 2012) (Pub. Doc. No. 75) (documenting consumption of gas by P.T. Tifico; in Notes to Financial Statements of P.T. Tifico, at p. 45, under "Guarantee Deposit," referring to "gas sale and purchase agreement with PT Perusahaan Gas Negara (Persero)").

Accordingly, although the parties' briefs frequently refer to the "double counting of coal," it is thus more accurate to refer to the double counting of "energy inputs" (or "energy sources" or "energy factors").  Zhaoqing Tifo's concern is that, to the extent that *natural gas* (and any other such energy inputs) are embedded in the surrogate financial ratios derived from P.T. Tifico's financial statements (and cannot be isolated and removed from those ratios), the inclusion of *coal* in the factors of production database may effectively result in the double counting of energy inputs.

inputs, Commerce continued to include coal in Zhaoqing Tifo's factors of production database in the Final Results, just as it had done in the Preliminary Results. *See* Issues & Decision Memorandum at 3-8 (Comment 1). Further, rejecting Zhaoqing Tifo's arguments favoring the use of Indonesian domestic data on coal prices, Commerce continued to rely on the same import statistics that it used in the Preliminary Results. *Id*. at 5-8.

Zhaoqing Tifo's objections to the surrogate value used for water in the Preliminary Results were mooted in the Final Results by Commerce's determination not to separately value water in the factors of production database. Commerce reasoned that, because P.T. Tifico's financial statements include no separate line item for water, water is "already captured in the surrogate financial ratios." *See* Final Results, 78 Fed. Reg. at 2367 (stating that Commerce "did not separately value electricity and water in the final margin program because these factors of production are already captured in the surrogate financial ratios"); Issues & Decision Memorandum at 13-14 (Comment 4) (explaining that, "[b]ecause P.T. Tifico's financial statement does not break out energy, consistent with [Commerce's] practice, [the Final Results] will not separately value water in the margin program, as it is already captured in the surrogate financial ratios" (footnote omitted)).[17] The Final Results assigned Zhaoqing Tifo a dumping margin of 9.98%. *See* Final Results, 78 Fed. Reg. at 2367.

---

[17]As noted above, Zhaoqing Tifo's administrative case brief addressed Commerce's practice of zeroing, and challenged the Preliminary Results' treatment of inland freight, and brokerage and handling costs, as well as the selection of financial statements and the surrogate values for coal and water used in the Preliminary Results. *See* n.14, *supra*. In the Final Results, Commerce made no changes to the way in which the Preliminary Results had treated inland freight costs, brokerage and handling costs, and zeroing. *See* Issues & Decision Memorandum at 11-13 (Comment 3) (inland freight costs); *id*. at 14-15 (Comment 5) (brokerage and handling costs); *id*. at 16 (Comment 8) (zeroing).

Zhaoqing Tifo was puzzled by the fact that – given that P.T. Tifico's financial statements do not include specific line items for electricity, water, or any other energy inputs (such as natural gas) – Commerce removed only electricity and water from Zhaoqing Tifo's factors of production database for purposes of the Final Results.  In light of Commerce's express recognition of the need to avoid double counting, and absent any explanation for treating coal differently than electricity and water, Zhaoqing Tifo assumed that Commerce's inclusion of coal in the factors of production database was an inadvertent error by the agency, and filed a Ministerial Error Correction Request with Commerce to that effect.  *See* Zhaoqing Tifo's Ministerial Error Correction Request (Pub. Doc. No. 112).  *But see* Domestic Producer's Rebuttal to Zhaoqing Tifo's Jan. 22nd "Clerical Error" Allegation (Pub. Doc. No. 113).

In its response to Zhaoqing Tifo's allegation of ministerial error, Commerce declined Zhaoqing Tifo's request to have coal removed from the factors of production database.  *See generally* Commerce's Ministerial Error Allegation Memorandum (Pub. Doc. No. 116) ("Commerce's Ministerial Error Allegation Memorandum").  Specifically, Commerce stated that the inclusion of coal in the factors of production database was "the result of a methodological decision" by the agency, not a "ministerial error."  *Id*. at 5-6.  In its entirety, Commerce's two-paragraph rationale reads:

> We disagree with Zhaoqing Tifo that [Commerce] made a ministerial error by including steam coal as a factor of production ("FOP") in its normal value calculations for Zhaoqing Tifo in the Final Results. . . . [A] ministerial error is defined at 19 CFR § 351.224(f) as "an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any [other] similar type of unintentional error which the Secretary considers ministerial."  Thus, any issue raised by interested parties as a ministerial error which is, in fact, the result of a methodological decision by [Commerce] will

not be considered a ministerial error as it would not meet [Commerce's] regulatory definition of the term.

As we noted in the Prelim[inary] Surrogate Value Memo, [Commerce] intended to include steam coal as an FOP in [the agency's] calculation of normal value, and to value this FOP using Indonesia's Harmonized Tariff Schedule category 2701.19. [Commerce] did not change this decision in the Final Results. Moreover, it is clear [Commerce] intended to include steam coal as an FOP in the Final Results as it is the first issue in the Issues and Decision Memo, where [the agency] articulated [its] intention to apply a surrogate value to the steam coal FOP. Thus, [Commerce] did not inadvertently fail to exclude steam coal as an FOP in the normal value calculations for the Final Results.

*Id*. (footnotes omitted).

Commerce's Ministerial Error Allegation Memorandum thus shed very little light on the Final Results' treatment of coal and other energy inputs such as natural gas (relative to water and electricity). In some respects, the Ministerial Error Allegation Memorandum raised more questions than it answered. The Memorandum does not explain why it is significant that Commerce's Preliminary Surrogate Value Memorandum indicated that the agency intended to value coal in the factors of production database. The Preliminary Surrogate Value Memorandum pre-dates the Preliminary Results, which relied on the financial statements of P.T. Asia Pacific; and those financial statements include line items for energy inputs. Thus, for purposes of the Preliminary Results, no party objected to including all three of Zhaoqing Tifo's energy inputs in the factors of production database (and, to avoid double counting, excluding water, electricity, and natural gas from the surrogate financial ratios). However, Commerce relied on a different set of financial statements for the Final Results – specifically, the financial statements of P.T. Tifico, which (unlike the financial statements of P.T. Asia Pacific) do not include line items for energy sources.

Further, the Preliminary Surrogate Value Memorandum indicated not only Commerce's

intent to value coal in the factors of production database, but also electricity and water as well

(which is, in fact, what Commerce did in the Preliminary Results).   The Ministerial Error

Allegation Memorandum is silent as to why the change of financial statements and the need to

avoid double counting required Commerce to remove (exclude) electricity and water from the

factors of production database in the Final Results, but did not also require the removal (exclusion)

of coal.

This action ensued.[18]

---

[18]Although Zhaoqing Tifo's Complaint includes a total of 10 specific counts, only the first four counts are addressed in the pending motion.  Those four counts relate to Commerce's inclusion of coal in the factors of production database for purposes of the Final Results, and Zhaoqing Tifo's attendant concerns about the potential double counting of energy inputs.

In particular, Count I alleges that Commerce's failure to remove coal from the factors of production database means that Commerce "did not select the 'best available information' for the surrogate value of coal," and that the Final Results are therefore "unsupported by substantial evidence."  *See* Complaint, Count I; *see* Pl.'s Brief at 8.  Count II alleges that Commerce acted "contrary to law" by including coal in the factors of production database at the same time the agency excluded water and electricity.  Complaint, Count II; *see* Pl.'s Brief at 8-9.  Count III alleges that it was "arbitrary and capricious" for Commerce to include coal, while excluding water and electricity.  Complaint, Count III; *see* Pl.'s Brief at 9.  And Count IV alleges that Commerce's inclusion of coal in the factors of production database, while excluding water and electricity, "was a ministerial error that should have been promptly corrected."  Complaint, Count IV.  Zhaoqing Tifo withdrew Count IV in its opening brief, explaining that "the remedy [sought by Count IV] overlaps the remedy sought in Counts I through III, namely the removal of the coal energy factor from [Zhaoqing Tifo's] [factors of production] database."  Pl.'s Brief at 9.  Accordingly, only Counts I through III are presently before the court.

 Counts V, VI, VII, and VIII of the Complaint contest the surrogate values that Commerce used in the Final Results to value various inputs – including, respectively, coal, inland freight, water, and brokerage and handling.  Complaint, Counts V-VIII.  Count IX alleges that Commerce erred in rejecting a letter of credit adjustment to brokerage and handling, while Count X asserts that Commerce's "failure to issue a deficiency questionnaire regarding the sources and meaning of the domestic Indonesian coal surrogate value was contrary to law."  *Id.*, Counts IX-X.  Count

## II.  Standard of Review

In an action reviewing an antidumping determination by Commerce, the agency's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); *see also* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380 (Fed. Cir. 2008) (same).

Moreover, any determination as to the substantiality of the evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn."   Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp., 340 U.S. at 487-88); *see also* Mittal Steel, 548 F.3d at 1380-81 (same).  That said, the mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent Commerce's determination from being supported by substantial evidence.   American Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); *see also* Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966).

In evaluating whether a determination by Commerce was "arbitrary and capricious," the court considers "whether the decision was based on a consideration of the relevant factors and

---

XI is an all-purpose "catch-all" claim, stating that "[u]pon information and belief, [Commerce] erred in other aspects of its final results" which are not specified.  *Id.*, Count XI.

whether there has been a clear error of judgment." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971). "The agency must articulate a 'rational connection between the facts found and the choice made.'" Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285 (1974) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)). A determination is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence . . . , or is so implausible that it [cannot] be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) ("State Farm"). Similarly, "[a]gency action is arbitrary and capricious if 'the agency offers insufficient reasons for treating similar situations differently.'" West Deptford Energy, LLC v. FERC, 766 F.3d 10, 21 (D.C. Cir. 2014) (quoting Muwekma Ohlone Tribe v. Salazar, 708 F.3d 209, 216 (D.C. Cir. 2013)).

Lastly, while Commerce must explain the bases for its decisions, "its explanations do not have to be perfect." NMB Singapore, 557 F.3d at 1319-20. Nevertheless, "the path of Commerce's decision must be reasonably discernable" to support judicial review. Id. (citing State Farm, 463 U.S. at 43); see generally 19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to "include in a final determination . . . an explanation of the basis for its determination").

### III.  <u>Analysis</u>

The motion at hand is directed to Zhaoqing Tifo's claim that Commerce "double counted" certain energy costs in calculating Zhaoqing Tifo's antidumping margin in the Final Results of the fourth administrative review at issue here.  Specifically, Zhaoqing Tifo contends that Commerce's use of surrogate financial ratios derived from the financial statements of P.T. Tifico (which do not break out energy costs), in tandem with Commerce's inclusion of coal in the factors of production database, resulted in the double counting of energy costs in the Final Results.  According to Zhaoqing Tifo, it was improper for Commerce to include coal in the factors of production database because the energy consumed by P.T. Tifico in its production of polyester staple fiber is embedded in manufacturing/factory overhead in P.T. Tifico's financial statements, and thus is included in the surrogate financial ratios that Commerce used in the Final Results.

As a threshold matter, the Government and the Domestic Producer contend that the doctrine of exhaustion of administrative remedies bars Zhaoqing Tifo from prosecuting that claim. As discussed below, however, the exhaustion argument is unavailing, in light of the specific circumstances of this case.  Moreover, the Final Results' treatment of energy sources other than electricity and water (including Zhaoqing Tifo's coal and P.T. Tifico's natural gas) is not explained, precluding both any assessment of the substantiality of the evidence supporting Commerce's inclusion of coal in the factors of production database and any determination as to whether Commerce's action was arbitrary and capricious, as Zhaoqing Tifo contends.

