Slip Op. 17-118

UNITED STATES COURT OF INTERNATIONAL TRADE

_____

ZHAOQING TIFO NEW FIBRE CO., LTD.,                  :

                    *Plaintiff,*                    :

          v.                                        :

UNITED STATES,                                      :

                    *Defendant,*                    :          Court No. 13-00044

          and                                       :

DAK AMERICAS LLC,                                   :

                    *Defendant-Intervenor*.         :
_____

[Remanding matter to U.S. Department of Commerce for second time]

Dated:  August 30, 2017

          Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiff.  With him on the briefs were J. Kevin Horgan and Alexandra Salzman.

          Ryan M. Majerus, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., argued for Defendant.  With him on the brief were Benjamin C. Mizer, Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch.  Of counsel on the brief was Shana Hofstetter, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

          Paul C. Rosenthal, Kelley Drye & Warren LLP, of Washington D.C., argued for Defendant-Intervenor.  With him on the brief was David C. Smith.

# OPINION

RIDGWAY, JUDGE:

          In this action, Plaintiff Zhaoqing Tifo New Fibre Co., Ltd. ("Zhaoqing Tifo") – a Chinese

producer and exporter of polyester staple fiber – has contested the Final Determination of the

U.S. Department of Commerce ("Commerce") in the fourth administrative review of the 2007

antidumping duty order on polyester staple fiber from the People's Republic of China.[1]   The

period of review is June 1, 2010 through May 31, 2011.  *See generally* Certain Polyester Staple

Fiber From the People's Republic of China: Final Results of Antidumping Duty Administrative

Review; 2010-2011, 78 Fed. Reg. 2366 (Jan. 11, 2013) ("Final Determination")[2]; Issues and

Decision Memorandum for the Final Results of the 2010-2011 Administrative Review (Jan. 4,

2013) (Pub. Doc. No. 108) ("Issues & Decision Memorandum")[3]; Zhaoqing Tifo New Fibre Co.

v. United States, 39 CIT ____, 60 F. Supp. 3d 1328 (2015) ("Zhaoqing Tifo I").

---

[1]As Zhaoqing Tifo I notes, polyester staple fiber is generally used as stuffing in sleeping bags, mattresses, ski jackets, comforters, cushions, pillows, and furniture.  *See* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1334.

[2]Antidumping duty investigations (*i.e.*, "original" investigations) determine in the first instance whether the elements necessary for the imposition of an antidumping duty exist.  The statute also provides for periodic (typically, annual) administrative reviews of antidumping duty orders (initiated at the request of an interested party), to update the applicable antidumping duty rate.  *See generally* Zhaoqing Tifo I, 39 CIT at ____ n.7, 60 F. Supp. 3d at 1334 n.7 (and authorities cited there).

[3]Because this action has been remanded to Commerce, two administrative records have been filed with the court – the initial administrative record (comprised of the information on which the agency's Final Determination was based) and the supplemental administrative record compiled during the course of the remand.

Each of the two administrative records includes confidential (*i.e.*, business proprietary) information.  Therefore, two versions of each of the records – a public version and a confidential version – were filed with the court.  The public versions of the administrative record and the supplemental administrative record consist of copies of all public documents in the record, and public versions of confidential documents with all confidential information redacted. The confidential versions consist of complete, un-redacted copies of only those documents that include confidential information.  The numbering of public versions of documents differs from the numbering of the confidential versions.

In its Complaint, Zhaoqing Tifo charges, *inter alia*, that the antidumping margin calculated by Commerce in its Final Determination "double counts" certain energy costs, because those costs are reflected in the financial statements of P.T. Tifico Fiber Indonesia Tbk ("P.T. Tifico") (on which the Final Determination relied) and then are counted again elsewhere in the agency's calculations (*i.e.*, in the factors of production database ("FOP database")). Zhaoqing Tifo contends that its dumping margin is therefore inflated. *See* Complaint, Counts I-III; *see also*, *e.g.*, Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1333, 1339 n.16.

Because the Final Determination failed to address Zhaoqing Tifo's double counting claim, Zhaoqing Tifo I remanded the matter to Commerce, to permit the agency to analyze whether energy costs are already reflected in the surrogate financial ratios that the agency derived from the financial statements of P.T. Tifico, such that the agency's inclusion of coal in the FOP database results in double-counting. *See* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1361-65.

Now pending is Commerce's Remand Determination, filed pursuant to Zhaoqing Tifo I. *See generally* Final Results of Redetermination Pursuant to Court Remand (Supp. Pub. Doc. No. 5) ("Remand Results").  On remand, Commerce reopened the decision that it made in its Final Determination concerning the selection of financial statements, abandoning its earlier selection of the financial statements of P.T. Tifico and substituting an entirely different set of financial statements that break out energy costs.  Based on that set of financial statements, Commerce

---

All citations to the administrative records herein are to the public versions, which are cited as "Pub. Doc. No. ____" or "Supp. Pub. Doc. No. ____," as appropriate.

excluded energy costs from the surrogate financial ratios and included them in the FOP database, thus accounting for energy costs but avoiding double counting. *See generally* Remand Results.

Emphasizing that the issue of Commerce's selection of financial statements was never appealed to this Court, Zhaoqing Tifo contends that, as a result, finality attached to that aspect of Commerce's Final Determination, and the agency thus lacked the authority to revisit the issue and to select a different set of financial statements on remand. Zhaoqing Tifo further argues that, in any event, the remand that Zhaoqing Tifo I ordered did not permit Commerce to reconsider its Final Determination as to the selection of financial statements and that the Remand Results therefore exceeded the scope of the remand. *See generally* Plaintiff's Comments in Opposition to Remand Redetermination ("Pl.'s Brief"); Plaintiff's Reply Comments on Remand Redetermination ("Pl.'s Reply Brief").[4]

In contrast, both the Government and the Defendant Intervenor, DAK Americas LLC (the "Domestic Producer"), maintain that the Remand Results should be sustained. They counter that Commerce did not exceed the scope of the remand ordered in Zhaoqing Tifo I, and that the agency properly eschewed P.T. Tifico's financial statements and selected a different set of statements on remand in order to avoid double-counting. The Government and the Domestic Producer further contend that Zhaoqing Tifo's double counting claim and the issue of the

---

[4]Although the two arguments outlined above are its principal arguments, Zhaoqing Tifo briefs two other arguments as well. First, Zhaoqing Tifo asserts that the Remand Results constitute "impermissible *post hoc* rationalization." *See* Pl.'s Brief at 8-10; Pl.'s Reply Brief at 6-7. *But see* Def.'s Brief at 10. In addition, Zhaoqing Tifo contends that, on the merits, Commerce's selection of a different set of financial statements on remand is not supported by substantial evidence. *See* Pl.'s Brief at 10-15; Pl.'s Reply Brief at 7-15. *But see* Def.'s Brief at 11-12; Def.-Int.'s Brief at 6-11, 13-16. In light of the disposition of Zhaoqing Tifo's two principal arguments, there is no need here to reach these other two.

selection of financial statements are so integrally related that analysis of Zhaoqing Tifo's claim

necessarily raises the issue of Commerce's selection of financial statements.   *See generally*

Defendant's Response to Comments on Remand [Determination] ("Def.'s Brief"); Defendant

Intervenor's Comments In Response to Plaintiff's Comments on Remand Redetermination

("Def.-Int.'s Brief").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[5]  For the reasons set forth below, this

matter must be remanded to Commerce for a second time.

## I.  Background

Zhaoqing Tifo I laid out the relevant statutory scheme, including citations to the statute

and other pertinent authorities.   That explanation, together with other relevant background, is

summarized below, for the sake of convenience and completeness.

As Zhaoqing Tifo I explained, dumping occurs when merchandise is imported into the

United States and sold at a price lower than its "normal value," resulting in material injury (or

the threat of material injury) to the U.S. industry.   The difference between the normal value of

the merchandise and the U.S. price is the "dumping margin."   When normal value is compared to

the U.S. price and dumping is found, antidumping duties equal to the dumping margin are

imposed to offset the dumping.   *See* Zhaoqing Tifo I, 39 CIT ____, 60 F. Supp. 3d at 1332 (and

authorities cited there).

---

[5]All citations to statutes herein are to the 2006 edition of the United States Code, and all references to regulations are to the 2010 edition of the Code of Federal Regulations.   The pertinent text of the statutes and regulations cited remained the same at all times relevant herein.

Normal value generally is calculated using either the price in the exporting market (*i.e.*, the price in the "home market" where the goods are produced) or the cost of production of the goods, when the exporting country is a market economy country.[6]  However, where – as here – the exporting country has a non-market economy, there is often concern that the factors of production (inputs) that are consumed in producing the merchandise at issue are under state control, and that home market sales therefore may not be reliable indicators of normal value.  *See* Zhaoqing Tifo I, 39 CIT ____, 60 F. Supp. 3d at 1332 (and authorities cited there).

In cases like this, where Commerce concludes that concerns about the sufficiency or reliability of the available data do not permit the normal value of the merchandise to be determined in the typical manner, Commerce identifies one or more market economy countries to serve as a "surrogate" and then "determine[s] the normal value of the subject merchandise on the basis of the value of the factors of production" in the relevant surrogate country or countries,[7] including "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  This surrogate value analysis is designed to determine a producer's costs of production as if the producer operated in a hypothetical market economy.  *See* Zhaoqing Tifo I, 39 CIT ____, 60 F. Supp. 3d at 1332-33 (and authorities cited there).