### A.  The Doctrine of Exhaustion of Administrative Remedies

Invoking the doctrine of exhaustion of administrative remedies in an effort to bar consideration of the merits of Zhaoqing Tifo's "double counting" claim, the Government and the Domestic Producer point to the statute, which provides that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."  28 U.S.C. § 2637(d); Def.'s Response Brief at 7-8; Def.-Int.'s Response Brief at 7.[19]  The Government and the Domestic Producer similarly note the Court of Appeals' observation that this Court "generally takes a 'strict view' of the requirement that parties exhaust their administrative remedies."  Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007); *see also* Def.'s Response Brief at 8; Defendant-Intervenor's Supplemental Brief in Response to the December 30, 2013 Court Order at 7 ("Def.-Int.'s Supp. Brief").  In addition, the Government and the Domestic Producer cite 19 C.F.R. § 351.309(c)(2), Commerce's regulation requiring that a party's administrative case brief (filed with the agency following issuance of preliminary results) "present all arguments that continue in the submitter's view to be relevant to the . . . final results."  19 C.F.R. § 351.309(c)(2); *see also* Def.'s Response Brief at 9, 12; Def.-Int.'s Supp. Brief at 7.

---

[19]To the extent that the Government intimates that 28 U.S.C. § 2637(d) is a "mandatory" exhaustion provision, the Court of Appeals has squarely held to the contrary.  *Compare* Defendant's Supplemental Brief at 6 ("Def.'s Supp. Brief"), *with* Corus Staal BV v. United States, 502 F.3d 1370, 1379, 1381 (Fed. Cir. 2007) (discussing 28 U.S.C. § 2637(d), noting (*inter alia*) that the language "is not absolute," and citing McCarthy v. Madigan, 503 U.S. 140, 144 (1992), for proposition that "where Congress has not clearly required exhaustion, sound judicial discretion governs"); *see also* n.33, *supra* (collecting cases which stand for proposition that, in international trade cases, application of doctrine of exhaustion is committed to Court of International Trade's sound discretion).

Against this backdrop, the Government asserts that Zhaoqing Tifo's administrative case brief "did not challenge Commerce's inclusion of steam coal in the factors of production [database]" and that Zhaoqing Tifo therefore failed to exhaust its administrative remedies and is prohibited from raising its double counting claim in this forum.  Def.'s Response Brief at 7; *see also*, *e.g.*, *id.* at 2, 5-6, 7-14.  The Domestic Producer makes the same argument.  *See*, *e.g.*, Def.-Int.'s Response Brief at 1-2, 8-13.

As explained below, however, the doctrine of exhaustion has no application here, where – at the time of the filing of administrative case briefs and rebuttal briefs with Commerce – Zhaoqing Tifo had no objection (and no reason to object) to Commerce's inclusion of coal in the factors of production database.  Moreover, even if the doctrine of exhaustion did apply, the administrative rebuttal brief filed by the Domestic Producer alerted Commerce to the potential for double counting of energy inputs if the agency were to switch to the financial statements of P.T. Tifico for purposes of the Final Results.  Commerce thus had sufficient opportunity to address the double counting of energy in the Final Results.  In fact, the Final Results did address double counting with respect to electricity and water, albeit not as to coal or natural gas or any other source of energy.[20]

--------

[20]The analysis in section III.A proceeds on the assumption that Zhaoqing Tifo's administrative case brief did not alert Commerce to Zhaoqing Tifo's position that the concurrent use of P.T. Tifico's financial statements and the inclusion of coal in the factors of production database would result in the double counting of energy inputs.  However, Zhaoqing Tifo points to the surrogate financial ratio calculations that it submitted as part of its administrative case brief (and, in particular, to the blank column for "Energy") as a reflection of its position that coal should not be valued in the factors of production database if Commerce relied on P.T. Tifico's financial statements in the Final Results, due to the risk of double counting.  *See* Zhaoqing Tifo's Administrative Case Brief at Exh. 3; *see also* Pl.'s Supp. Brief at 11-12 (captioned "Zhaoqing Tifo Presented A Financial Calculation With No Energy Factors, Implying That If The Department Included Them As [Factors of Production] They Would Be Double Counted"); Pl.'s Supp. Response Brief at 5, 8 (similar).

1.   <u>The Inapplicability of the Doctrine of Exhaustion</u>

The Government and the Domestic Producer seek to make much of the fact that Commerce

included coal in the factors of production database at the Preliminary Results stage.  Thus, they

_____

Zhaoqing Tifo thus contends that, in fact, it did exhaust its administrative remedies by raising the double counting issue in its administrative case brief.  *But see* Def.'s Supp. Response Brief at 4-5; Defendant-Intervenor's Supplemental Response Brief at 4-6, 14 ("Def.-Int.'s Supp. Response Brief").  Because the analysis here concludes that Zhaoqing Tifo is entitled to pursue its double counting claim in this forum even if Zhaoqing Tifo did not raise that claim at the administrative level, there is no need to consider whether Zhaoqing Tifo's administrative case brief would have sufficed to preserve its rights.

Zhaoqing Tifo also suggests that its filing of a ministerial error allegation with Commerce following issuance of the Final Results served to exhaust its administrative remedies.  *See* Pl.'s Reply Brief at 7; Pl.'s Supp. Brief at 2, 15, 16-17, 25, 27; [Plaintiff's] Supplemental Authority Regarding Exhaustion of Administrative Remedies at 5 ("Pl.'s Brief on Supp. Authority"); [Plaintiff's] Response to Notice of Supplemental Authority Regarding Exhaustion of Administrative Remedies at 2, 4.  According to the Domestic Producer, "where a party properly challenges a ministerial error following the final results of an administrative review, that party will be deemed to have exhausted its administrative remedies with regards to that error."  Def.-Int.'s Response Brief at 8 (citing 19 U.S.C. § 1673d(e)); *see also* <u>Fischer S.A. Comercio, Industria & Agricultura v. United States</u>, 36 CIT ____, ____, 885 F. Supp. 2d 1366, 1375 (2012).  However, the Domestic Producer argues that, in this case, Zhaoqing Tifo's ministerial error allegation "was in fact a substantive challenge to Commerce's Final Results, dressed up as a ministerial error because [Zhaoqing Tifo] had not properly and timely raised that issue before Commerce."  Def.-Int.'s Response Brief at 11-13.  The Domestic Producer contends that the ministerial error allegation therefore did not exhaust Zhaoqing Tifo's administrative remedies.  *Id.* (citing <u>Fischer</u>, 36 CIT at ____, 885 F. Supp. 2d at 1376 (stating that court would not permit plaintiffs there "to make an end run around the exhaustion requirement by entertaining an unexhausted substantive issue disguised as a ministerial error")); *see also* Def.-Int.'s Response Brief at 9 & n.31; Def.-Int.'s Supp. Response Brief at 6-7, 11.  The Government makes much the same argument.  *See* Def.'s Supp. Response Brief at 3-4, 5-6, 7.  Both because this issue was not sufficiently briefed and because the analysis here concludes that Zhaoqing Tifo is entitled to pursue its double counting claim in this forum even if Zhaoqing Tifo did not raise that claim at the administrative level, there is no need to reach the issue of whether the ministerial error allegation exhausted Zhaoqing Tifo's remedies.

contend, Zhaoqing Tifo was obligated to include in its administrative case brief an objection to

that treatment of coal, and the absence of such an objection constitutes a failure to exhaust

administrative remedies.  According to the Government and the Domestic Producer, it was too late

for Zhaoqing Tifo to object to the inclusion of coal in the factors of production database and to

raise its concerns about double counting energy inputs after the Final Results issued.  *See*, *e.g.*,

Def.'s Response Brief at 5-6, 7, 9-13; Def.-Int.'s Response Brief at 1-2, 9-11.[21]

---

[21]The Government and the Domestic Producer go so far as to assert – time and time again, throughout the course of briefing – that, in its administrative case brief, Zhaoqing Tifo "affirmatively argued . . . that Commerce should apply a surrogate value to steam coal and value it as a factor of production," and that Zhaoqing Tifo therefore should not now be heard to complain that Commerce included coal in the factors of production database in the Final Results.  Def.'s Response Brief at 9-10; *see also*, *e.g.*, *id.* at 21; Def.-Int.'s Response Brief at 3, 9-10, 20, 22, 24 n.69; Def.'s Supp. Brief at 3, 8, 10, 11, 13-14; Def.-Int.'s Supp. Brief at 2, 3, 7,  11, 15, 16, 19, 22, 23-24, 24; Def.'s Supp. Response Brief at 4, 4-5, 6, 7; Def.-Int.'s Supp. Response Brief at 2, 3, 6, 9, 10-11, 12, 14; Defendant-Intervenor's Memorandum on Supplemental Authority in Response to Court Order Dated March 2, 2015 at 3, 5, 9, 10 ("Def.-Int.'s Brief on Supp. Authority"); Defendant's Response to Notices of Supplemental Authority at 2-3 ("Def.'s Response Brief on Supp. Authority").

The Government claims, for example, that "Zhaoqing Tifo's [administrative] case brief squarely addressed the issue of whether steam coal should be treated as part of overhead or as a factor of production" and that Zhaoqing Tifo "argued extensively that coal must be treated as a factor of production."  Def.'s Supp. Brief at 10-11.  In like vein, the Domestic Producer claims that Zhaoqing Tifo "affirmatively argued that Commerce should value coal as a direct material," Def.-Int.'s Response Brief at 10 (emphasis omitted), and "specifically argued for including the coal factor in the [factors of production] database."  Def.-Int.'s Supp. Response Brief at 10; Def.-Int.'s Brief on Supp. Authority at 3 (emphasis omitted; otherwise, *verbatim*).

This is a wholesale mischaracterization of Zhaoqing Tifo's position and goes perilously beyond the bounds of permissible zealous advocacy.  On the assumption that Commerce would continue to rely on P.T. Asia Pacific's financial statements in the Final Results (as it did in the Preliminary Results) and thus would continue to include coal in the factors of production database (as it did in the Preliminary Results), Zhaoqing Tifo argued in its administrative case brief that – in the Final Results – Commerce should use domestic Indonesian data from Indonesia's Ministry of Energy and Mineral Resources to value coal, rather than the Indonesian import statistics that Commerce used in the Preliminary Results.  *See* Zhaoqing Tifo's Administrative Case Brief at 7-

What the Government and the Domestic Producer fail to appreciate, however, is the significance of Commerce's decision to change the financial statements on which it relied for calculating surrogate financial ratios between the Preliminary Results (where Commerce used the financial statements of P.T. Asia Pacific) and the Final Results (where the agency instead relied on the statements of P.T. Tifico).  Because the financial statements of P.T. Asia Pacific include individual line items for energy inputs, the Preliminary Results isolated and specifically excluded those inputs from the surrogate financial ratios and instead included coal, water, and electricity in the factors of production database.  As such, Zhaoqing Tifo had no objections to the inclusion of coal (or water, or electricity) in the factors of production database, and no concerns about the double counting of energy inputs, at the Preliminary Results stage.[22]

---

15.  As a separate argument, Zhaoqing Tifo's administrative case brief also urged Commerce to abandon the financial statements of P.T. Asia Pacific in favor of those of P.T. Tifico, because the operations of P.T. Tifico more closely resemble those of Zhaoqing Tifo.  *See* Zhaoqing Tifo's Administrative Case Brief at 15-20.  And, to paraphrase Zhaoqing Tifo, "[a]scertaining the correct surrogate valu[e] of coal" (which is the subject of Count V of the Complaint and is not the subject of the pending motion) is a separate issue from whether (in the abstract) coal should be valued in the factors of production database, which is, in turn, "a separate issue from whether it is double counting to value coal at all" if energy costs are already embedded in surrogate financial ratios, as Zhaoqing Tifo here contends.  *See* Pl.'s Supp. Brief at 8.

[22]The folly in this argument of the Government and the Domestic Producer is readily exposed by reframing Zhaoqing Tifo's objection.  Contrary to the assertions of the Government and the Domestic Producer, Zhaoqing Tifo's claim is not an objection to the inclusion of coal in the factors of production database *per se*.  Instead, Zhaoqing Tifo's claim is an objection to the double counting of energy inputs – and, implicitly, an objection to the inclusion of coal in the factors of production database if it results in double counting.

Zhaoqing Tifo's point is that the inclusion of coal in the factors of production database carried with it no risk of double counting until the Final Results, where Commerce derived the surrogate financial ratios from the financial statements of P.T. Tifico, which – as Commerce candidly concedes – "do[] not break out energy [costs]."  Issues & Decision Memorandum at 14.