---

[6]In addition, in certain market economy cases, Commerce may calculate normal value using the price in a third country (*i.e.*, a country other than the exporting country or the United States).  *See* Zhaoqing Tifo I, 39 CIT at ____ n.3, 60 F. Supp. 3d at 1332 n.3 (and authorities cited there).

[7]Commerce typically values all factors of production using a single surrogate country. *See* Zhaoqing Tifo I, 39 CIT at ____ n.4, 60 F. Supp. 3d at 1332 n.4 (and authorities cited there).

Under 19 U.S.C. § 1677b(c)(3), the factors of production to be valued "include, but are

not limited to – (A) hours of labor required, (B) quantities of raw materials employed, (C)

amounts of energy and other utilities consumed, and (D) representative capital cost, including

depreciation."   However, valuing the factors of production consumed in producing subject

merchandise does not capture certain items such as (1) manufacturing/factory overhead, (2)

selling, general, and administrative expenses ("SG&A"), and (3) profit.   Commerce calculates

those surrogate values using ratios – known as "surrogate financial ratios" – that the agency

derives from the financial statements of one or more companies that produce identical (or at least

comparable) merchandise in the relevant surrogate market economy country.  *See* Zhaoqing Tifo

I, 39 CIT at ____, 60 F. Supp. 3d at 1333 (and authorities cited there).

Zhaoqing Tifo's claim here is that there are certain energy costs that are embedded in the

surrogate financial ratios that Commerce used in its Final Determination that are also included

elsewhere in the agency's antidumping calculations (specifically, in the FOP database), resulting

in the "double counting" of energy costs and inflating Zhaoqing Tifo's antidumping margin.[8]

---

[8]As Zhaoqing Tifo I explained, the case law holds that, as a general rule, double counting is not permitted in antidumping calculations, because it is distortive, rendering dumping margins less accurate.  *See* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1333 n.6 (citing DuPont Teijin Films China Ltd. v. United States, 38 CIT ____, ____, 7 F. Supp. 3d 1338, 1345-46 (2014) (ruling that "double counting should be avoided, as it does not provide a fair price comparison"); Geum Poong Corp. v. United States, 26 CIT 322, 326-28, 193 F. Supp. 2d 1363, 1369-71 (2002) (remanding matter to agency for reconsideration of double counting, explaining that "[c]ounting potentially anomalous profit rates twice . . . would give a misleading picture of the profit experience of other . . . producers of goods in the same general category as the subject merchandise"); Holmes Products Corp. v. United States, 16 CIT 628, 632, 795 F. Supp. 1205, 1207-08 (1992) (holding that "[d]ouble-counting is to be avoided"); *see also* Pl.'s Brief at 22 n.5 (collecting cases on double counting)); Hangzhou Yingqing Material Co. v. United States, 40 CIT ____, ____, 195 F. Supp. 3d 1299, 1309-10 (2016) (summarizing policy of avoiding double-counting in accounting for labor costs in surrogate financial ratios).

As <u>Zhaoqing Tifo I</u> noted, in Commerce's Preliminary Determination here, Commerce selected Indonesia as the surrogate country and relied on the financial statements of P.T. Asia Pacific, an Indonesian producer of polyester staple fiber.  Commerce based that decision in part on its understanding at that time that P.T. Asia Pacific "shares the same level of integration as Zhaoqing Tifo."  *See* <u>Zhaoqing Tifo I</u>, 39 CIT at \_\_\_\_, 60 F. Supp. 3d at 1336 (quoting Certain Polyester Staple Fiber From the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review, 77 Fed. Reg. 39,990, 39,991-93, 39,995 (July 6, 2012)) ("Preliminary Determination").

P.T. Asia Pacific's financial statements are relatively detailed, and include separate line items for that company's energy inputs.  In Commerce's Preliminary Determination, the agency therefore was able to exclude all energy costs from the surrogate financial ratios that it derived from P.T. Asia Pacific's financial statements, and to value all of Zhaoqing Tifo's energy inputs – coal, electricity, and water – separately, in the FOP database, with no concerns about double counting.  *See* <u>Zhaoqing Tifo I</u>, 39 CIT at \_\_\_\_, 60 F. Supp. 3d at 1336 (and authorities cited there).[9]

---

Commerce's administrative determinations are to the same general effect.  *See* <u>Zhaoqing Tifo I</u>, 39 CIT at \_\_\_\_ n.6, 60 F. Supp. 3d at 1333 n.6 (citing Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Multilayered Wood Flooring from the People's Republic of China (Oct. 11, 2011) at 20 (Comment 2) (stating that "[i]t is [Commerce's] longstanding practice to avoid double-counting costs where the requisite data are available to do so" (emphasis omitted) (citation omitted))).

[9]Zhaoqing Tifo consumes coal in its production of polyester staple fiber.  However, it appears that P.T. Tifico and P.T. Asia Pacific use natural gas instead.  Accordingly, although some of the papers filed by the parties in this matter have referred to the "double counting of coal," it is more accurate to refer to the double counting of "energy inputs" (or "energy sources"

In the  administrative case brief that it filed with Commerce following the Preliminary Determination, Zhaoqing Tifo argued that the operations of P.T. Asia Pacific are much more highly integrated than those of Zhaoqing Tifo, and that it was therefore not appropriate for Commerce to rely on P.T. Asia Pacific's financial statements in calculating surrogate financial ratios for this administrative review.  For example, Zhaoqing Tifo characterized P.T. Asia Pacific as "an integrated producer of 'purified terephthalic acid' ('PTA'), a main raw material of polyester," the production of which is highly "capital intensive."   In contrast, Zhaoqing Tifo described itself as a "simple regenerated fiber producer that consumes mainly recycled PET materials," more comparable to P.T. Tifico – an Indonesian producer of polyester fiber which, according to Zhaoqing Tifo, has "less integrated, less complex, production operations."  As such, Zhaoqing Tifo argued that Commerce should use P.T. Tifico's financial statements in its Final Determination.  *See generally* Zhaoqing Tifo I, 39 CIT ____, 60 F. Supp. 3d at 1336-37 (and authorities cited there, including, *inter alia*, Zhaoqing Tifo's Administrative Case Brief (Pub. Doc. No. 94), quoted above).

Although it did not file an administrative case brief, the Domestic Producer filed a rebuttal brief responding to Zhaoqing Tifo's case brief.  There, the Domestic Producer argued that, in calculating surrogate financial ratios, Commerce's Final Determination should continue to rely on the financial statements of P.T. Asia Pacific that were used in the Preliminary Determination.  The Domestic Producer argued that Zhaoqing Tifo "ha[d] not demonstrated that

---

or "energy factors").  Zhaoqing Tifo's concern is that, to the extent that *natural gas* (or any other such energy input) is embedded in the surrogate financial ratios derived from P.T. Tifico's financial statements (and cannot be isolated and excluded from those ratios), Commerce's inclusion of *coal* in the FOP database results in the double counting of energy expenses.  *See* Zhaoqing Tifo I, 39 CIT at ____ n.16, 60 F. Supp. 3d at 1339 n.16 (and authorities cited there).

the difference in integration levels actually exists" and that, in any event, any differences between the levels of integration of Zhaoqing Tifo and P.T. Asia Pacific are "trivial."   *See generally* Zhaoqing Tifo I, 39 CIT ____, 60 F. Supp. 3d at 1337-38 (and authorities cited there, including, *inter alia*, Domestic Producer's Administrative Rebuttal Brief (Pub. Doc. No. 101), quoted above).

In addition, the Domestic Producer emphasized that the financial statements of P.T. Tifico are less "complete and detailed" than those of P.T. Asia Pacific – a consideration that the Domestic Producer deemed "more critical" than any differences in the levels of integration of the companies' operations.   In particular, the Domestic Producer expressly and specifically cautioned Commerce that, because P.T. Tifico's financial statements ""include[] *no separate breakout* of [P.T. Tifico's] energy costs," Commerce's use of P.T. Tifico's financial statements in the Final Determination would require the agency to "place all potential energy costs into the [manufacturing/factory] overhead numerator" in the surrogate financial ratios and to "turn off all company-specific energy and water consumption factors, in order to capture all costs while also preventing double-counting."   In other words, the Domestic Producer stated flatly and unequivocally that – if Commerce used the financial statements of P.T. Tifico in the Final Determination to derive surrogate financial ratios – Commerce would have no choice but to remove coal from the FOP database in order to avoid double counting, because the lack of detail in P.T. Tifico's financial statements would make it impossible for the agency to identify and exclude energy expenses from the surrogate financial ratios.  *See generally* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1338 (and authorities cited there, including the Issues & Decision Memorandum, and Domestic Producer's Administrative Rebuttal Brief, quoted above).

In its Final Determination, Commerce reversed course.  Instead of relying on P.T. Asia

Pacific's financial statements (as Commerce had in the Preliminary Determination), Commerce

used the financial statements of P.T. Tifico to derive the surrogate financial ratios.  In the words

of the Final Determination, Commerce concluded that P.T. Tifico's "less integrated and less

complex production operations are more comparable to Zhaoqing Tifo's than those of P.T. Asia

Pacific."  *See generally* Zhaoqing Tifo I, 39 CIT at \_\_\_\_, 60 F. Supp. 3d at 1338 (and authorities

cited there, including the Issues & Decision Memorandum, quoted above).