Under these circumstances, Zhaoqing Tifo was not required to exhaust its administrative

remedies, because – simply stated – at the time of the Preliminary Results, there was nothing to

exhaust. *See generally*, *e.g.*, Corus Staal, 502 F.3d at 1381 (observing that doctrine of exhaustion

does not apply in situations where "the agency change[s] its position . . . after [a] party's case brief

[has] been filed"); Qingdao Taifa Group Co. v. United States, 33 CIT 1090, 1092-93, 637 F. Supp.

2d 1231, 1236-37 (2009) (stating that "[a] party . . . may seek judicial review of an issue that it did

not raise in a case brief if Commerce did not address the issue until its final decision, because in

such a circumstance, the party would not have had a full and fair opportunity to raise the issue at

the administrative level" (citation omitted)), *aff'd*, 467 F. App'x 887 (Fed. Cir. 2012) (non-

precedential); Jacobi Carbons AB v. United States, 38 CIT ____, ____, 992 F. Supp. 2d 1360,

1366-67 (2014) (same).[23]

---

[23]*See also*, *e.g.*, Essar Steel, Ltd. v. United States, 753 F.3d 1368, 1374 (Fed. Cir. 2014)
(recognizing that doctrine of exhaustion does not apply in circumstances "where the party 'had no
opportunity' to raise the issue before the agency" (citation omitted)); Yangzhou Bestpak Gifts &
Crafts, 716 F.3d at 1381 (same); Consol. Bearings Co. v. United States, 348 F.3d 997, 1003-04
(Fed. Cir. 2003) (rejecting application of doctrine of exhaustion, concluding that there simply was
"[no] administrative procedure to exhaust"); CEMEX, S.A. v. United States, 133 F.3d 897, 904-
05 (Fed. Cir. 1998) (affirming trial court's decision to remand issue to Commerce for correction
of particular error even though error had not been previously raised before agency; rejecting
argument that remand was barred by doctrine of exhaustion, because error at issue "was
undiscoverable until after Commerce published its final results"); Papierfabrik August Koehler
AG v. United States, 38 CIT ____, ____ n.14, 971 F. Supp. 2d 1246, 1256 n.14 (2014) (rejecting
argument that plaintiff's claim was barred by doctrine of exhaustion, where plaintiff's case brief
filed with the agency "could not have opposed [Commerce's] construction of the regulations"
because that construction "did not appear until [Commerce] issued the Final Results"); Albemarle
Corp. v. United States, 37 CIT ____, ____, 931 F. Supp. 2d 1280, 1286-89 (2013) (as to two
separate claims, rejecting argument that litigation was barred by doctrine of exhaustion;
emphasizing that, as to first claim, "[Commerce's] change in position . . . was announced in the
Final Results, after the submission of case briefs," and, as to second claim, "[t]he ground on which
[plaintiff] brings [its] challenge . . . did not become apparent until issuance of the Final Results,
when Commerce announced that it had changed its surrogate value for [a certain input] based on

the argument made by [another party]"); Zhengzhou Huachao Industrial Co. v. United States, 37 CIT ____, ____, 2013 WL 3215181 *7 (2013) (dismissing Government argument that doctrine of exhaustion barred plaintiff's claim, where agency position at issue "changed between the Preliminary Determination and the Final Determination," such that "plaintiff had no real opportunity" to object at administrative level); Shantou Red Garden Foodstuff Co. v. United States, 36 CIT ____, ____, 815 F. Supp. 2d 1311, 1333-34 (2012) (concluding that doctrine of exhaustion did not apply, explaining that "[plaintiff] was not required to raise [the issue in question] before [Commerce] to exhaust administrative remedies because [Commerce's] determination of [the relevant] surrogate values changed between the Preliminary Determination and the Final Determination"); Globe Metallurgical Inc. v. United States, 35 CIT ____, ____, 781 F. Supp. 2d 1340, 1357 (2011) (declining to apply doctrine of exhaustion, where "the issue [in question] . . . first manifested itself in the Final Results," and "it was only after Commerce issued the Final Results that [plaintiffs] had the opportunity to review the specific methodology Commerce applied" in the Final Results); Jiaxing Brother Fastener Co. v. United States, 34 CIT ____, ____, 751 F. Supp. 2d 1345, 1355-56 (2010) (recognizing line of authority holding that "the Court of International Trade will decide an unexhausted issue on the merits when the party raising the issue had no opportunity to do so before the agency"); Dongbu Steel Co. v. United States, 34 CIT ____, ____, 677 F. Supp. 2d 1353, 1360-62 (2010) (concluding that plaintiffs' "zeroing" claim was not barred by doctrine of exhaustion "because [plaintiffs'] objections were not yet ripe at the time case briefs were due in the administrative review"; "[Plaintiffs] were not required to exhaust their remedies before the agency, because there was nothing to exhaust"), *vacated on other grounds*, 635 F.3d 1363 (Fed. Cir. 2011); Zhengzhou Harmoni Spice Co. v. United States, 33 CIT 453, 495 n.49, 617 F. Supp. 2d 1281, 1318 n.49 (2009) (explaining that "the Chinese Producers had no reason to raise [their] claim . . . until *after* Commerce made its argument in the Final Results, when Commerce, in effect, 'opened the door' on the issue . . . . Under such circumstances, the Chinese Producers were not required to exhaust their remedies before the agency, because there was nothing to exhaust"); Valley Fresh Seafood, 31 CIT at 1990-91, 1994-96 (rejecting claim of failure to exhaust where "Commerce did not apply [a certain regulation] in the Preliminary Results and, at that time, gave no indication that it was considering doing so in the Final Results," such that "the Final Results constituted the first public statement by Commerce" of the agency's position); China Steel Corp. v. United States, 28 CIT 38, 59-60, 306 F. Supp. 2d 1291, 1310-11 (2004) (holding that exhaustion doctrine did not preclude consideration of merits of plaintiff's claim where challenged Commerce position "was first pronounced in the agency's Final Determination," such that "[p]laintiff did not have the opportunity to presents its objections . . . at the administrative level"); Pohang Iron & Steel Co. v. United States, 23 CIT 778, 792-93 (1999) (holding doctrine of exhaustion inapplicable, in light of the "lack of fair opportunity to raise the issue before the agency," where Preliminary Results indicated that U.S. sales would be treated one way, then Final Results treated such sales differently); LTV Steel Co. v. United States, 21 CIT 838, 867-69 & n.26, 985 F. Supp. 95, 119-20 & n.26 (1997) (finding that exhaustion doctrine did not preclude judicial review of party's claim where party "did not have the opportunity to challenge Commerce's methodology until Commerce articulated that methodology and applied it" in the Final Results); Saha Thai Steel Pipe Co. v. United States, 17 CIT 727, 729-30, 828 F. Supp. 57,

Zhaoqing Tifo's claim for potential double counting did not arise until the Final Results,

when Commerce *both* relied on the financial statements of P.T. Tifico *and* included coal in the

---

59-60 (1993) (holding that a party was not required to file a case brief or rebuttal brief to exhaust its administrative remedies where it had "received all the remedy it sought from the preliminary determination, *i.e.*, it received a very low company-specific duty assessment," but Commerce assigned a higher country-wide rate in the final determination); <u>SKF USA, Inc. v. U.S. Dep't of Commerce</u>, 15 CIT 152, 159 n.6, 762 F. Supp. 344, 350 n.6 (1991) (finding exhaustion doctrine inapplicable where party lacked opportunity to contest issue involving Commerce's use of third country data to determine foreign market value of merchandise, because agency did not reveal results of recalculations of home market viability until final determinations), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992) (non-precedential); <u>Al Tech Specialty Steel Corp. v. United States</u>, 11 CIT 372, 377, 661 F. Supp. 1206, 1210 (1987) (stating that "in determining whether questions are precluded from consideration on appeal [because they were not first raised before the agency], the Court will assess the practical ability of a party to have its arguments considered by the administrative body"); <u>American Permac, Inc. v. United States</u>, 10 CIT 535, 536 n.2, 642 F. Supp. 1187, 1188 n.2 (1986) (noting that application of doctrine of exhaustion would be "inappropriate" because issue did not arise until long after comment period for preliminary results, and because Commerce could issue its final decision at any time; as such, it was unclear whether plaintiffs had a "definite" opportunity to raise their objections before Commerce); <u>Philipp Bros. v. United States</u>, 10 CIT 76, 83-84, 630 F. Supp. 1317, 1324 (1986) (ruling that, because Commerce did not address issue in question until agency's final decision, plaintiff had no opportunity to raise the issue at the administrative level and doctrine of exhaustion therefore did not preclude judicial review).

The Government and the Domestic Producer seek to distinguish a handful of the cases cited here. *See generally*, *e.g.*, Def.-Int.'s Supp. Brief at 10-12 & nn.31-33, 16 & n.50 (discussing, and seeking to distinguish, cases cited for proposition that requirement of exhaustion does not apply where, as a practical matter, party had no meaningful opportunity to raise issue at agency level); Def.'s Supp. Response Brief at 8-9 (same); Def.-Int.'s Supp. Response Brief at 9, 10-11 & n.37 (same); Def.-Int.'s Brief on Supp. Authority at 5-6, 10 (same); Def.'s Response Brief on Supp. Authority at 2-3 (same); Defendant-Intervenor's Response to Plaintiff's March 6, 2015 Supplemental Authority at 2-3 ("Def.-Int.'s Response Brief on Supp. Authority") (same). But the efforts of the Government and the Domestic Producer are in vain. It is true that the facts of each case are different and that none of the cases relied on precisely parallels this case. However, the Government and the Domestic Producer cannot meaningfully distinguish each and every case on point. Nor can they dismiss the broader current of thought that runs through the cited decisions or the compelling considerations of policy, pragmatism, and fundamental fairness that inform them.

factors of production database.[24]  Although the financial statements of P.T. Tifico do not include

separate line items for energy inputs (unlike the statements of P.T. Asia Pacific), the Final Results

left coal in the factors of production database, and excluded only electricity and water.[25]

The Government and the Domestic Producer argue that Zhaoqing Tifo's administrative

case brief should have anticipated the determinations that Commerce reached in the Final Results.

*See*, *e.g.*, Defendant's Supplemental Brief at 3-4, 8-10 ("Def.'s Supp. Brief"); Def.-Int.'s Supp.

Brief at 1-2, 9, 15-19; Defendant-Intervenor's Memorandum on Supplemental Authority in

Response to Court Order Dated March 2, 2015 at 3-4, 9-10 ("Def.-Int.'s Brief on Supp.

Authority").  But the law does not mandate that litigants be prescient.[26]

---

[24]In the course of briefing, the Domestic Producer (in effect) candidly concedes that Zhaoqing Tifo's claim did not arise until the Final Results, with Commerce's switch to the financial statements of P.T. Tifico:  "The double-counting issue ar[ose] only due to the lack of specificity of [P.T. Tifico's] financial statements; indeed, [Zhaoqing Tifo] never alleged double-counting in the Preliminary Results specifically because the P.T. Asia [Pacific] financial statements were . . . more detailed[] than those for P.T. Tifico."  Def.-Int.'s Supp. Brief at 19.

[25]Zhaoqing Tifo makes out a case that its failure to raise its double counting claim in its administrative case brief is largely attributable to the actions (or, more accurately, the inaction) of the Domestic Producer in failing to submit its views on surrogate country selection in accordance with the deadline set by Commerce.  Specifically, Zhaoqing Tifo posits that if – on or before that deadline – the Domestic Producer had submitted its views on surrogate country selection (advocating for the selection of Indonesia), then Zhaoqing Tifo would have submitted the financial statements of P.T. Tifico before the Preliminary Results.  Presumably, Commerce would have chosen P.T. Tifico's financial statements for the Preliminary Results (as it did in the Final Results). And, if Commerce also included coal in the factors of production database for the Preliminary Results (as it presumably would have done), then the double counting issue would have been presented in the Preliminary Results, and Zhaoqing Tifo would have raised the issue in its administrative case brief.  *See*, *e.g.*, Pl.'s Supp. Brief at 4.

[26]With the benefit of 20/20 hindsight, it now may seem abundantly clear to the Government and the Domestic Producer that Zhaoqing Tifo could have anticipated that, in the Final Results, Commerce would decide to rely on the financial statement of P.T. Tifico, and that Commerce also would exclude water and electricity – but not coal – from the factors of production database.