The Final Determination acknowledged the Domestic Producer's admonition regarding

the lack of detail in P.T. Tifico's financial statements, noting that P.T. Tifico's statements "do[]

not include a separate breakout of [P.T. Tifico's] costs for electricity and water."  Therefore, "in

order to prevent double counting," Commerce in its Final Determination "placed all electricity

and water costs into the [manufacturing/factory] overhead numerator" (*i.e.*, included electricity

and water in the surrogate financial ratios) and removed from the FOP database the "electricity

and water consumption factors" that the agency had included in the database for purposes of the

Preliminary Determination.  *See* Zhaoqing Tifo I, 39 CIT at \_\_\_\_, 60 F. Supp. 3d at 1338-39

(and authorities cited there, including the Issues & Decision Memorandum, and Domestic

Producer's Administrative Rebuttal Brief, quoted above).

However, Commerce left coal in the FOP database.  Commerce did not explain why

concerns about double counting – which led the agency to exclude water and electricity from the

FOP database in the Final Determination – do not apply with equal force to coal.  Nor did

Commerce confront the Domestic Producer's statement that using P.T. Tifico's financial

statements would require Commerce to remove coal from the FOP database, in order to avoid

double-counting.  *See* <u>Zhaoqing Tifo I</u>, 39 CIT at ____, 60 F. Supp. 3d at 1339 (and authorities cited there, including the Issues & Decision Memorandum).

Zhaoqing Tifo appealed, alleging, *inter alia*, that Commerce's Final Determination double-counts certain energy expenses.  Specifically, Zhaoqing Tifo contends that Commerce's inclusion of coal in the FOP database in the Final Determination is unsupported by substantial evidence, contrary to law, and arbitrary and capricious, because energy costs are already reflected in the surrogate financial ratios that Commerce derived from the financial statements of P.T. Tifico.  *See* Pl.'s Complaint, Counts I-III.

Significantly, no party sought judicial review of Commerce's selection of financial statements (*i.e.*, Commerce's decision between the financial statements of P.T. Tifico and those of P.T. Asia Pacific) for use in the Final Determination.

Because Zhaoqing Tifo had successfully advocated for the use of P.T. Tifico's financial statements in the Final Determination, Zhaoqing Tifo's Complaint does not raise the issue of Commerce's selection of financial statements.  Zhaoqing Tifo's double-counting claim is much more narrow, specific, and refined – *i.e.*, that if energy expenses cannot be isolated and excluded from the surrogate financial ratios that Commerce derives from P.T. Tifico's financial statements, then coal expenses must be excluded from the FOP database in order to avoid double counting.

The Domestic Producer intervened in the instant action.  The Domestic Producer could have filed its own action, to challenge Commerce's selection of financial statements in the Final Determination – *i.e.*, Commerce's decision to use the financial statements of P.T. Tifico, rather than those of P.T. Asia Pacific (which the Domestic Producer had favored).  Certainly the

Domestic Producer had exhausted its administrative remedies.  As summarized above, the Domestic Producer had exhorted Commerce to use the financial statements of P.T. Asia Pacific, rather than the statements of P.T. Tifico.  The Domestic Producer had explicitly warned Commerce that the use of P.T. Tifico's statements would require the agency to exclude energy expenses (including coal) from the FOP database in order to avoid double counting, because the agency would find it impossible to isolate and exclude energy expenses from P.T. Tifico's statements.  However, for whatever reason, the Domestic Producer elected not to seek judicial review of Commerce's selection of financial statements and thus waived the issue.

In the briefing that preceded Zhaoqing Tifo I, the parties devoted much ink and energy to debate over whether or not Zhaoqing Tifo had failed to exhaust its double-counting claim at the administrative level.  Zhaoqing Tifo I concluded that the doctrine of exhaustion of administrative remedies does not bar Zhaoqing Tifo's claim.  *See generally* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1343-59.

Turning to the merits of Zhaoqing Tifo's claim, Zhaoqing Tifo I found, in essence, that there was no rationale or record evidence to indicate that Commerce had considered whether both using surrogate financial ratios derived from P.T. Tifico's financial statements and separately valuing coal in the FOP database resulted in the double-counting of energy costs in the Final Determination.  *See generally* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1361-65.  Specifically, Zhaoqing Tifo I observed that "the Issues and Decision Memorandum . . . give[s] no indication whether Commerce ever considered the potential for double counting of energy inputs other than electricity and water, much less the rationale for any determination on

that issue.  Commerce's explanation is not merely thin; it is non-existent." *Id.*, 39 CIT at ____,

60 F. Supp. 3d at 1364-65.

This matter was therefore remanded to Commerce, to allow the agency to determine

whether – as Zhaoqing Tifo contends -- energy expenses are embedded in the surrogate financial

ratios derived from P.T. Tifico's financial statements, such that Commerce's inclusion of coal in

the FOP database results in double counting in the Final Determination, and, in addition, to allow

the agency, if appropriate, to explain any disparity in its treatment of water and electricity *versus*

coal.  Significantly, in urging Commerce to consider reopening the administrative record on

remand, Zhaoqing Tifo I noted that additional information could be placed on the record

addressing "the energy sources that *P.T. Tifico* uses in its production of polyester staple fiber,

whether *P.T. Tifico* uses those energy sources for any other purpose, and how the sources are

treated in *P.T. Tifico's* financial statements and in the surrogate financial ratios that Commerce

derived from the financial statements." Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1365

(emphasis added).  The remand instructions said nothing about revisiting the already-settled

issue of the selection of financial statements.  Nor did the remand instructions refer to the use of

any financial statements other than those of P.T. Tifico.

On remand, rather than analyzing Zhaoqing Tifo's claim (which is confined to the

financial statements of P.T. Tifico, the inclusion of coal in the FOP database, and the alleged

resulting double counting of energy expenses), Commerce instead reopened the issue of the

selection of financial statements as a whole – an issue which was not raised by any party to this

litigation and one which Commerce had decided in the Final Determination.  Ultimately,

Commerce flip-flopped once again in the Remand Results, reverting back to the financial

statements of P.T. Asia Pacific – the same financial statements on which the agency had relied in its Preliminary Determination.  *See* Remand Results at 2, 9-10.

In effect, the Remand Results do not reconsider Commerce's decision in the Final Determination to leave coal in the FOP database notwithstanding an apparent inability to exclude energy expenses from P.T. Tifico's financial statements and any resulting double-counting. Rather, the Remand Results reconsider a different decision from the Final Determination:  *i.e.*, Commerce's decision in the Final Determination to select the financial statements of P.T. Tifico for the surrogate financial ratios over those of P.T. Asia Pacific.

The Remand Results do not directly address why Commerce on remand did not focus specifically on P.T. Tifico's financial statements and related surrogate financial ratios from the Final Determination, in order to determine whether it is possible to isolate and exclude energy expenses.  The Remand Results also offer no explanation for the disparate treatment of water, electricity, and coal in the Final Determination, where Commerce relied on the financial statements of P.T. Tifico and removed water and electricity from the FOP database for the professed purpose of avoiding double counting, but left coal in the database.  Similarly, the Remand Results give no indication as to whether Commerce has conducted a considered analysis of the matter and has concluded that using P.T. Tifico's financial statements while including coal in the FOP database in fact results in double-counting.

In unraveling the Final Determination and reconsidering the issue of the selection of financial statements, the Remand Results once again survey all of the financial statements on the administrative record, and their respective pros and cons, much as Commerce did when the agency analyzed the issue previously in the Final Determination.  *See* Remand Results at 5-6.

And, much as it did in its Final Determination, Commerce once again quickly narrows the field to the financial statements of P.T. Tifico and those of P.T. Asia Pacific. *Id*. As between those two, Commerce attributes its "about-face" in selecting the financial statements of P.T. Asia Pacific to an asserted factual error in its analysis of the issue in the Final Determination. *See generally id*. at 7-9.

According to the Remand Results, "[u]pon reexamination of both financial statements," Commerce found that it had "erred in [the Final Determination] in evaluating the similarities between Zhaoqing Tifo and P.T. Tifico on one hand, and the dissimilarity between P.T. Tifico and P.T. Asia Pacific on the other hand in terms of the level of integration," which were the bases for its decision in the Final Determination. Remand Results at 7.

Focusing first on similarities between Zhaoqing Tifo and P.T. Tifico, the Remand Results state that, in evaluating the two companies' relative levels of integration, Commerce "made a factual error [in its Final Determination] when stating that P.T. Tifico *purchases* polyester chips from third parties which then go into the production of [polyester staple fiber]." *See* Remand Results at 7 (apparently referring to Final Determination at 10). The Remand Results contrast Commerce's finding in the Final Determination with P.T. Tifico's financial statements, which state that, in fact, P.T. Tifico is "primarily engaged in the *manufacture* of polyester chips, staple fiber," and other products. Remand Results at 7. The Remand Results conclude that – because P.T. Tifico *manufactures* its own polyester chips, while Zhaoqing Tifo *purchases* recycled polyester input – the Final Determination's finding that P.T. Tifico's level of integration parallels that of Zhaoqing Tifo was incorrect. *Id*. at 7 (apparently referring to Final Determination at 10).