Zhaoqing Tifo was not required to anticipate that Commerce (1) would adopt P.T. Tifico's

financial statements in lieu of those of P.T. Asia Pacific for purposes of the Final Results, and (2)

would recognize that P.T. Tifico's financial statements do not include discrete line items for water,

electricity, and other energy inputs, and (3) would therefore exclude water and electricity from the

factors of production database, but (4) would leave coal in the database, with no explanation for

that treatment (particularly in light of any potential for double counting).  Because Commerce gave

no indication prior to the Final Results that it would use financial ratios derived from financial

statements that lacked line items for energy inputs but would nevertheless leave coal in the factors

of production database, Zhaoqing Tifo's "first meaningful opportunity to challenge Commerce's

decision [to include coal in the factors of production database for purposes of the Final Results] .

. . is in this judicial review proceeding."  *See* Valley Fresh Seafood, Inc. v. United States, 31 CIT

1989, 1994 (2007); *see generally id.*, 31 CIT at 1991, 1994-96 (same); *see also* Jacobi Carbons,

38 CIT at ____, 992 F. Supp. 2d at 1367 (under similar circumstances, noting that "while plaintiffs

---

However, the judgment of the Government and the Domestic Producer on this point is distorted
(at least to some extent) by the well-documented cognitive phenomenon known as "hindsight
bias."

"Hindsight bias" refers to the "tendency for people to overestimate the predictability of
past events."  C. Guthrie, J. Rachlinski, & A. Wistrich, *Inside the Judicial Mind*, 86 Cornell Law
Rev. 777, 799 (2001); *see generally id.*, 86 Cornell Law Rev. at 778, 780 & n.13, 784, 799-805,
816-18 & nn.198-201, 820 & nn.209, 212, 821 & n.213, 824-25, 827, 828 & nn.233-36, 829
(explaining, *inter alia*, that, although "[f]ew judgments in ordinary life require people to assess the
predictability of past outcomes," "such judgments are pervasive in the law"; citing numerous
examples of operation of hindsight bias in the law; and discussing empirical evidence on effect of
hindsight bias in the law and in the legal system); *see also, e.g.*, C. Guthrie, J. Rachlinski, & A.
Wistrich, *Judging by Heuristic*: *Cognitive Illusions in Judicial Decision Making*, 86 Judicature 44,
47-48 (July/August 2002) (abstracted from *Inside the Judicial Mind*).  Many other authorities
similarly address hindsight bias, in a legal context and otherwise.

argued for the use of [certain] data [in their administrative briefs filed with Commerce], they could

hardly foresee [at that time] what use [Commerce] would make of that data," and reasoning that

"[i]t is simply too much to ask of the parties to anticipate" the position that Commerce would take

and the rationale that the agency would give in the Final Results, and holding that, "because

plaintiffs had no realistic opportunity to present their arguments before [Commerce], . . . plaintiffs

did not fail to exhaust their administrative remedies").[27]

---

[27]*See also* <u>Dongbu Steel</u>, 34 CIT at ____, 677 F. Supp. 2d at 1360-62 (emphasizing that "the law does not require a party to be prescient, and to be able to precisely predict the timing and the exact contours" of final agency action, and explaining that "[a]lthough [plaintiffs] might have been well-advised to raise their concerns in their case briefs filed with the agency (concerns which, by definition, would have been somewhat hypothetical), they were under no legal obligation to do so"); <u>Qingdao Taifa</u>, 33 CIT at 1092-93, 637 F. Supp. 2d at 1236-37 (concluding that doctrine of exhaustion did not apply, because a party "[was] not required to predict that Commerce would accept other parties' arguments and change its decision" in Final Results); <u>Pohang Iron & Steel</u>, 23 CIT at 792-93 (reasoning that, as a matter of sound policy, parties should not be required to raise anticipatory arguments in their administrative case briefs; "It would be foolish to encourage parties to make arguments because they might somehow become important under a possible future scenario.  In the interest of administrative efficiency, parties should be encouraged to address only the issues that are currently relevant"); <u>Saha Thai</u>, 17 CIT at 729-30, 828 F. Supp. at 59-60 (soundly rejecting Government argument that exhaustion doctrine should be applied to require parties to anticipate issues and to "motivate all interested parties to an administrative review to brief and litigate every possible issue," pointing out that such an approach would lead to "wasteful litigation"); *cf*. <u>CEMEX</u>, 133 F.3d at 904-05 (affirming trial court's decision to remand issue to Commerce for correction of error even though error had not been previously raised before agency; explaining that "the remand . . . was not improper merely because [a party] did not exhaust its administrative remedies," where error at issue "was undiscoverable until after Commerce published its final results").

Like the court in <u>Pohang Iron & Steel</u> as well as <u>Saha Thai</u> (discussed above), other courts too have highlighted the compelling policy considerations that weigh against unduly demanding application of the doctrine of exhaustion – that is, policy considerations that counsel against requiring parties to try to foresee the future and to anticipate in their comments filed with the agency the range of options and potential courses of action that the agency ultimately might take. Thus, for example, as the U.S. Court of Appeals for the D.C. Circuit observed:

In sum, the doctrine of exhaustion of administrative remedies has no application here.

---

> While we certainly require some degree of foresight on the part of commenters, we do not require telepathy.  We should be especially reluctant to require advocates for affected industries and groups to anticipate every contingency.  To hold otherwise would encourage strategic vagueness on the part of agencies and overly defensive, excessive commentary on the part of interested parties seeking to preserve all possible options for appeal.  Neither response well serves the administrative process.

Portland Cement Ass'n v. EPA, 665 F.3d 177, 186 (D.C. Cir. 2011); *cf.* Portland General Electric Co. v. Bonneville Power Administration, 501 F.3d 1009, 1024 n.13 (9th Cir. 2007) (underscoring wisdom of excusing failure to exhaust where issue that a plaintiff seeks to litigate was raised by another party at the administrative level; "If we required each [party] . . . to raise every issue or be barred from seeking judicial review of the agency's action, we would be sanctioning the unnecessary multiplication of comments and proceedings before the administrative agency.  That would serve neither the agency nor the parties."); American Forest & Paper Ass'n v. EPA, 137 F.3d 291, 295 (5th Cir. 1998) (in context of challenge to agency rulemaking, rejecting agency argument that, because plaintiff "did not participate in the agency proceedings below," it was "preclude[d] . . . from raising its objection in [the] court"; "The rule urged by EPA [*i.e.*, that the court should preclude a plaintiff from litigating an issue that it did not raise at the administrative level] would require everyone who wishes to protect himself from arbitrary agency action . . . to become . . . a psychic able to predict the possible changes that could be made" by the agency in the course of the administrative proceeding).

The Government and the Domestic Producer attempt to distinguish a number of the cases cited above.  *See generally*, *e.g.*, Def.-Int.'s Supp. Brief at 16 & n.49 (discussing, and seeking to distinguish, cases cited for proposition that it would be unrealistic and impractical, and/or unsound as a matter of administrative law and policy, to interpret doctrine of exhaustion as requiring parties to predict, or foresee, or anticipate possible ultimate agency action); Def.'s Supp. Response Brief at 8-9 (same); Def.-Int.'s Brief on Supp. Authority at 10 (same).  Again, however, the efforts of the Government and the Domestic Producer meet with no success.  To be sure, as explained in note 23 above, the facts of each case are different, and none of the cases relied on is "on all fours" with this case.  However, it is also true that the Government and the Domestic Producer cannot distinguish each and every case that is cited in a way that is meaningful.  Moreover, they fail to grapple with the undercurrent of thought that is reflected in the cited decisions and the considerations of policy, pragmatism, and fundamental fairness that inform them.

2.   <u>Assuming *Arguendo* That the Doctrine of Exhaustion Applied</u>

Even if the doctrine of exhaustion of administrative remedies were applicable, two separate but related exceptions to that doctrine also would apply.  Thus, even if the doctrine of exhaustion were applicable, Zhaoqing Tifo nevertheless still would be entitled to its day in court on its claim that Commerce's inclusion of coal in the factors of production database, coupled with the agency's use of P.T. Tifico's financial statements (which do not separately break out energy costs), resulted in the double counting of energy inputs in the Final Results.

One well-recognized exception to the doctrine of exhaustion permits a party to litigate an issue that the party did not exhaust at the administrative level where that issue was raised before the agency by a different party.  *See*, *e.g.*, <u>Indiana Utility Regulatory Comm'n v. FERC</u>, 668 F.3d 735, 739 (D.C. Cir. 2012) (acknowledging exception to doctrine of exhaustion "when an agency has considered the argument at the urging of another party"); <u>Kessler v. Surface Transportation Board</u>, 635 F.3d 1, 8 (D.C. Cir. 2011) (recognizing exception to exhaustion doctrine allowing a plaintiff to "raise [in litigation] any issue raised by any party to the administrative proceeding"); <u>Portland General Electric Co. v. Bonneville Power Administration</u>, 501 F.3d 1009, 1023-25 (9th Cir. 2007) (explaining that failure to exhaust is excused where issue that plaintiff seeks to raise in litigation "was raised by someone other than the [plaintiff]" at the administrative level); <u>American Forest & Paper Ass'n v. EPA</u>, 137 F.3d 291, 295-96 (5th Cir. 1998) (explaining that, even though plaintiff "did not participate in the agency proceedings below" (and thus, by definition, did not raise before the agency the issues that plaintiff sought to litigate in court), "the concerns underlying the exhaustion doctrine [were] not implicated" where the issues that plaintiff sought to raise in

litigation were raised by *opposing parties* at the administrative level; pointing out that "it is ironic

that [plaintiff] now seeks to preserve its claim on the basis of its opponents' complaints").[28]

_____

[28]To some extent, like the plaintiff in <u>American Forest & Paper Ass'n</u>, Zhaoqing Tifo too now finds itself in the unusual and rather "ironic" position of "seek[ing] to preserve its [double counting] claim on the basis of its opponent['s] complaints" – *i.e.*, on the basis of the Domestic Producer's cautions to Commerce about the potential for double counting and the resulting need to remove "all [Zhaoqing Tifo]-specific energy and water . . . factors" from the factors of production database if the agency decided to rely on P.T. Tifico's financial statements for purposes of determining the surrogate financial ratios for the Final Results. *See* <u>American Forest & Paper Ass'n v. EPA</u>, 137 F.3d at 295-96; Domestic Producer's Administrative Rebuttal Brief at 13-14.