The Remand Results also revisit the Final Determination's conclusions on similarities between the production processes of Zhaoqing Tifo and P.T. Tifico.  *See generally* Remand Results at 8 (apparently referring to Final Determination at 10).  The Remand Results state that – because Zhaoqing Tifo purchases recycled polyester input and manufactures its polyester staple fiber from "used bottles from waste collection companies," while P.T. Tifico "purchase[s] supplies from chemical companies as raw materials" and manufactures its own polyester chips which it then uses to produce its polyester staple fiber, the Final Determination erred to the extent that it found similarities in "the respective production processes of P.T. Tifico and . . . Zhaoqing Tifo."  Remand Results at 8 (apparently referring to the Final Determination at 10).

In addition to reevaluating similarities in the respective levels of integration of P.T. Tifico and Zhaoqing Tifo (discussed above), the Remand Results also re-examined Commerce's findings in the Final Determination as to dissimilarities in the levels of integration of P.T. Tifico and P.T. Asia Pacific.  *See* Remand Results at 8-9 (apparently referring to Final Determination at 10).

In the Final Determination, Commerce based its selection of the financial statements of P.T. Tifico over those of P.T. Asia Pacific in part on Commerce's understanding that P.T. Asia Pacific is significantly more highly integrated than P.T. Tifico.  *See* Final Determination at 10-11.  According to the Remand Results, Commerce no longer believes that to be true in light of facts about the two companies' production processes as the agency now knows them.  *See* Remand Results at 8-9.  The Remand Results thus conclude that "the record does not reflect that there is a meaningful difference in the level of integration between these two potential surrogate companies [*i.e.*, P.T. Tifico and P.T. Asia Pacific], such that level of integration would be the

deciding factor in determining which statement represents the best available information" and

that "both P.T. Tifico and P.T. Asia [Pacific] have a production process that is equally dissimilar

from that of Zhaoqing Tifo." *Id.* at 8-9.[10]

In the Remand Results, Commerce decided that, if the choice between the financial

statements of P.T. Tifico and P.T. Asia Pacific was no longer driven by the three companies'

relative levels of integration, the decisive factor would be the level of detail reflected in the

financial statements.   Noting that P.T. Tifico's financial statements do not include a separate

breakout of the company's energy expenses, the Remand Results state that, if the agency were to

---

[10]Commerce was not misled as to the relevant facts here.  With respect to the factual errors that Commerce alleges it made in the Final Determination concerning the relative level of integration of Zhaoqing Tifo compared to P.T. Tifico, as well as the relative level of integration of P.T. Tifico compared to P.T. Asia Pacific, Commerce already had the accurate information before it at the time it reached its Final Determination.  If Commerce in fact did not know the facts at the time of the Final Determination, it could – and should – have known them.

For example, to support Commerce's new findings on the nature of P.T. Tifico's business operations, the Remand Results point to a statement in Zhaoqing Tifo's administrative case brief to the effect that "P.T. Tifico is . . . a manufacturer of virgin, or fresh, [polyester staple fiber]." *See* Remand Results at 8 (citing Zhaoqing Tifo's Administrative Case Brief at 18-19).  Zhaoqing Tifo's administrative case brief was filed following Commerce's Preliminary Determination, and well before issuance of Commerce's Final Determination.

Commerce also cites P.T. Tifico's financial statements in support of the agency's revised findings of fact.  However, Zhaoqing Tifo placed those financial statements on the administrative record even before Commerce's Preliminary Determination – and, thus, obviously, far in advance of the Final Determination.  *See* Remand Results at 7-8 (citing financial statements of P.T. Tifico).

Even more directly, the Domestic Producer's administrative rebuttal brief, filed following the Preliminary Determination and well before the Final Determination, states – expressly and in no uncertain terms – that P.T. Tifico manufactures its own polyester chips.  *See* Domestic Producer's Administrative Rebuttal Brief at 13 (stating that P.T. Tifico "buys . . . chemicals to make polyester chips").

use P.T. Tifico's statements, it would be necessary to exclude coal from the FOP database in

order to avoid double-counting.[11]   In the Remand Results, Commerce therefore selected P.T.

Asia Pacific's financial statements, which are more detailed and include line item breakouts for

energy expenses (among others), allowing the agency to exclude energy from the surrogate

financial ratios and to instead value it separately in the FOP database, without double-counting.

*See generally* Remand Results at 2, 9-10.

Commerce's use of P.T. Asia Pacific's financial statements in the Remand Results

significantly increases Zhaoqing Tifo's dumping margin.  The Final Determination, which used

the financial statements of P.T. Tifico, calculated Zhaoqing Tifo's dumping margin as 9.98% – a

margin which, according to Zhaoqing Tifo, double counts certain energy expenses and thus

would be even lower if the double-counting were eliminated.  In the Remand Results, which use

the financial statements of P.T. Asia, Zhaoqing Tifo's dumping margin jumps to 25.56%.

## II.  Standard of Review

---

[11]Specifically, the Remand Results indicate that, "[t]o use P.T. Tifico's financial
statements would require placing all potential energy costs into the factory/manufacturing
overhead figures [*i.e.*, in the surrogate financial ratios derived from P.T. Tifico's financial
statements] and the exclusion [from the FOP database] of company-specific energy consumption
figures that would normally be valued as an FOP, in order to capture all costs while also
preventing double counting."   *See* Remand Results at 9-10.   This seeming concession by
Commerce – which is essentially a recitation of the clear warning that the Domestic Producer
gave Commerce before the Final Results – arguably disposes of Zhaoqing Tifo's double-
counting claim, in favor of Zhaoqing Tifo, leaving nothing for further litigation (at least as to this
claim).   However, the seeming concession is a wholly conclusory statement.   The Remand
Results are devoid of any analysis or explanation by Commerce to back it up.   Under these
circumstances, judgment counsels against treating the statement as a formal and official
statement by Commerce of the agency's considered opinion.

In reviewing a remand determination by Commerce in an antidumping duty case, the agency's determination must be upheld except to the extent that it is found to be "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i); *see also* <u>NMB Singapore Ltd. v. United States</u>, 557 F.3d 1316, 1319 (Fed. Cir. 2009).   In addition, the remand determination is reviewed for compliance with the court's remand order.  <u>Yantai Xinke Steel Structure Co. v. United States</u>, 38 CIT ____, ____, 2014 WL 13875259 * 2 (2014) (quoting <u>Xinjiamei Furniture (Zhangzou) Co. v. United States</u>, 38 CIT ____, ____, 968 F. Supp. 2d 1255, 1259 (2014) (internal quotation marks omitted)); <u>Since Hardware (Guangzhou) Co. v. United States</u>, 39 CIT ____, ____, 49 F. Supp. 3d 1268, 1272 (2015) (same); *see also* <u>Changzhou Wujin Fine Chemical Factory Co. v. United States</u>, 701 F.3d 1367, 1374 (Fed. Cir. 2012) (analyzing on review whether Commerce's remand results were "within the scope of the Court of International Trade's remand order" and sustaining the Court of International Trade's conclusion on that point).

A trial court's determination as to the scope of its own remand order is entitled to great deference.  *See*, *e.g.*, <u>Changzhou</u>, 701 F.3d at 1375 (explaining that "an appellant 'faces a very high hurdle when it tries to convince us that, despite the remanding Court's satisfaction, we must conclude that the [agency] on remand acted outside the scope of the remand directions'") (quoting <u>Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB</u>, 375 F.2d 807, 814 (Fed. Cir. 1992)).

## III.  <u>Analysis</u>

Zhaoqing Tifo objects to the Remand Results, advancing two principal arguments – one

based on the scope of this litigation, and the other based on the scope of the remand instructions

as set forth in <u>Zhaoqing Tifo I</u>.   The two arguments are analyzed below, together with the

counter-arguments of the Government and the Domestic Producer.

## A.   <u>The Scope of This Litigation</u>

Raising arguments concerning, *inter alia*, the Court's jurisdiction and the applicable

statute of limitations, Zhaoqing Tifo reasons that, because the scope of this litigation is

determined by Zhaoqing Tifo's Complaint, and because that Complaint does not challenge

Commerce's selection of P.T. Tifico's financial statements over those of P.T. Asia Pacific,

Commerce on remand "[did] not have the authority" to reconsider the issue of the selection of

financial statements for use in calculating Zhaoqing Tifo's dumping margin.   *See* Pl.'s Brief at 2

(caption, modified to lower case letters); *see generally id*. at 2-4; Pl.'s Reply Brief at 1-6.

The statute (together with relevant agency regulations and the applicable Rules of the

Court) strikes a balance between the significant interests in the accuracy and completeness of

Commerce's determinations and the competing, equally compelling, need for "finality." *See*

*generally*, *e.g.*, <u>Southern Rambler Sales, Inc. v. American Motors Corp.</u>, 375 F.2d 932, 938 (5th

Cir. 1967) (underscoring importance of finality, observing that "[a]ll things must end – even

litigation").

In the interests of finality, Commerce's final determination in any antidumping

proceeding is essentially immune to attack, except to the extent that a party commences a timely

challenge of that final determination in this Court – and, even then, only to the extent of those

specific issues that are raised in the complaint.  *See generally* 19 U.S.C. § 1516a(a)(1) (requiring

that any action challenging a final determination in an antidumping proceeding be commenced

by the filing of a summons within 30 days after Federal Register publication of the

determination, followed by a complaint within 30 days thereafter); USCIT Rule 3(a)(2) (same).