*See also*, *e.g.*, <u>Cellnet Communication, Inc. v. FCC</u>, 965 F.2d 1106, 1109 (D.C. Cir. 1992) (holding plaintiffs' failure to exhaust to be excused where issue sought to be litigated was raised by other parties at the administrative level); <u>Natural Resources Defense Council, Inc. v. EPA</u>, 824 F.2d 1146, 1150-52 (D.C. Cir. 1987) ("<u>NRDC v. EPA</u>") (*en banc*) (quoting <u>Buckeye</u>, and, in action challenging EPA's withdrawal of proposed amendments to regulations, holding that plaintiff was excused from exhaustion – notwithstanding plaintiff's "total abstention from participation in the rulemaking proceedings" – where the issue raised by plaintiff in litigation was "explicitly raised . . . before the EPA in [another party's] comments on the proposed amendments"); <u>Washington Ass'n for Television & Children v. FCC</u>, 712 F.2d 677, 680-84 & n.10 (D.C. Cir. 1983) (citing <u>Buckeye</u> and recognizing exception to exhaustion requirement where issue that plaintiff seeks to litigate was raised before the agency by a different party); <u>Office of Communication of the United Church of Christ v. FCC</u>, 465 F.2d 519, 523-24 (D.C. Cir. 1972) (permitting plaintiff to litigate issue that it did not raise at administrative level, explaining that purpose of requiring exhaustion is to allow agency an opportunity to consider issues before being subject to litigation and that "[t]here is no requirement that this opportunity [for the agency to consider issues] be afforded in any particular manner, or by any particular party"); <u>Buckeye Cablevision, Inc. v. United States</u>, 438 F.2d 948, 951-52 (6th Cir. 1971) (holding plaintiff entitled to litigate issues that it did not raise at administrative level where "the identical issues . . . were raised by other parties" before the agency); <u>Shantou Red Garden</u>, 36 CIT at ____, 815 F. Supp. 2d at 1332 (holding that, although plaintiff failed to exhaust its administrative remedies, "[e]xcusing the failure . . . is appropriate here because Commerce considered [plaintiff's] objection . . . when it addressed the argument advanced by [a different party]"); <u>Trust Chem Co. v. United States</u>, 35 CIT ____, ____ n.27, 791 F. Supp. 2d 1257, 1268 n.27 (2011) (excusing failure to exhaust where "Commerce was [previously] put on notice of the issue" that plaintiff sought to raise in litigation and "the specific information upon which [p]laintiff relie[d], . . . submitted by the [opposing party], [was] necessarily before the agency"); <u>Pakfood Public Co. v. United States</u>, 34 CIT ____, ____, 724 F. Supp. 2d 1327, 1351 (2010) (acknowledging that exhaustion is excused where agency had opportunity to consider issue at administrative level "as a result of other parties' arguments"), *aff'd*, 453 F. App'x 986 (Fed. Cir. 2011) (non-precedential); <u>Valley Fresh Seafood</u>, 31 CIT at

It is therefore of relatively little moment whether or not, at the administrative level,

Zhaoqing Tifo raised concerns about the potential double counting of energy inputs, because –

without regard to whatever Zhaoqing Tifo said or didn't say – the Domestic Producer clearly

sounded the alarm.  Among other things, the administrative rebuttal brief that the Domestic

Producer filed with Commerce specifically and explicitly warned Commerce in no uncertain terms

---

1990-91, 1994-95, 1998 (citing, *inter alia*, NRDC v. EPA, and excusing failure to exhaust where issue plaintiff sought to litigate was raised by another party at the administrative level, noting that "[plaintiff's] participation [at the administrative level] was not necessary to Commerce's deliberation on that issue" because "the petitioners raised [the] issue in their case brief"); Jinan Yipin Corp. v. United States, 31 CIT 1901, 1938-40, 526 F. Supp. 2d 1347, 1379-81 (2007) (citing, *inter alia*, NRDC v. EPA, and excusing failure to exhaust where issue that one plaintiff respondent sought to litigate had been raised at administrative level by another plaintiff respondent; "[Plaintiff respondent #1's] . . . arguments were before Commerce as a part of [plaintiff respondent #2's] case brief"); LTV Steel, 21 CIT at 867-69 & n.26, 985 F. Supp. at 119-20 & n.26 (excusing failure to exhaust where, *inter alia*,  issue that party sought to litigate had been raised by a different party at the administrative level, "albeit on more limited and general grounds"); Holmes Products Corp. v. United States, 16 CIT 1101, 1103-04 (1992) (stating that "exhaustion may be excused if the issue [in litigation] was raised by another party" before the agency); Timken Co. v. United States, 16 CIT 429, 437-38, 795 F. Supp. 438, 445 (1992) (excusing plaintiff's failure to exhaust, emphasizing that "[w]hile it may be true that [plaintiff] did not raise this issue below, it is certain that [a different party] did," and that "[t]he fact that it was another party that raised [the issue in question] below does not prevent [plaintiff] from challenging it here"); SKF, 15 CIT at 159 n.6, 762 F. Supp. at 350 n.6 (excusing plaintiff's failure to exhaust where "other parties brought the issue to Commerce's attention during the investigations").

The Government concedes that a party's failure to exhaust is excused if the issue to be litigated was raised before the agency by a different party.  *See* Def.'s Supp. Brief at 15.  However, the Domestic Producer disputes the point and seeks to distinguish several of the cases cited to support that proposition.  *See generally*, *e.g.*, Def.-Int.'s Supp. Response Brief at 8 n.25, 9-10 (discussing, and seeking to distinguish, cases cited for proposition that a party is entitled to litigate an issue notwithstanding the party's failure to exhaust at the administrative level where the issue was raised before the agency by a different party).  As explained above, although it is true that the facts of each case are different and that none of the cases relied on precisely parallels this case, the Domestic Producer cannot possibly distinguish every case cited.  Nor it is possible to ignore the broader themes that run through the cited decisions and the important considerations of policy, pragmatism, and fundamental fairness that motivate them.  *See generally* nn.23 & 27, *supra*.

that, if the agency were to rely on P.T. Tifico's financial statements in the Final Results, the agency

could avoid double counting only by "plac[ing] *all potential energy costs* into the

[manufacturing/factory] overhead numerator" in the surrogate financial ratios and "turn[ing] off

*all* [*Zhaoqing Tifo*]*-specific energy and water consumption factors*" by removing them from the

factors of production database.   Domestic Producer's Administrative Rebuttal Brief at 14

(emphases added).[29]   In short, even if the doctrine of exhaustion were applicable here (which it is

---

[29]Throughout supplemental briefing, the Domestic Producer repeatedly insists that its administrative rebuttal brief did not raise the issue of the potential for double counting of coal. *See, e.g.*, Def.-Int.'s Supp. Brief at 2 (arguing that "no party raised the issue of double-counting *coal* in its administrative case or rebuttal briefs"); *id*. at 8 (asserting that "[t]he issue of double-counting the *coal* value was never raised before Commerce until after the Final Results were issued"); *id*. at 9 (stating that "[n]o party to the case ever argued that *coal* would be double-counted"); *id*. at 21-22 (asserting that Domestic Producer "raised in its administrative rebuttal brief before Commerce the issue of double-counting *water and electricity* if Commerce chose to use the new surrogate financial statement," and that "no party raised the issue of double-counting the *coal* factor in their briefs before Commerce"); *id*. at 23 (arguing that "[t]he double-counting issue *as to coal as a factor of production* was never addressed before Commerce" until after the Final Results); Def.-Int.'s Supp. Response Brief at 2 (asserting that "*no party* raised the double-counting of coal issue in administrative case or rebuttal briefs"); *id*. at 4 (stating that no party raised "the double-counting *of coal* issue" in its administrative brief filed with Commerce); *id*. at 8 (arguing that "[n]owhere in its rebuttal brief did [the Domestic Producer] raise the double-counting *of coal* issue"); *id*. (asserting that "[i]n its rebuttal brief arguments regarding energy factors, [the Domestic Producer] repeatedly refers to 'water and electricity,' not coal"); *id*. at 9 (stating that "double-counting of coal was never briefed before [Commerce]"); *id*. at 10 (asserting that "no party briefed the issue of double-counting coal"); *id*. at 11 (arguing that "[t]he double-counting of coal issue was not raised until . . . after the Final Results"); Def.-Int.'s Brief on Supp. Authority at 11 (asserting that no party raised "the double-counting coal issue" until after Final Results).

True enough, the Domestic Producer's administrative rebuttal brief did not refer specifically to coal. *See generally* Domestic Producer's Administrative Rebuttal Brief at 13-14. But that is not the whole story, and it is a far cry from the Domestic Producer's implication that its brief addressed the potential double counting of only electricity and water and nothing else. *See, e.g.*, Def.-Int.'s Supp. Brief at 21-22 (asserting that Domestic Producer "raised in its administrative rebuttal brief . . . the issue of double-counting *water and electricity*"); Def.-Int.'s Supp. Response Brief at 8 (arguing that Domestic Producer's administrative rebuttal brief "repeatedly refers to 'water and electricity,' not coal"). To the contrary, as discussed above, the Domestic Producer's

administrative rebuttal brief speaks to the potential for double counting not only electricity and water, but also, more generally, "other energy factors" as well. *See* Domestic Producer's Administrative Rebuttal Brief at 13-14 (referring broadly to P.T. Tifico's "energy costs"); *id.* at 14 (referring generally to P.T. Tifico's "electricity, water [and] other energy factors"); *id.* (arguing that, if Commerce uses P.T. Tifico's financial statements in Final Results, agency must account for "all potential energy costs" – not *some* energy costs, and certainly not only electricity and water – in surrogate financial ratios); *id.* (arguing that, if Commerce uses P.T. Tifico's financial statements in Final Results, agency must "turn off all company-specific energy and water consumption factors" – not merely electricity and "water consumption factors," but *all energy* and water consumption factors – in the factors of production database); *id.* (referring to "the lack of electricity, water or any other energy-specific data" in P.T. Tifico's financial statements).

The Domestic Producer's administrative rebuttal brief thus referred specifically to water and electricity – but, contrary to the Domestic Producer's representations in this forum, it did not stop there. The brief expressly discussed "other energy factors" as well. *See* Domestic Producer's Administrative Rebuttal Brief at 13-14. It is telling that the Domestic Producer has ignored the brief's broader references to energy sources in general. Further, the Domestic Producer has offered no explanation as to what was meant by phrases such as "other energy factors" and no explanation as to why those references do not include energy inputs such as coal and natural gas. Whatever the Domestic Producer meant to say in its administrative rebuttal brief, it cannot truthfully claim that it intended to limit its argument concerning the potential for double counting to water and electricity alone. It requires no imagination to read the Domestic Producer's reference to "other energy factors" (and other similar phrases) to cover energy inputs such as coal and natural gas; and nothing on the record indicates that the Domestic Producer intended otherwise.

Even more troubling are the Domestic Producer's outright misrepresentations of fact. At one point, for example, the Domestic Producer states – in a brief filed in this forum – that its administrative rebuttal brief "argued that if Commerce used the P.T. Tifico financial statement . . . , then Commerce would need to 'turn off' electricity and water consumption factors to prevent double-counting." *See* Def.-Int.'s Supp. Brief at 3-4. However, that is not an accurate statement of what the Domestic Producer actually said in the referenced brief. Contrary to the Domestic Producer's claim, the statement in its administrative rebuttal brief was not limited to "*electricity* and water consumption factors" (as the Domestic Producer now contends). (Emphasis added.) Instead, the statement in the Domestic Producer's brief referred much more broadly to "*energy* and water consumption factors." (Emphasis added.) *See* Domestic Producer's Administrative Rebuttal Brief at 14 (stating that Commerce would need to "turn off all company-specific *energy* and water consumption factors . . . [to] prevent[] double-counting") (emphasis added). Again, this exceeds the limits of zealous advocacy. *See* n.21, *supra*.

not),[30] any failure to exhaust on the part of Zhaoqing Tifo would be excused, because the Domestic

Producer raised the double counting issue before Commerce.

In addition, there is a second, related exception that would similarly serve to excuse any

failure to exhaust by Zhaoqing Tifo (again, assuming *arguendo* that the doctrine of exhaustion

otherwise applied). Specifically, the exhaustion requirement does not bar a plaintiff from raising

an issue in litigation if the agency in fact had an opportunity to consider the issue at the

administrative level, whether or not the agency actually availed itself of that opportunity. *See*,

*e.g.*, Indiana Utility Regulatory Comm'n v. FERC, 668 F.3d at 739 (acknowledging exception to

doctrine of exhaustion "when an agency has considered the argument"); Ningbo Dafa Chemical

Fiber Co. v. United States, 580 F.3d 1247, 1259 (Fed. Cir. 2009) (sustaining Court of International

Trade's ruling that plaintiff's litigation of issue was not barred by doctrine of exhaustion where

Commerce had opportunity to consider plaintiff's "alternative methodology" in course of agency

proceeding), *aff'g*, 32 CIT 926, 933, 577 F. Supp. 2d 1304, 1311 (2008) (stating court's

disagreement with Government's "stance" that "Commerce lacked the opportunity to consider"

issue raised by plaintiff in litigation); Portland General Electric, 501 F.3d at 1023-25 (explaining

that failure to exhaust is excused where "[the] agency . . . had an opportunity to consider the issue[,]

. . . . even if the issue was considered sua sponte by the agency").[31]

---

[30]*See* section III.A, *supra* (explaining that doctrine of exhaustion is not applicable under facts of this case).