In other words, finality attaches to all aspects of a final determination except those that are

challenged in a timely-filed complaint.[12]

   A party that does not file its own complaint may be permitted to intervene in a case, to

participate in the briefing and argument on issues raised in the plaintiff's complaint.  *See*

*generally* 28 U.S.C. § 2631(j)(1)(B) (specifying requirements applicable to motions to intervene

in antidumping cases); USCIT Rule 24(a) (setting forth timing and other requirements applicable

to motions to intervene in antidumping cases).  But an intervenor is not permitted to raise its own

challenges to the final determination at issue.  The scope of any litigation is confined to the

issues raised in the plaintiff's complaint.  An intervenor must take a case as it lies.  *See, e.g.,*

Vinson v. Washington Gas Light Co., 321 U.S. 489, 498 (1944) (explaining that an intervening

party "is admitted to a proceeding as it stands, and in respect of the pending issues, but is not

permitted to enlarge those issues"); Laizhou Auto Brake Equip. Co. v. United States, 31 CIT

212, 212-15, 477 F. Supp. 2d 1298, 1299-1301 (2007) (similar); Habas Sinai ve Tibbi Gazlar

---

[12]Where a plaintiff seeks to amend its timely-filed complaint (*e.g.*, to attempt to belatedly raise a new issue that was not raised in the complaint at the time of filing), the plaintiff's ability to do so is narrowly circumscribed.  *See* USCIT R. 15(a)(1)-(2) (providing that, where more than 21 days have elapsed since service of complaint, complaint may be amended "only with the opposing party's written consent or the court's leave . . . when justice so requires."); *see also, e.g.*, Oreck Corp. v. Whirlpool Corp., 639 F.2d 75, 81 (2d Cir. 1980) (affirming district court's denial of motion to amend complaint prior to trial on remand, emphasizing, in particular, "the[] circumstances of extended delay and failure to raise initially claims of which [the plaintiff] was aware").

Istihsal Endustri A.S. v. United States, 30 CIT 542, 425 F. Supp. 2d 1374 (2007) (noting that it is

"clear beyond cavil" that intervenors "must take a case as they find it"); Siam Food Prods. Public

Co. v. United States, 22 CIT 826, 830, 24 F. Supp. 2d 276, 280 (1998) (concluding that movants

there were "time barred from bringing their own case and thus even as intervenors . . . [could]

not bring their own challenges to [Commerce's] determination") (citation omitted).

Further, as a matter of first principles, Commerce is not permitted to attack its own final

determination[13]; nor is a court permitted to *sua sponte* interject issues into litigation.  Issues that

are not the subject of a timely-filed complaint are, as a general rule, beyond the court's

jurisdiction and cannot be entertained by the court.  *See generally*, *e.g.*, Georgetown Steel Corp.

v. United States, 801 F.2d 1308, 1309-10, 1311-13 (Fed. Cir. 1986) (holding that Court of

International Trade lacked jurisdiction over action where party failed to file timely appeal).  As

such, "finality" trumps "accuracy/completeness," and the complaint defines and delimits the

scope of litigation before the court.  *See generally*, *e.g.*, Civil Aeronautics Board v. Delta Air

Lines, Inc., 367 U.S. 316, 321-22 & n.5 (1961) (explaining that "[w]henever a question

concerning administrative, or judicial, reconsideration arises, two opposing policies demand

recognition: the desirability of finality, on the one hand, and the public interest in reaching what,

ultimately, appears to be the right result on the other," and noting that "[s]ince these policies are

in tension, it is necessary to reach a compromise"); Federated Department Stores, Inc. v. Moitie,

---

[13]Commerce's procedure for the correction of "ministerial errors" in its determinations is an important, but very limited, exception to this rule.  However, the ministerial errors procedure has no bearing on the analysis here.  *See* 19 U.S.C. § 1675(h) ("Administrative review of determinations: Correction of ministerial errors"); 19 C.F.R. § 351.224(c)-(g) (under "Disclosure of calculations and procedures for the correction of ministerial errors").

452 U.S. 394, 401 (1931) (stating that, in the interests of finality, "[p]ublic policy dictates that

there be an end of litigation; that those who have contested an issue shall be bound by the result

of that contest, and that matters once tried shall be considered forever settled as between the

parties"); NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995)

(acknowledging, on appeal in an antidumping duty case, that "[i]n some instances, a tension may

arise between finality and [a] correct result"); Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn

Bhd., 334 F.3d 1284, 1292 (Fed. Cir. 2003) (recognizing the "strong interest in the finality of

Commerce's decisions").[14]

Here, Zhaoqing Tifo's timely-filed Complaint defines and delimits the scope of this

litigation; and it does not include a challenge to Commerce's selection of financial statements.[15]

---

[14] See also, e.g., Comfort v. Lynn School Committee, 560 F.3d 22, 26 (1st Cir. 2009) (observing that, in the interests of finality, "a case cannot be re-opened simply because some new development makes it appear, in retrospect, that a judgment on the merits long since settled was brought about by judicial error"); Oakes v. United States, 400 F.3d 92, 97 (1st Cir. 2005) (characterizing finality as an "institutional value[] that transcends the litigants' parochial interests).

[15] Zhaoqing Tifo's Complaint consists of a total of 10 specific counts.  However, as indicated above, none of those counts challenges Commerce's decision to rely on the financial statements of P.T. Tifico – rather than those of P.T. Asia Pacific – in the agency's Final Determination.  Quite to the contrary, Zhaoqing Tifo's Complaint in fact relies on Commerce's selection of P.T. Tifico's financial statements, but alleges that – because energy expenses are already embedded in those statements, Commerce must exclude energy expenses from the FOP database.

As Zhaoqing Tifo I explained, only the first four counts of the Complaint were addressed in Zhaoqing Tifo's motion for judgment on the agency record.  Each of those four counts relates to Commerce's inclusion of coal in the FOP database for purposes of the agency's Final Determination, and Zhaoqing Tifo's attendant concerns about the potential double counting of energy inputs.  See generally Zhaoqing Tifo I, 39 CIT at _____ n.18, 60 F. Supp. 3d at 1341 n.18 (listing the subject of each of 10 counts of Zhaoqing Tifo's Complaint).  As such, it is those four counts (now three, as noted below) that are relevant to the Remand Results.

In its briefs contesting the Remand Results, Zhaoqing Tifo draws on the principles and authorities summarized above (which no party disputes), and advances arguments as to both the scope and the timing of this litigation.  As Zhaoqing Tifo correctly observes, the issue of the selection of financial statements is beyond the scope of its Complaint.  Significantly, no party contends that Zhaoqing Tifo's Complaint challenges Commerce's selection of financial statements – *i.e.*, Commerce's decision to rely on the financial statements of P.T. Tifico for purposes of the agency's Final Determination.  Certainly Zhaoqing Tifo has not sought to amend its Complaint to add such a challenge.  The Domestic Producer could have – and apparently

In particular, Count I alleges that Commerce's failure to remove coal from the factors of production database means that Commerce "did not select the 'best available information' for the surrogate value of coal," and that the Final Determination is therefore "unsupported by substantial evidence."  *See* Complaint, Count I.  Count II alleges that Commerce acted "contrary to law" by including coal in the factors of production database at the same time the agency excluded water and electricity.  *Id.*, Count II.  Count III alleges that it was "arbitrary and capricious" for Commerce to include coal, while excluding water and electricity.  *Id.*, Count III.  And Count IV alleges that Commerce's inclusion of coal in the factors of production database, while excluding water and electricity, "was a ministerial error that should have been promptly corrected."  *Id.*, Count IV.  Zhaoqing Tifo withdrew Count IV in its opening brief in this litigation, explaining that "the remedy [sought by Count IV] overlaps the remedy sought in Counts I through III, namely the removal of the coal energy factor from [Zhaoqing Tifo's] [factors of production] database."  *See* Zhaoqing Tifo I, 39 CIT at ____ n.18, 60 F. Supp. 3d at 1341 n.18 (citation omitted).  Accordingly, only Counts I through III are presently before the court.

Counts V, VI, VII, and VIII of the Complaint contest the surrogate values that Commerce used in its Final Determination to value various inputs – including, respectively, coal, inland freight, water, and brokerage and handling.  Complaint, Counts V-VIII.  Count IX alleges that Commerce erred in rejecting a letter of credit adjustment to brokerage and handling, while Count X asserts that Commerce's "failure to issue a deficiency questionnaire regarding the sources and meaning of the domestic Indonesian coal surrogate value was contrary to law."  *Id.*, Counts IX-X.  Count XI is an all-purpose "catch-all" claim, stating that "[u]pon information and belief, [Commerce] erred in other aspects of its final results" which are not specified.  *Id.*, Count XI; *see generally* Zhaoqing Tifo I, 39 CIT at ____ n.18, 60 F. Supp. 3d at 1341 n.18.

should have – preserved its rights by timely filing its own complaint, so as to challenge Commerce's selection of P.T. Tifico's financial statements over those of P.T. Asia Pacific.[16] But it is far too late for the Domestic Producer to do that now. *See generally* 19 U.S.C. § 1516a(a)(1); USCIT Rule 3(a)(2).