[31]*See also*, *e.g.*, American Forest & Paper Ass'n v. EPA, 137 F.3d at 295-96 (recognizing that failure to exhaust is excused where agency had opportunity to consider the issue that plaintiff seeks to litigate, and ruling that, "because the public comments . . . were sufficiently specific to prompt EPA to *adopt* the provision contested [in the case at bar], the agency cannot reasonably claim that it has been denied the opportunity to consider the issue"); NRDC v. EPA, 824 F.2d at

---

1150-52 (quoting Office of Communication of the United Church of Christ v. FCC, and, in action challenging EPA's withdrawal of proposed amendments to regulations, holding that plaintiff was excused from exhaustion – notwithstanding plaintiff's "total abstention from participation in the rulemaking proceedings" – where issue raised by plaintiff in litigation in fact "was raised before the agency," such that the agency "had notice of [the] issue and could, or should have, taken it into account in reaching a final decision on the proposed amendments"; ultimately finding it "clear that the EPA actually did consider" issue that plaintiff sought to raise in litigation); Cellnet Communication, 965 F.2d at 1109 (holding plaintiffs' failure to exhaust to be excused where issue sought to be litigated was raised by other parties before the agency; "[c]onsideration of [an] issue by the agency at the behest of another party is enough to preserve it"); Washington Ass'n for Television & Children, 712 F.2d at 680-84 & n.10 (recognizing exception to exhaustion requirement where the agency "in fact considered the issue"); Office of Communication of the United Church of Christ, 465 F.2d at 523-24 (permitting plaintiff to litigate issue not exhausted at administrative level, where issue in fact was "raised by the majority and challenged by the dissenters" in agency's final determination); Buckeye, 438 F.2d at 951-52 (holding plaintiff entitled to litigate issues that it did not raise at administrative level where agency nevertheless "had an opportunity to consider the identical issues"); Shantou Red Garden, 36 CIT at ____, 815 F. Supp. 2d at 1332 (holding that, although plaintiff failed to exhaust its administrative remedies, "[e]xcusing the failure . . . is appropriate here because Commerce considered [plaintiff's] objection . . . when it addressed the argument advanced by [a different party]"); Trust Chem, 35 CIT at ____ n.27, 791 F. Supp. 2d at 1268 n.27 (excusing failure to exhaust, emphasizing that "[t]he determinative question is whether Commerce was put on notice of the issue," and concluding that, in case at bar, "Commerce was aware that [p]laintiff was contesting" the issue that plaintiff subsequently raised in litigation and that "the specific information upon which [p]laintiff relie[d] . . . [was] before the agency"); Pakfood, 34 CIT at ____, ____, 724 F. Supp. 2d at 1351, 1352-53 (acknowledging that exhaustion is excused where "the agency in fact thoroughly considered the issue in question," but ruling that, under specific circumstances of the case, Commerce did not have "full and adequate opportunity to consider the [issue] in the first instance"); Valley Fresh Seafood, 31 CIT at 1990-91, 1994-95, 1998 (citing general principle that "[t]he court may excuse a party's failure to raise an argument before the administrative agency if . . . the agency in fact considered the issue," and excusing failure to exhaust where "the issue on which [plaintiff] now seeks judicial review was presented to, and considered by, Commerce during the administrative review"; emphasizing, inter alia, that "Commerce had [a] full opportunity to consider the . . . issue [raised by plaintiff in litigation] during the administrative review"); Jinan Yipin, 31 CIT at 1938-40, 526 F. Supp. 2d at 1379-81 (recognizing that "[t]he court may excuse a party's failure to raise an argument before the administrative agency if . . . the agency in fact considered the issue," and excusing failure to exhaust where "[plaintiff's] failure to raise [its] claims [at the administrative level] did not prevent Commerce from actually considering . . . [the] issues at the agency level"; noting that "[a]lthough [plaintiff] did not raise arguments [as to two issues] below, Commerce actually considered [those] issues at the agency level through the arguments of [other parties]"); Holmes Products Corp. v. United States, 16 CIT 1101, 1103-04 (stating that "[a] party may be excused from failure to raise an argument before the administrative agency as long as the agency

The record here leaves no doubt that Commerce had an opportunity to consider the potential for double counting of energy inputs as a result of the agency's inclusion of coal in the factors of production database, in tandem with its use of P.T. Tifico's financial statements.[32]  As

_____

in fact considered the issue.  Thus, exhaustion may be excused . . . if it is clear that the agency had an opportunity to consider [the issue that a plaintiff seeks to raise]" (citations omitted)); <u>Timken</u>, 16 CIT at 437-38, 795 F. Supp. at 445 (excusing plaintiff's failure to exhaust, emphasizing that "[w]hile it may be true that [plaintiff] did not raise this issue below, it is certain . . . that the [agency] addressed it in its Final Results"); <u>SKF</u>, 15 CIT at 159 n.6, 762 F. Supp. at 350 n.6 (excusing plaintiff's failure to exhaust where agency itself addressed issue in recalculations in agency's Final Determinations); <u>Al Tech Specialty Steel</u>, 11 CIT at 377 n.5, 661 F. Supp. at 1210 n.5 (recognizing exception to doctrine of exhaustion for "issues not properly raised but in fact considered by the administrative body").

The Domestic Producer attempts to distinguish the facts of this case from two of the cases cited above.  *See generally* Def.-Int.'s Supp. Response Brief at 9-10 (discussing, and seeking to distinguish, <u>Valley Fresh Seafood</u> and <u>Jinan Yipin</u>).  The distinction that the Domestic Producer seeks to draw, however, rests mainly on its claim that, in this case, Commerce had no opportunity to consider the potential double counting of coal – a claim that is, as discussed above, simply incorrect.  More generally, as previously noted, the facts of every case differ and none of the cases cited above perfectly parallels the case at bar.  But it is not possible for the Domestic Producer to distinguish all of the cases on point.  And, in any event, there is a broader current of thought that runs through the cases cited, and compelling considerations of policy, pragmatism, and fundamental fairness that undergird them, which the Domestic Producer does not address.  *See generally* nn.23, 27, & 28, *supra*.

[32]The Government and the Domestic Producer repeatedly assert that Commerce had no opportunity to consider whether, in the Final Results, coal should be excluded from the factors of production database and whether double counting would otherwise result.  However, such assertions by the Government and the Domestic Producer cannot be reconciled with other statements that they make, where they claim (in essence) that Commerce in fact *did* consider excluding coal from the database and/or the potential for double counting, but ultimately rejected those concerns and made a reasoned and (according to the Government and the Domestic Producer) a reasonable decision that coal should be included in the database.

*Compare*, *e.g.*, Def.'s Response Brief at 5-6 (asserting that "Commerce was deprived of the opportunity to address" Zhaoqing Tifo's argument that "the failure to exclude steam coal from the factors of production is unsupported by substantial evidence"); *id*. at 7 (asserting that, "[b]ecause Zhaoqing Tifo did not raise [its] argument [that Commerce double counted the value for steam coal because it was also included as part of factory overhead] in its case brief, Commerce

did not have the opportunity to address [the] argument"); *id.* at 10 (asserting that "[b]ecause Zhaoqing Tifo chose not to raise [its] argument [that "assign[ing] a surrogate value to steam coal, instead of excluding it from the factors of production, results in double counting"] during the administrative proceedings, it deprived Commerce of the opportunity to make a determination, finding, or conclusion with respect to this argument in the final results"); *id.* at 12 (asserting that "Zhaoqing Tifo chose not to object to Commerce's calculation of normal value with steam coal included as a factor of production," and that Commerce therefore "was deprived of the opportunity to address that argument in the final results"); *id.* at 14 (referring to "Commerce's failure to address" whether steam coal should be excluded from the factors of production database); Def.'s Supp. Brief at 12 (asserting that "[h]ad Zhaoqing Tifo properly framed the issue in its case brief, Commerce could have addressed the treatment of steam coal under P.T. Tifico's financial statement in the final results"); *id.* (asserting that "Commerce did not have the benefit of advocacy from all parties on ["the proper treatment of energy factors by Commerce under P.T. Tifico's financial statement"] prior to the final results"); *id.* at 14 (asserting that "Zhaoqing Tifo's submission of a timely argument in its case brief would have given Commerce the opportunity to consider and address the issue" of the alleged need to "treat steam coal as part of overhead" if the Final Results relied on P.T. Tifico's financial statements); Def.-Int.'s Response Brief at 19 (asserting that "[i]f Zhaoqing Tifo had timely raised the double-counting issue before Commerce, . . . Commerce would have had the benefit of the advocacy of the parties"); Def.-Int.'s Supp. Brief at 2 (stating that "Commerce did not address double counting of coal"); Def.-Int.'s Supp. Response Brief at 2 (asserting that Commerce "neither double-counted coal nor addressed double-counting of coal" in the Final Results); *id.* at 4 (asserting that Commerce "neither considered nor addressed the double-counting *of coal*" in the Final Results, because, according to Domestic Producer, "no party had raised it in their case briefs"); *id.* at 8 n.25 (asserting that Commerce "did not address or consider [the] issue [of "the double-counting *of coal*"] in its Final Results"); *id.* at 10 (asserting that, "[b]ecause no party briefed the issue of double-counting coal, . . . [Commerce] neither considered nor addressed that issue in its Final Results"); Def.-Int.'s Brief on Supp. Authority at 13 (asserting that "Zhaoqing Tifo did not raise the double-counting coal issue in its administrative case . . . brief[] . . . , and Commerce was deprived of the opportunity to consider and respond to any such argument"); *with* Def.'s Response Brief at 1 (referring to "Commerce's decision to assign a surrogate value to steam coal, *instead of excluding steam coal from the factors of production*") (emphasis added); *id.* at 5 (asserting that Commerce included steam coal as a factor of production "because there is no record evidence that steam coal is included in PT Tifico's surrogate financial statement as part of factory overhead"); *id.* at 6 (asserting that "Commerce reasonably determined that steam coal in this context is not a general expense, but rather is a direct input in the production of polyester staple fiber"); *id.* at 19 (asserting that, "[s]team coal energy is used to melt polyethylene terephthalate chips and polypropylene chips at the melting or spinning stage of production," and that, therefore, in the Final Results, "Commerce determined that steam coal is not a general expense, and, thus, it should be considered among the factors of production and not as factory overhead"); *id.* at 21 (referring to "Commerce's finding that steam coal is a direct input in the production process and should be valued as a factor of production"); Def.-Int.'s Response Brief at 20 (asserting that "Commerce excluded electricity and water costs from the [factors of

production] database because it reasonably concluded . . . that those factors were accounted for in P.T. Tifico's manufacturing overhead," and, in contrast, "reasonably concluded that . . . coal was not included in P.T. Tifico's manufacturing overhead"); *id*. at 21 (asserting that "it was Commerce's intention to include the coal in the [factors of production] database, consistent with the statute and [the agency's] longstanding practice of including energy and direct material factors in the [factors of production] database"); *id*. at 23 (asserting that "Commerce reasonably concluded that P.T. Tifico included electricity and water, but did not include coal, in its overhead"); *id*. (asserting that "it was reasonable for Commerce to conclude that any coal that P.T. Tifico may use was included in the cost of materials held in inventory, rather than manufacturing overhead"); *id*. at 24 (asserting that "[c]onsistent with its practice to include in the [factors of production] database inputs that are used in significant volumes in the production of subject merchandise, Commerce reasonably included coal, but not electricity or water"); Def.-Int.'s Supp. Brief at 12 (asserting that "Commerce applied its longstanding and established practice with regard to calculating normal value under its [factors of production] methodology – including its practice to only turn off energy inputs when record evidence demonstrates that doing so would result in double-counting and its practice to treat significant inputs as direct materials in its [factors of production] methodology"); *id*. at 22-23 (asserting that, "in the Final Results, Commerce included coal in the [factors of production] database, but excluded the electricity and water factors . . . because Commerce found that [P.T.] Tifico's financial statement did not breakout electricity and water, and there was no evidence that coal was included in P.T. Tifico's manufacturing overhead"); Def.-Int.'s Response Brief on Supp. Authority at 3 (asserting that Commerce "excluded electricity (the energy [factor of production]) but included coal (a direct material input in the production of polyester staple fiber . . . ) in the normal value in the Final Results based on its longstanding practice and because there was no indication that coal was used by the surrogate financial ratio company" (*i.e.*, P.T. Tifico)).