Neither the Government nor the Domestic Producer makes any real effort to respond to Zhaoqing Tifo's arguments concerning the limited scope of this litigation (including the role of the Complaint vis-à-vis the court's jurisdiction and the strict time limits for filing an action challenging a Final Determination). *See* Def.'s Brief, *passim*; Def.-Int.'s Brief, *passim*. The Government acknowledges in passing that Zhaoqing Tifo "argues that Commerce lacks the statutory authority" to revisit on remand the selection of financial statements; and the Government asserts broadly that Zhaoqing Tifo's argument lacks merit. *See* Def.'s Brief at 4. However, the Government's briefing on the matter consists of no more than a few sentences and does not address the substantive merits of the significant points that Zhaoqing Tifo raises. *See id.* at 11.[17] The Domestic Producer similarly acknowledges Zhaoqing Tifo's argument, but, like

---

[16]The issue of the selection of financial statements – and the respective pros and cons of the financial statements of P.T. Tifico and P.T. Asia Pacific – was hotly contested by the parties before Commerce's Final Determination issued. Indeed, as noted above, in advocating for use of P.T. Asia Pacific's statements, the Domestic Producer specifically warned Commerce that the agency's selection of the financial statements of P.T. Tifico would preclude the agency from including coal in the FOP database, due to the need to avoid double-counting.

[17]The Government conflates and then summarily dismisses a number of Zhaoqing Tifo's points with the conclusory assertion that Zhaoqing Tifo's arguments and authorities "in no way support the notion that this Court lacks jurisdiction to consider a change by Commerce in the selection of surrogate financial statements." *See generally* Def.'s Brief at 11.

the Government, gives the argument very short shrift and does not directly confront it.  *See* Def.-Int.'s Brief at 6, 11.[18]

Zhaoqing Tifo candidly notes that – notwithstanding the (nearly) ironclad rule prizing finality over accuracy/completeness in circumstances such as these – segments of antidumping proceedings have been re-opened on extremely rare occasions, in but a handful of cases.  *See generally* Pl.'s Brief at 3-4; Pl.'s Reply Brief at 2.[19]  However, in such cases, the inherent tension between finality and accuracy/completeness is resolved in favor of reopening Commerce's determination because such extraordinary action is required in order to ensure the fundamental

---

[18]Like the Government, the Domestic Producer devotes roughly 10 lines to Zhaoqing Tifo's arguments concerning jurisdiction and the statute of limitations.  *See* Def.-Int.'s Brief at 6, 11.  Its treatment of the argument is both brief and substantively wide of the mark.

In response to Zhaoqing Tifo's point that "'no party appealed' the selection of the financial statement[s]" used in Commerce's Final Determination, the Domestic Producer argues that Zhaoqing Tifo I "did not restrict the universe of sources Commerce could consider on remand."  *See* Def.-Int.'s Brief at 6 (citation omitted).  But, even assuming that it were true, that assertion is no answer to a claim that the court lacks jurisdiction to entertain a challenge that was not raised in the Complaint.  A court cannot expand its own jurisdiction, whether by a remand or by any other means.  Elsewhere in its brief, the Domestic Producer responds to Zhaoqing Tifo's arguments concerning the scope of this litigation by quoting an excerpt from the Remand Results in which Commerce asserts that "'accounting for energy inputs in the [Factors of Production] database is the basis' of [Zhaoqing Tifo's] complaint."  *See id*. at 11 (quoting Remand Results at 11).  But the Domestic Producers fail to "connect the dots" by spelling out the relationship between that idea and the jurisdiction of the court, the Complaint's limiting effect on the scope of litigation, and/or the time limits for commencing an action to challenge some aspect of the Final Determination here.  Moreover, while Commerce's interpretation of relevant statutes and regulations is generally entitled to great deference, its interpretation of a party's complaint carries no special weight.

[19]In addition to the exception to the principle of finality set forth above, there are certain other limited and specific circumstances where an issue that is not raised in a complaint may nevertheless be the subject of litigation if that issue is inextricably intertwined with an issue that is raised in the complaint.  Such cases are discussed in section III.B, below.

integrity of Commerce's processes. *See, e.g.*, <u>Tokyo Kikai Seisakusho, Ltd. v. United States</u>, 31 CIT 117, 122-23, 473 F. Supp. 2d 1349, 1354-55 (2007), *aff'd in part and rev'd in part*, 529 F.3d 1352 (Fed. Cir. 2008)  (explaining that "an agency may act pursuant to its inherent authority to protect the integrity of its proceedings from fraud") (internal quotation marks omitted); <u>Elkem Metals Co. v. United States</u>, 26 CIT 234, 240 & n.6, 193 F. Supp. 2d 1314, 1321 & n.6 (2002) (involving allegations of "serious material misrepresentations" and "price-fixing conspiracy" that assertedly tainted prior agency investigation); <u>Alberta Gas Chemicals, Ltd. v. Celanese Corp.</u>, 650 F.2d 9, 12-13 (2d Cir. 1981) (invoking "the power of an administrative agency to insure the integrity of proceedings before it," in action involving alleged perjured testimony in earlier ITC proceeding, which had concluded).[20]

This is not such a case.  Commerce's alleged factual error here plainly does not implicate the fundamental integrity of Commerce's processes.  No party contends otherwise.  As the Government itself acknowledges, the referenced line of cases "recognize[s] Commerce's inherent authority to take actions to guard against fraud" and thus involves facts that are "entirely different" from the facts of the instant case.  Def.'s Brief at 11.

In sum, Zhaoqing Tifo's points concerning the scope of this litigation (including matters such as the court's jurisdiction, the requirements governing the timing of the filing of a challenge

---

[20]*See also* <u>Hazel-Atlas Glass Co. v. Hartford-Empire Co.</u>, 322 U.S. 238, 244-45 (1944) (setting forth well-settled general rule against reopening settled judgments, based on "the belief that in most instances society is best served by putting an end to litigation after a case has been tried and judgment entered," but noting that, "under certain circumstances, one of which is after-discovered fraud, relief will be granted against judgments" without regard to when they were entered); <u>Universal Oil Prods. Co. v. Root Refining Co.</u>, 328 U.S. 575, 580 (1946) (explaining that "[t]he inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question");

to a final determination, and the limiting function of its Complaint) are well-taken.   There is, however, no need here to reach a definitive determination as to whether or not the court *could* have ordered a remand in which Commerce was free to re-open the issue of the selection of financial statements – because, as explained below, the court did not do so.

### B.  The Scope of the Remand Order in Zhaoqing Tifo I

Zhaoqing Tifo's second major argument focuses not on the scope of this litigation (discussed immediately above), but, rather, on the scope of the remand instructions in Zhaoqing Tifo I.  Zhaoqing Tifo here assumes, *arguendo*, that the court could have ordered a remand in which Commerce would have been permitted to revisit the issue of the agency's selection of P.T. Tifico's financial statements over the financial statements of P.T. Asia Pacific for purposes of the agency's Final Determination.   In other words, in advancing this second argument, Zhaoqing Tifo assumes that there were no statutory bars (vis-à-vis the court's jurisdiction and requirements governing the timely filing of complaints) that would preclude the court from directing such a broad remand.   Zhaoqing Tifo argues that Commerce nevertheless was not permitted on remand to re-analyze the issue of the relative merits of the different financial statements on the administrative record because that issue lies beyond the scope of the remand that was ordered in Zhaoqing Tifo I.  *See generally* Pl.'s Brief at 2-4; Pl.'s Reply Brief at 1-6.

In contrast, the Government and the Domestic Producer contend that Zhaoqing Tifo reads the remand instructions too narrowly and that, under Zhaoqing Tifo I, Commerce was permitted to reach back and reconsider the issue of the agency's selection of financial statements.   As

outlined below, Zhaoqing Tifo's reading of the remand instructions in Zhaoqing Tifo I is the correct one.

The Government and the Domestic Producer maintain that nothing in the remand instructions in Zhaoqing Tifo I barred Commerce from re-opening the issue of the selection of financial statements. *See*, *e.g.*, Def.'s Brief at 5; Def.-Int.'s Brief at 6. The Government and the Domestic Producer assert, in essence, that the remand instructions in Zhaoqing Tifo I should be given a broad reading, as permitting Commerce to reconsider its selection of final statements, because – according to the Government and the Domestic Producer – the court could not have intended a "limited remand," which is generally "disfavored." *See* Def.'s Brief at 3; Def.-Int.'s Brief at 10; Changzhou, 701 F.3d at 1374-75 (explaining that the Court of Appeals "generally disfavors limited remands that restrict Commerce's ability to collect and fully analyze data on a contested issue").[21] *But see* Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 68 F.3d 487 (unpublished table decision), *available at* 1995 WL 596834 * 1 (Fed. Cir. 1995) *(per curiam)* (where Court of Appeals remanded action to agency with "specific and concise" instructions for very limited remand (*i.e.*, directing agency "to

---

[21]In the terminology of Changzhou, the "contested issue" here is not Commerce's selection of the financial statements of P.T. Tifico over those of P.T. Asia Pacific. The "contested issue" here is whether Commerce is double-counting certain energy costs by including coal in the FOP database, when energy costs allegedly are already embedded in the surrogate financial ratios derived from the financial statements of P.T. Tifico. As discussed herein, Zhaoqing Tifo I left Commerce with a number of potential courses of action on remand. Moreover, as discussed herein, the court specifically declined Zhaoqing Tifo's request for limiting instructions directing Commerce to remove coal from the FOP database on remand. As such, the remand in Zhaoqing Tifo I clearly was not a limited remand. But fact that it was not a limited remand does not mean that it was unbounded. Given the specific nature of the double-counting claim set forth in Zhaoqing Tifo's Complaint, Commerce was required on remand to continue to rely on the financial statements of P.T. Tifico.

recalculate the dumping margins without [certain] deductions" on remand), criticizing "Commerce's excursion beyond the mandate of [the Court of Appeals' remand]," but nevertheless affirming agency action where the dumping margin recalculated on remand "[did] not include the prohibited deduction").