The Government and the Domestic Producer cannot have it both ways. They cannot logically claim both that Commerce was deprived of the opportunity to consider the asserted need to exclude coal from the factors of production database and the potential for double counting, and also simultaneously argue that Commerce reached a deliberate determination on those points. It is possible to *argue* in the alternative. But these are matters of *fact*.

Moreover, it is one thing for counsel to seek to "prop up" an agency determination through subtle suggestions that an agency's determination could be sustained on the basis of record evidence and arguments that the agency itself did not cite. *See* section III.C, *infra* (rejecting various arguments by the Government and Domestic Producer as impermissible *post hoc* rationale). It is another matter entirely to affirmatively state – as the Government and the Domestic Producer do, at the citations noted above – that the agency in fact considered points and reasoned its way to a decision when the record is devoid of any indication whatsoever that the agency did so. Taking such liberties with the record goes well beyond the limits of zealous advocacy. *See* nn.21 & 29, *supra*.

discussed immediately above, the double counting issue was raised at a minimum by the Domestic

Producer – and the fact that Commerce thus had an opportunity to consider the issue in the Final

Results would alone suffice to preserve Zhaoqing Tifo's right to pursue its double counting claim

in this forum.  But, in addition, the record further makes it clear that Commerce in fact considered

the potential for double counting, at least as to some energy inputs.

Specifically, Commerce's Issues and Decision Memorandum recognizes that "P.T. Tifico's

financial statement does not break out energy [costs]."  Issues & Decision Memorandum at 14.

Therefore, "in order to prevent double counting" (by having electricity and water both captured in

the surrogate financial ratios and also included in the factors of production database), Commerce

"placed all electricity and water costs into the [manufacturing/factory] overhead numerator" in the

financial ratios, and removed from the factors of production database the "electricity and water

[costs]" that the agency had included in the database in the Preliminary Results.  *Id*. at 11; *see also*

Final Results, 78 Fed. Reg. at 2367 (stating that Commerce "did not separately value electricity

and water in the final margin program because these factors of production are already captured in

the surrogate financial ratios").  However, Commerce did not address any potential double

counting of the "other energy factors" (beyond water and electricity) to which the Domestic

Producer's rebuttal brief referred.  *See*, *e.g.*, Domestic Producer's Administrative Rebuttal Brief

---

Absent telepathy, it is impossible to know what was in the minds of Commerce decision-
makers as they prepared the Final Results.  In any event, even if Commerce did consider the
possibility of excluding coal from the factors of production database and/or the potential for double
counting (as it had the opportunity to do), the fact remains that there is no rationale articulated for
any such determination and no evidence cited to support it.

at 14 (stating that P.T. Tifico's financial statements have "no breakout for electricity, water or *other energy factors*") (emphasis added).

As such, even assuming arguendo that the doctrine of exhaustion did apply, any failure to exhaust by Zhaoqing Tifo would be excused, because Commerce was not deprived of the opportunity to address the double counting of energy inputs in the Final Results.   In fact, Commerce's Final Results did address double counting – albeit only as to electricity and water, and not coal or natural gas or any other source of energy.[33]

---

[33]Zhaoqing Tifo argues that, in any event, it is well settled that the application of the doctrine of exhaustion in an international trade case is a matter that is committed to the court's sound discretion.  *See* Pl.'s Reply Brief at 5-7; Pl.'s Supp. Brief at 30-31; Pl.'s Brief on Supp. Authority at 5; 28 U.S.C. § 2637(d) (providing that "the Court of International Trade shall, *where appropriate*, require the exhaustion of administrative remedies") (emphasis added).

Accordingly, even if the doctrine of exhaustion were to apply here, and even if it were determined that Zhaoqing Tifo had failed to exhaust and that such failure was not excused by any of the exceptions discussed above, Zhaoqing Tifo nevertheless could be permitted to litigate its double counting claim, subject to the court's discretion.  *See, e.g.*, Essar Steel, 753 F.3d at 1374 (acknowledging that application of doctrine of exhaustion is subject to discretion of Court of International Trade); Itochu Building Prods. v. United States, 733 F.3d 1140, 1145, 1148 (Fed. Cir. 2013) (recognizing that Court of International Trade's application of exhaustion doctrine is matter of "discretion," subject to appellate review only pursuant to "the demanding abuse-of-discretion standard"); Yangzhou Bestpak Gifts & Crafts, 716 F.3d at 1381 (same); Ningbo Dafa, 580 F.3d at 1259 (noting that Court of Appeals has "held that applying exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade") (citation omitted); Agro Dutch Industries Ltd. v. United States, 508 F.3d 1024, 1029 (Fed. Cir. 2007) (quoting Corus Staal for principle that "application of 'exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade'"); Corus Staal, 502 F.3d at 1381 & n.5 (same; sustaining trial court determination that party failed to exhaust, and underscoring breadth of trial court's discretion by expressly noting that determination that trial court did not abuse its discretion in finding failure to exhaust "does not imply that the court would have abused its discretion if it had excused [the party] from having to exhaust its administrative remedies"); Norsk Hydro Canada, Inc. v. United States, 472 F.3d 1347, 1356 n.17 (Fed. Cir. 2006) (citing Court of International Trade's "discretion" as to whether or not to "impose an 'exhaustion' requirement under 28 U.S.C. § 2637(d)"); Consol. Bearings, 348 F.3d at 1003 (referring to "discretion" of Court of International Trade in application of exhaustion); CEMEX, 133 F.3d at

### B.  The Doctrine of Judicial Estoppel

Apart from its invocation of the doctrine of exhaustion of administrative remedies, the

Domestic Producer also contends that Zhaoqing Tifo's double counting claim is independently

barred by the doctrine of judicial estoppel.  *See generally* Def.-Int.'s Supp. Brief at 1, 2, 23-25;

Defendant-Intervenor's Supplemental Response Brief at 12, 15 ("Def.-Int.'s Supp. Response

Brief"); Def.-Int.'s Brief on Supp. Authority at 8-9.  Like the exhaustion arguments analyzed

above, this argument too is lacking in merit.

The gravamen of judicial estoppel is that, "[a]bsent any good explanation, a party should

not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent

advantage by pursuing an incompatible theory."  18B C. Wright, A. Miller, & E. Cooper, Federal

Practice and Procedure § 4477, at 553 (2d ed. 2002) ("Wright, Miller, & Cooper") (earlier edition

quoted in New Hampshire v. Maine, 532 U.S. 742, 749 (2001)).[34]  In the seminal case, Davis v.

Wakelee, the Supreme Court explained:

> [W]here a party assumes a certain position in a legal proceeding, and succeeds in
> maintaining that position, he may not thereafter, simply because his interests have
> changed, assume a contrary position, especially if it be to the prejudice of the party
> who has acquiesced in the position formerly taken by him.

---

905 (explaining that, as to international trade cases, "Congress has not clearly required exhaustion"
(citation omitted)).

[34]*See also* 18 J. Moore *et al*., Moore's Federal Practice § 134.30, at 134-63 (3d ed. 2014)
(stating that "[t]he doctrine of judicial estoppel prevents a party from asserting a claim in a legal
proceeding that is inconsistent with a claim taken by that party . . . in a previous proceeding"
(footnote omitted)) (earlier edition quoted in New Hampshire v. Maine, 532 U.S. at 749).

Davis v. Wakelee, 156 U.S. 680, 689 (1895) (quoted in New Hampshire v. Maine, 532 U.S. at

749).  Thus, judicial estoppel "generally prevents a party from prevailing in one phase of a case

on an argument and then relying on a contradictory argument to prevail in another phase." Pegram

v. Herdrich, 530 U.S. 211, 227 n.8 (2000).

The Domestic Producer argues, in essence, that Zhaoqing Tifo is judicially estopped from

claiming in this forum that coal should not be included in the factors of production database,

because – according to the Domestic Producer – Zhaoqing Tifo claimed at the administrative level

that coal should be included in the database.  *See generally* Def.-Int.'s Supp. Brief at 1, 2, 23-25;

Def.-Int.'s Supp. Response Brief at 12, 15; Def.-Int.'s Brief on Supp. Authority at 8-9.   That

argument fails for several reasons.

As an initial matter, raising an argument for the first time in supplemental briefing is much

too late.  Even if the Domestic Producer's judicial estoppel argument had been made in a timely

fashion, however, it would have fared no better.

As the Supreme Court observed in New Hampshire v. Maine, judicial estoppel applies only

where "a party's later position . . . [is] 'clearly inconsistent' with its earlier position." New

Hampshire v. Maine, 532 U.S. at 750 (citations omitted); *see also* Hill-Rom Services, Inc. v.

Stryker Corp., 755 F.3d 1367, 1380-82 (Fed. Cir. 2014) (same).  This is not such a case.

As detailed above, contrary to the assertions of the Government and the Domestic

Producer, Zhaoqing Tifo did not affirmatively argue at the administrative level that coal should be

included in the factors of production database.  Instead, on the assumption that Commerce would

continue to rely on P.T. Asia Pacific's financial statements in the Final Results and thus would

also continue to include coal in the factors of production database (as Commerce did in the

Preliminary Results), Zhaoqing Tifo argued that Commerce should use a certain set of data (*i.e.*, coal prices from the Indonesian Ministry of Energy and Mineral Resources) in lieu of the Indonesian import statistics that Commerce used to value coal in the Preliminary Results.  *See*, *e.g.*, n.21, *supra* (rejecting assertions of Government and Domestic Producer that Zhaoqing Tifo affirmatively advocated for inclusion of coal in factors of production database).  That is precisely the same position that Zhaoqing Tifo presses in this litigation; and it is the subject of Count V of the Complaint (which is not at issue in the pending motion).  *See* Complaint, Count V (contesting "the surrogate value of coal" that was used in the Final Results, if court determines that including a surrogate value for coal in the factors of production database "[was] legally valid"); n.18, *supra* (explaining that pending motion is addressed solely to Counts I-IV of Complaint).  Accordingly, contrary to the Domestic Producer's judicial estoppel argument, Zhaoqing Tifo is not "blowing hot and cold."   And, because there is no inconsistency between Zhaoqing Tifo's position in litigation and its position at the administrative level, judicial estoppel does not apply.

In addition, there is yet a third reason why the Domestic Producer's judicial estoppel claim must fail.  The Supreme Court has emphasized that judicial estoppel applies only where the party sought to be estopped "has succeeded in persuading a court to accept that party's earlier position." New Hampshire v. Maine, 532 U.S. at 750; *see also* Hill-Rom Services, 755 F.3d at 1380 (same).[35] As the Supreme Court has pointed out, "[a]bsent success in a prior proceeding, a party's later

---

[35]Although the point is not entirely settled, it is generally accepted that judicial estoppel may apply where the prior inconsistent position was asserted before an agency (as the Domestic Producer alleges here).  *See* 18B Wright, Miller, & Cooper § 4477, at 575 n.41 (citing, *inter alia*, Lampi Corp. v. American Power Products, Inc., 228 F.3d 1365, 1377 (Fed. Cir. 2000)).

inconsistent position introduces no 'risk of inconsistent . . . determinations,' and thus poses little

threat to judicial integrity." New Hampshire v. Maine, 532 U.S. at 750-51 (citations omitted).

Here, however, Zhaoqing Tifo did not prevail at the administrative level.  Zhaoqing Tifo's

arguments notwithstanding, the Final Results rejected the coal prices from the Indonesian Ministry

of Energy and Mineral Resources that Zhaoqing Tifo proffered and instead continued to value coal

using the same Indonesian import statistics that Commerce had used in the Preliminary Results.

See Issues & Decision Memorandum at 5, 8 (Comment 1) (stating that Final Results continue to

value coal using Indonesian import statistics relied on in Preliminary Results).  Because Zhaoqing

Tifo did not "succeed in persuading [Commerce] to accept [Zhaoqing Tifo's] . . . position" (an

agency determination that Zhaoqing Tifo contests in Count V), judicial estoppel cannot apply –

not even as to Count V of the Complaint, which (again) is not the subject of the pending motion.

Judicial estoppel thus is no bar to consideration of the merits of Zhaoqing Tifo's double counting

claim.