To similar ends, the Government and the Domestic Producer emphasize that, in the initial round of briefing in this case (*i.e.*, before <u>Zhaoqing Tifo I</u> issued), the relief that Zhaoqing Tifo sought was an order directing Commerce "to remove the coal energy factor from the [factors of production] database and recalculate Zhaoqing Tifo's antidumping duty margin." *See* <u>Zhaoqing Tifo I</u>, 39 CIT at ____, 60 F. Supp. 3d at 1365 (citation omitted); Def.'s Brief at 3; Def.-Int.'s Brief at 10. As the Government and the Domestic Producers note, <u>Zhaoqing Tifo I</u> declined to grant that specific relief, ruling that, in light of the procedural posture of the case at that time, such relief was "not warranted." *See* <u>Zhaoqing Tifo I</u>, 39 CIT at ____, 60 F. Supp. 3d at 1365; Def.'s Brief at 3; Def.-Int.'s Brief at 10. The Government and the Domestic Producer point to the court's decision declining to direct Commerce on remand "to remove the coal energy factor from the [factors of production] database" as support for their claim that the remand instructions authorized Commerce to do what it did in the Remand Results – *i.e.*, to revisit and re-open Commerce's decision to rely on P.T. Tifico's financial statements for purposes of the agency's Final Determination. *See* Def.'s Brief at 5; Def.-Int.'s Brief at 10-11.

However, the Government and the Domestic Producer set up a false dichotomy between a disfavored "limited remand," on the one hand, and, on the other hand, a remand permitting Commerce to reexamine the relative merits of the financial statements of P.T. Tifico and P.T. Asia Pacific. Mindful that limited remands are disfavored (and for other reasons), <u>Zhaoqing Tifo</u>

I declined to instruct Commerce "to remove the coal energy factor from the [factors of production] database" on remand.  *See* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1341 n.18.[22]  But, contrary to the implications of the Government and the Domestic Producers, the court's decision declining Zhaoqing Tifo's request for highly specific remand instructions does not – as a matter of fact and logic – automatically and necessarily mean that Zhaoqing Tifo I authorized Commerce to reconsider the selection of financial statements that the agency made in its Final Determination.  On remand, Commerce was required to continue to rely on the financial statements of P.T. Tifico – the financial statements that Commerce selected in its Final Determination, in a decision as to which no party sought judicial review.

Under Zhaoqing Tifo's reading of Zhaoqing Tifo I, there were a number of avenues open to Commerce on remand (some of which are not mutually exclusive):  For example, on remand, Commerce at least conceivably could have defended its selection and treatment of financial statements in the agency's Final Determination.  In other words, Commerce conceivably could have developed and proffered an explanation for the seeming disparity between the Final Determination's treatment of water and electricity (which Commerce removed from the FOP database in the Final Determination, due to the agency's concerns about double counting of energy inputs) *versus* the Final Determination's treatment of coal (which Commerce included in the FOP database in the Final Determination, with no explanation as to any potential double counting).  Under this option, Commerce's explanation would set forth in full, *inter alia*, the

---

[22]There is no need here to decide whether or not remand instructions directing Commerce on remand "to remove the coal energy factor from the [factors of production] database" would constitute a "limited remand," or whether such remand instructions would be "disfavored" or even improper.

basis for the agency's confidence that the inclusion of coal in the FOP database would not result in double-counting, and the agency would detail with specificity substantial record evidence to support that position.[23]

Commerce conceivably also could have reopened the administrative record on remand and sought further evidence to help clarify which energy sources (coal, water, and/or electricity) are reflected elsewhere in P.T. Tifico's financial statements (and, thus, in the agency's calculations), which, to avoid double-counting, therefore presumably would not be included in the FOP database. Commerce conceivably could have eliminated the disparity in its treatment of coal *versus* water and electricity by removing coal from the FOP database, clearly explaining that decision and anchoring that action in substantial evidence. Alternatively, Commerce conceivably could have eliminated the disparity in the treatment of coal *versus* water and electricity by including all three sources in the FOP database, clearly explaining its decision (detailing, in particular, the basis for the agency's confidence that such treatment does not result in double-counting) and rooting the agency's decision in substantial evidence.

The listing above is illustrative, not exhaustive. No doubt there were other options open to Commerce on remand that have not been catalogued here. In any event, as the listing above demonstrates, the reading that Zhaoqing Tifo gives the remand instructions in <u>Zhaoqing Tifo I</u> cannot fairly be characterized as a "limited remand." Indeed, constrained only by the applicable standard of review ("substantial evidence," "in accordance with law," and not "arbitrary and capricious"), <u>Zhaoqing Tifo I</u> essentially gave Commerce unfettered discretion on remand to do whatever the agency deemed appropriate to ascertain how to properly account for water, coal,

---

[23]*See supra* n.11.

and electricity using the financial statements of P.T. Tifico, while at the same time avoiding double-counting.

What Commerce was not permitted to do on remand was to reopen and re-review the settled issue of the agency's decision in its Final Determination to select the financial statements of P.T. Tifico – rather than those of P.T. Asia Pacific – as the basis for the surrogate financial ratios used to calculate the dumping margin for Zhaoqing Tifo.   The issue of Commerce's selection of financial statements was laid to rest in the Final Determination and, because the Domestic Producer failed to seek judicial review, the issue cannot be resurrected.

The Government and the Domestic Producer excerpt language from <u>Zhaoqing Tifo I</u> in an effort to support their broad reading of the remand instructions and their assertion that, under <u>Zhaoqing Tifo I</u>, Commerce was permitted to reconsider the selection of financial statements that it made in the agency's Final Determination.

For example, the Government reads much into the language in the conclusion section of <u>Zhaoqing Tifo I</u> which states that, "[f]or the reasons set forth above, Plaintiff's Motion for Judgment on the Agency Record must be granted and this matter remanded to the U.S. Department of Commerce *for further action not inconsistent with this opinion*."  Def.'s Brief at 7 (quoting <u>Zhaoqing Tifo I</u>, 39 CIT at ____, 60 F. Supp. 3d at 1365) (emphasis added by Defendant).   The reliance of the Government and the Domestic Producer is misplaced.   The quoted language is, in essence, "boilerplate," not a license for Commerce to do whatever it pleases on remand.  The language must be read in the broader context of the rest of <u>Zhaoqing Tifo I</u>.  Moreover, the expansive reading that the Government and the Domestic Producer give the referenced text would lead to absurd results.  Re-opening the issue of the selection of the

surrogate country, or the issue of the valuation of the cost of inland freight, would not have been "inconsistent with" Zhaoqing Tifo I.  But surely the Government and the Domestic Producer do not contend that Commerce was permitted to reconsider those issues on remand.  In actuality, it is Commerce's reopening of the issue of the selection of financial statements that is "inconsistent with" the remand instructions here.

The Government and the Domestic Producer similarly seize on the language in Zhaoqing Tifo I which "encouraged [Commerce] to reopen the administrative record on remand, to *ensure that the Remand Results are based on an appropriate record* and to allow the parties an adequate opportunity to place on the record, for the consideration of the agency, information to illuminate or clarify key points."  *See* Def.'s Brief at 7 (quoting Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1365) (emphasis added by Defendant); Def.-Int.'s Brief at 6.   However, the Government and the Domestic Producer fail to note that the "key points" listed in Zhaoqing Tifo I that were to be illuminated or clarified by reopening the record are "the energy sources that *P.T. Tifico* uses . . . , whether *P.T. Tifico* uses those energy sources for any other purpose, and how the sources are treated in *P.T. Tifico's* financial statements and in the surrogate financial ratios that Commerce derived from the financial statements."  Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1365 (emphases added).

As discussed above, the Government and the Domestic Producer also highlight the language in Zhaoqing Tifo I which declined Zhaoqing Tifo's request for "specific limiting instructions" directing the agency on remand "to remove the coal energy factor from the [factors of production] database and recalculate Zhaoqing Tifo's antidumping duty margin."  *See* Def.'s Brief at 10 (quoting Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1365); Def.-Int.'s Brief

at 10.  As explained elsewhere herein, however, the court's decision not to issue such "specific limiting instructions" is, as a matter of logic and fact, a far cry from authorizing Commerce to reopen on remand its decision on the issue of the selection of financial statements – a decision that Commerce reached in the Final Determination.

In yet another example, the Government and the Domestic Producer emphasize that Zhaoqing Tifo I directed Commerce on remand to "expressly consider any . . . potential for double counting of energy inputs."  Def.'s Brief at 9 (quoting Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1365); Def.Int.'s Brief at 10.  Again, however, the reading that the Government and the Domestic Producer suggest is at odds with the whole of Zhaoqing Tifo I and, even more importantly, Zhaoqing Tifo's claim, which is specific to the use of P.T. Tifico's financial statements, Commerce's inclusion of coal in the FOP database, and the alleged "potential for double counting of energy inputs."