## C.   The Merits of Zhaoqing Tifo's "Double Counting" Claim

Although the administrative rebuttal brief that the Domestic Producer filed with Commerce

put the agency on notice that P.T. Tifico's financial statements include "no breakout for electricity,

water or other energy factors" and argued that – in order to avoid double counting – the use of

those financial statements in the Final Results would require the agency to exclude all energy

inputs from the factors of production database, there is no dispute that Commerce removed only

water and electricity, leaving coal in the database.  See Domestic Producer's Administrative

Rebuttal Brief at 14; see also id. at 13-14 (emphasizing that P.T. Tifico's financial statements

"include[] *no separate breakout* of the company's energy costs"); *id.* at 14 (arguing that use of P.T. Tifico's financial statements in Final Results would require agency "to place all potential energy costs into the [manufacturing/factory] overhead numerator [*i.e.*, to account for all potential energy costs in the surrogate financial ratios] and turn off [*i.e.*, to exclude from the factors of production database] all company-specific energy and water consumption factors, in order to capture all costs while also preventing double-counting"); *id.* (highlighting lack of "electricity, water or any other energy-specific data in [P.T. Tifico's] financial statements").[36]

In its Issues and Decision Memorandum, Commerce acknowledged that "P.T. Tifico's financial statement does not break out energy [inputs]."  Issues & Decision Memorandum at 13-14; *see also id.* at 11 (stating that "P.T. Tifico's financial statement does not include a separate breakout of its costs for electricity and water").  Recognizing that fact, the Issues and Decision Memorandum expressly addressed the potential for double counting and the need to avoid double counting by excluding energy sources from the factors of production database – but only as to water and electricity, and not as to coal or natural gas or any other energy inputs.

The Issues and Decision Memorandum thus explained that, "in order to prevent double counting," the Final Results "placed all electricity and water costs into the [manufacturing/factory] overhead numerator" (*i.e.*, accounted for all electricity and water costs by including them in the

---

[36]As outlined above, Zhaoqing Tifo would be entitled to litigate the merits of its double counting claim even if the Domestic Producer had not alerted Commerce to the issue at the administrative level.  *See generally* section III.A.1, *supra* (explaining that Zhaoqing Tifo was not required to raise double counting issue at the administrative level because that issue did not arise until the Final Results); section III.A.2, *supra* (explaining that failure to exhaust was excused because Commerce in fact had opportunity to address issue); *see also* n.20 (summarizing argument that Zhaoqing Tifo exhausted its administrative remedies in its administrative case brief); n.33 (explaining that application of doctrine of exhaustion is committed to court's sound discretion).

surrogate financial ratios) and removed from the factors of production database the "electricity and water consumption factors" that Commerce had included in the database for purposes of the Preliminary Results.  Issues & Decision Memorandum at 11; *see also* Final Results, 78 Fed. Reg. at 2367 (stating that Commerce "did not separately value electricity and water in the final margin program because these factors of production are already captured in the surrogate financial ratios").  Similarly, elsewhere in the Issues and Decision Memorandum (discussing the surrogate value for water), Commerce explained that "[b]ecause P.T. Tifico's financial statement does not break out energy, consistent with [Commerce's] practice, [the Final Results] will not separately value water in the margin program, as it is already captured in the surrogate financial ratios."  Issues & Decision Memorandum at 13-14 (footnote omitted).

Conspicuously absent from the Final Results, however, is any explanation for Commerce's treatment of coal or natural gas or any "other energy factors" beyond water and electricity to which the Domestic Producer's administrative rebuttal brief referred.  *See* Domestic Producer's Administrative Rebuttal Brief at 14 (stating that P.T. Tifico's financial statements include "no breakout for electricity, water or *other energy factors*") (emphasis added).  Zhaoqing Tifo maintains that there are no grounds for treating coal differently than water and electricity, and that Commerce's inclusion of coal in the factors of production database for purposes of the Final Results led to the double counting of energy inputs, because – according to Zhaoqing Tifo – like electricity and water, other energy inputs (such as natural gas) also are embedded in the surrogate financial ratios.  *See*, *e.g.*, Pl.'s Brief at 3, 4, 6-7, 8-9, 11, 16, 20-21, 22, 23; Pl.'s Reply Brief at 1-2, 13-15, 22.  Commerce's Issues and Decision Memorandum is mum on these points.

Commerce's Issues and Decision Memorandum does not explain, for example, why the agency singled out electricity and water, and did not address the "other energy factors" referenced in the Domestic Producer's administrative rebuttal brief.  Commerce does not explain the agency's rationale for excluding electricity and water from the factors of production database, but not coal. Commerce offers no justification for the difference in treatment.  Similarly, Commerce does not explain why including coal in the factors of production database does not result in the double counting of energy inputs.  It is the absence of "a separate breakout of . . . costs for electricity and water" in P.T. Tifico's financial statements that led Commerce to exclude those inputs from the factors of production database for purposes of the Final Results.  But nowhere does Commerce identify the "separate breakout" of other energy inputs (such as natural gas) in P.T. Tifico's financial statements that might serve as a basis for an agency determination that such inputs are not captured in the surrogate financial ratios and that coal may be included in the factors of production database without fear of double counting.  Nowhere does Commerce explain why its concerns about the double counting of electricity and water do not also extend to coal (and any other energy sources, such as natural gas).

In their briefs filed with the court, the Government and the Domestic Producer argue at some length that Commerce properly included coal in the factors of production database and that Commerce reasonably treated coal differently than electricity and water.  *See generally* Def.'s Response Brief at 6, 15-21; Def.-Int.'s Response Brief at 2, 13-25.[37]  They argue, for example, that

---

[37]*See also* Def.-Int.'s Brief on Supp. Authority at 12-13; Def.'s Response Brief on Supp. Authority at 3-4; Def.-Int.'s Response Brief on Supp. Authority at 3-5.

Commerce "distinguishes between energy inputs that are general expenses (*i.e.*, not direct costs) accounted for in [manufacturing/]factory overhead, and energy inputs that are direct inputs in the production process and that are not accounted for in [manufacturing/]factory overhead."  Def.'s Response Brief at 18; *see also* Def.-Int.'s Response Brief at 21 (similar).  They state that "Commerce looks at how [an] energy input is used and then determines on a case-by-case basis whether (1) to exclude that input because it is accounted for by [manufacturing/]factory overhead, or (2) to include it as a factor of production."  Def.'s Response Brief at 19; *see also* Def.-Int.'s Response Brief at 18 (similar).

The Government and the Domestic Producer assert that Commerce's preference is to value energy inputs in the factors of production database, particularly when the energy sources are "direct inputs in the production process."  Def.'s Response Brief at 18; *see also* Def.-Int.'s Response Brief at 18, 21, 24 (similar).  They further assert that "Commerce's practice is to exclude energy inputs from the factors of production [database] when they are used in the general running of the business – *i.e.*, in offices, bathrooms, and other facilities – as opposed to being used in the direct production of the subject merchandise."  Def.'s Response Brief at 17; *see also* Def.-Int.'s

---

According to the Domestic Producer, "the relevant [Commerce] practices are: . . . (b) Commerce's standard practice to include [factors of production], including energy inputs, in the [factors of production] database unless [Commerce] knows that doing so would result in double-counting; (c) when it is not definitive whether [a factor of production] is included in the surrogate financial ratios, Commerce utilizes the best information available, on a case-by-case basis, to determine whether to include that factor in the [factors of production] database or the financial ratio; (d) Commerce's practice to treat significant inputs, such as coal in this case, as direct materials in its [factors of production] methodology; and (e) Commerce has a preference for valuing respondents' own energy inputs as [factors of production] when such inputs are part of an energy-intensive process."  Def.-Int.'s Response Brief on Supp. Authority at 3-4.

Response Brief at 18, 24 (similar).  They state that, here, Commerce "determined that PT Tifico's surrogate financial statements likely included water and electricity in its general expenses, and specifically in its [manufacturing/]factory overhead."  Def.'s Response Brief at 17; *see also* Def.-Int.'s Response Brief at 20, 23 (similar).  And they claim that, in contrast, "coal is used as a direct input and, consequently, would not be accounted for within [manufacturing/]factory overhead expenses."  Def.'s Response Brief at 20; *see also* Def.-Int.'s Response Brief at 18-19, 23 (similar).[38]  Further, while the Government is basically silent on the matter, the Domestic Producer argues that there is no record evidence that energy was double counted in Commerce's calculations.  Def.-Int.'s Response Brief at 2, 17-18, 22.  *But see* Pl.'s Reply Brief at 9, 13-21 (disputing claims of Government and Domestic Producer that Commerce properly included coal in the factors of production database and that Commerce reasonably treated coal differently than electricity and water); [Plaintiff's] Supplemental Authority Regarding Exhaustion of Administrative Remedies at 3-4 ("Pl.'s Brief on Supp. Authority") (same); [Plaintiff's] Response to Notice of Supplemental Authority Regarding Exhaustion of Administrative Remedies at 11-12 (same).

Without regard to the accuracy or reasonableness of the representations made by the Government and the Domestic Producer, the bottom line is that none of this information appears in Commerce's Issues and Decision Memorandum.  The sundry reasons and explanations and justifications offered by the Government and the Domestic Producer in their briefs thus constitute

---

[38]As noted above, it appears that P.T. Tifico does not use coal, but uses natural gas (and perhaps other energy sources as well), which Zhaoqing Tifo does not use.  The fact that P.T. Tifico does not use coal obviously does nothing to diminish any concerns about the potential double counting of energy inputs.  Clearly P.T. Tifico uses some energy source for its production process.

impermissible *post hoc* rationale.  Litigation counsel's attempts at "backfill" are no substitute for an agency's own reasoned decisionmaking on the administrative record.  Burlington Truck Lines, 371 U.S. at 168-69; Abbott Laboratories v. United States, 573 F.3d 1327, 1332-33 & n.1 (Fed. Cir. 2009).  It is black letter law that an agency's action may be upheld, if at all, only on the grounds articulated by the agency itself.  State Farm, 463 U.S. at 50.  As such, the arguments made and the information supplied by the Government and the Domestic Producer cannot be credited.  *See generally* Pl.'s Reply Brief at 9-10, 21.

The long and the short of it is that the Issues and Decision Memorandum (and, more generally, the Final Results) give no indication whether Commerce ever considered the potential for double counting of energy inputs other than electricity and water, much less the rationale for any determination on that issue.  Commerce's explanation is not merely thin; it is non-existent.  It thus cannot be said that "the agency's path may reasonably be discerned."  State Farm, 463 U.S. at 43 (citation omitted).  Moreover, the absence of any articulated rationale for Commerce's inclusion of coal in the factors of production database (given any potential for double counting) precludes any assessment of the substantiality of the evidence in support of the agency's action, as well as any evaluation as to whether that action was arbitrary and capricious.

Zhaoqing Tifo asks that this matter be remanded to Commerce "with specific limiting instructions" directing the agency "to remove the coal energy factor from the [factors of production] database and recalculate Zhaoqing Tifo's antidumping duty margin."  Pl.'s Brief at 23; Pl.'s Reply Brief at 10, 22.  However, particularly in light of the procedural posture of the case, such relief is not warranted.

Instead, this matter is remanded to Commerce to permit the agency to reconsider its determination on the inclusion of coal in the factors of production database and to expressly consider any associated potential for double counting of energy inputs, explaining its reasoning fully and with reference to the record evidence.  In the interests of due process and fundamental fairness, Commerce is encouraged to reopen the administrative record on remand, to ensure that the Remand Results are based on an appropriate record and to allow the parties an adequate opportunity to place on the record, for the consideration of the agency, information to illuminate or clarify key points such as the energy sources that P.T. Tifico uses in its production of polyester staple fiber, whether P.T. Tifico uses those energy sources for any other purpose, and how the sources are treated in P.T. Tifico's financial statements and in the surrogate financial ratios that Commerce derived from the financial statements for use in the Final Results (including whether there is any potential for double counting).

## IV.   Conclusion

For the reasons set forth above, Plaintiff's Motion for Judgment on the Agency Record must be granted and this matter remanded to the U.S. Department of Commerce for further action not inconsistent with this opinion.

A separate order will enter accordingly.


                                                    /s/ Delissa A. Ridgway
                                                     Delissa A. Ridgway
                                                            Judge


Dated:  April 9, 2015
          New York, New York