The Government and the Domestic Producers cherry-pick their quotations from Zhaoqing Tifo I, reading too much into them and taking them out of context.  Reading Zhaoqing Tifo I fairly, in context, and as a whole makes plain the court's intent to have Commerce grapple on remand with the treatment of energy in the surrogate financial ratios that the agency derived from the financial statements of P.T. Tifico (which the agency itself selected for use in the Final Determination), and to analyze whether, in light of the treatment of energy in those financial statements, coal can be included in the FOP database without double-counting.  *See generally*, *e.g.*, Changzhou, 701 F.3d at 1375 (highlighting the great deference accorded a trial court's determination as to whether agency action on remand was within the scope of the court's remand order).

Lastly, the Government and the Domestic Producer argue that the issue of the relative merits of the financial statements of P.T. Tifico and P.T. Asia Pacific (*i.e.*, the matter that Commerce reopened on remand) is inextricably intertwined with the specific, narrow issue raised in Zhaoqing Tifo's Complaint – *i.e.*, the extent to which there are energy costs that are already embedded in P.T. Tifico's financial statements (and thus reflected in Commerce's surrogate financial ratios), such that Commerce's inclusion of coal in Zhaoqing Tifo's FOP database results in double-counting.  *See generally* Def.'s Brief at 6 & n.1; Def.-Int.'s Brief at 11.  If in fact the issues are inextricably intertwined, the logical extension of the argument is that Commerce was free to revisit on remand the issue of its selection of final statements without regard to the intent behind the remand ordered in <u>Zhaoqing Tifo I</u> and the language of the remand instructions, and without regard to any considerations of finality that would otherwise apply.

The Government and the Domestic Producer assert, for example, that the issue that Zhaoqing Tifo has raised (concerning the treatment of energy factors in the financial statements of P.T. Tifico and the potential for double-counting of energy factors if Commerce separately values coal) "necessarily" implicates the much broader issue of Commerce's selection of financial statements, that the two issues "cannot be divorced," and that the double-counting issue "cannot be viewed in isolation."  Def.'s Brief at 6 & n.1; Def.-Int.'s Brief at 11.

It is true that the issue that Zhaoqing Tifo has raised is related to the issue of Commerce's selection of financial statements.  However, the two issues are entirely discrete. There is – as a matter of logic – no need for Commerce to reassess the relative merits of the financial statements of P.T. Tifico and P.T. Asia Pacific in order to address the issue that Zhaoqing Tifo has raised,

Case 1:13-cv-00044-TCS   Document 111   Filed 08/30/17   Page 38 of 42

Court No. 13-00044                                                          Page 38

which is specific to P.T. Tifico – *i.e.*, whether Commerce can exclude energy costs from the

surrogate financial ratios derived from the financial statements of P.T. Tifico, such that

Commerce may separately value coal in the FOP database without double-counting.  Contrary to

the assertions of the Government and the Domestic Producer, it is entirely possible for

Commerce to analyze how P.T. Tifico's energy costs are reflected in the company's financial

statements, and the consequences that flow from that, without reopening the agency's decision to

rely on P.T. Tifico's financial statements rather than the statements of P.T. Asia Pacific for

purposes of Commerce's Final Determination.

As both Commerce and the Domestic Producer have now acknowledged, one simple,

straightforward way to avoid double counting while relying on P.T. Tifico's financial statements

would be to exclude coal from the FOP database.  Commerce and the Domestic Producer may be

dissatisfied with such a "fix."  They posit that such an approach may under-value Zhaoqing

Tifo's energy costs.[24]  But the point is that, contrary to the assertions of the Government and the

---

[24]Contrary to the implications of the Government and the Domestic Producer, such an approach would not omit energy from Commerce's calculation of Zhaoqing Tifo's dumping margin.  As Zhaoqing Tifo notes, the energy expenses would be embedded in P.T. Tifico's financial statement and the financial ratios derived from those statements.  *See generally* Pl.'s Brief at 10.  Further, although Commerce may prefer to do things otherwise, Zhaoqing Tifo notes that, in other cases, Commerce has excluded energy from the FOP database because the financial statements on which the agency relied did not break out energy costs – the result that Zhaoqing Tifo seeks here.  *See id*. at 11-12.

Zhaoqing Tifo justifiably also takes issue with Commerce's assertion in the Remand Results that the use of P.T. Tifico's financial statements "would result in a less accurate antidumping duty margin calculation as significant production costs would not be captured in normal value."  *See* Remand Results at 9-10; Pl.'s Brief at 11-12.  As explained immediately above, there is no truth to the assertion that any costs – much less "*significant* production costs" – would be missing if Commerce relies on the financial statements of P.T. Tifico.  Moreover, Commerce's assertion that a dumping margin based on the financial statements of P.T. Tifico

Domestic Producer, Commerce in fact can – and, indeed, must – respond to Zhaoqing Tifo's concern about double-counting without resorting to financial statements other than those of P.T. Tifico.

Even assuming that, if the issue of the selection of financial statements were before it today, Commerce would reverse its earlier decision and choose P.T. Asia Pacific's financial statements rather than those of P.T. Tifico, that fact is of no moment and no relevance to the task that now confronts Commerce.  Because no party sought judicial review of Commerce's selection of P.T. Tifico's financial statements in the Final Determination, Commerce now must focus solely on P.T. Tifico's financial statements, to the exclusion of all others.  Commerce now must consider the treatment of energy costs in P.T. Tifico's financial statements and must ascertain whether it is possible to identify and exclude those costs from the statements so that the agency may instead include coal in the FOP database without double-counting.

If Commerce ultimately concludes, whether on the existing administrative record or on an expanded record, that it cannot identify and extract energy costs from P.T. Tifico's financial statements, or if Commerce ultimately concludes that energy costs are not reflected in the surrogate financial ratios derived from P.T. Tifico's financial statements but Commerce cannot support that conclusion with a reasoned explanation and substantial evidence, the remedy is not that Commerce goes back to the drawing board and selects another, more detailed set of financial statements (as the agency did on remand here).

---

would be "less accurate" than a margin based on the statements of P.T. Asia Pacific is unsupportable on the existing record.  On the existing record, one can say that a dumping margin based on the financial statements of P.T. Asia Pacific would be *higher* than one based on the statements of P.T. Tifico.  But it is logically impossible, based on the existing record, to say that one would be "*less accurate*" than the other.

For purposes of its Final Determination in the administrative review that is the subject of this case, Commerce selected the financial statements of P.T. Tifico and valued coal separately in the FOP database.   Finality attached to Commerce's selection of P.T. Tifico's financial statements when no party challenged that selection in litigation.   That ship has sailed.   In contrast, raising concerns about the potential for double-counting, Zhaoqing Tifo has timely challenged Commerce's decision in the Final Determination to value coal separately in the FOP database while relying on P.T. Tifico's financial statements.   If Commerce cannot establish – by substantial evidence – that, given its decision to rely on P.T. Tifico's financial statement, the inclusion of coal in the FOP database does not result in double-counting, Commerce apparently will have no choice but to remove coal from the database – the very outcome that the Domestic Producer explicitly warned Commerce about before Commerce issued its Final Determination.

As discussed above, Zhaoqing Tifo's double-counting claim concerns only the financial statements of P.T. Tifico (and the surrogate financial ratios derived from them) and only to the extent that they bear on any potential for double-counting inherent in Commerce's treatment of energy costs for purposes of calculating Zhaoqing Tifo's dumping margin and its inclusion of coal in the FOP database.   There is no merit to the assertions of the Government and the Domestic Producer that the issue of the selection of financial statements cannot be severed from Zhaoqing Tifo's double-counting claim.   Given the specific nature of Zhaoqing Tifo's double-counting claim, there simply is no scenario in which Commerce would have cause to resort to reconsidering the relative merits of the financial statements of P.T. Tifico and P.T. Asia Pacific. The Remand Results exceeded the scope of the remand.

### C.   A Second Remand to Commerce

Because the Remand Results exceeded the scope of the remand ordered in <u>Zhaoqing Tifo</u> <u>I</u>, this matter must be remanded to Commerce once again, to permit the agency to reconsider its inclusion of coal in the FOP database in the Final Determination, in light of its use of financial ratios derived from the financial statements of P.T. Tifico, and to expressly consider any associated potential for double counting of energy inputs, explaining its reasoning fully and with reference to the record evidence.   Commerce is once again encouraged to give careful consideration to whether it might be helpful to reopen the administrative record on remand (for example, to receive any additional evidence (such as expert opinions) concerning how energy expenses are treated in the financial statements of P.T. Tifico, or any other evidence bearing on whether or not the use of surrogate financial ratios derived from the financial statements of P.T. Tifico, in tandem with the inclusion of coal in the FOP database, results in double-counting).

### IV.   **Conclusion**

Because the Remand Results exceeded the scope of the remand ordered in <u>Zhaoqing Tifo</u> <u>I</u>, this matter must be remanded to Commerce once again, to permit the agency to reconsider how the surrogate financial ratios that it derived from P.T. Tifico's financial statements account for energy sources and whether the inclusion of coal in the FOP database results in double-counting. In its redetermination on remand, Commerce shall explain its reasoning fully and with reference to substantial evidence in the administrative record.

A separate order will enter accordingly.


                                              /s/ Delissa A. Ridgway
                                            _____
                                              Delissa A. Ridgway
                                                    Judge


Dated:  August 30, 2017
           New York, New York