Slip Op. 18-168

UNITED STATES COURT OF INTERNATIONAL TRADE

---

ZHAOQING TIFO NEW FIBRE CO., LTD., :

           *Plaintiff*, :

    v. :

UNITED STATES, :

           *Defendant*, :

    and :

DAK AMERICAS LLC, :

           *Defendant-Intervenor*. :

Court No. 13-00044

---

[Sustaining Second Remand Results]

Dated: November 30, 2018

    Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, D.C., on the brief.

    Mollie L. Finnan, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington D.C., on the brief, together with Chad A. Readler, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Brandon J. Custard, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

    Paul C. Rosenthal, Kelley Drye & Warren LLP, of Washington D.C., on the brief, together with David C. Smith.

# OPINION

RIDGWAY, JUDGE:

    In this action, Plaintiff Zhaoqing Tifo New Fibre Co., Ltd. ("Zhaoqing Tifo") – a Chinese

producer and exporter of polyester staple fiber – has contested the Final Determination of the U.S.

Department of Commerce ("Commerce") in the fourth administrative review of the 2007

antidumping duty order on polyester staple fiber from the People's Republic of China.[1]   *See*

*generally* Certain Polyester Staple Fiber From the People's Republic of China: Final Results of

Antidumping Duty Administrative Review; 2010-2011, 78 Fed. Reg. 2366 (Jan. 11, 2013) ("Final

Determination")[2]; Issues and Decision Memorandum for the Final Results of the 2010-2011

Administrative Review (Jan. 4, 2013) (Pub. Doc. No. 108) ("Issues & Decision Memorandum")[3];

---

[1]As Zhaoqing Tifo I notes, polyester staple fiber is generally used as stuffing in sleeping bags, mattresses, ski jackets, comforters, cushions, pillows, and furniture. *See* Zhaoqing Tifo New Fibre Co. v. United States, 39 CIT ____, ____, 60 F. Supp. 3d 1328, 1334 (2015) ("Zhaoqing Tifo I").

[2]Antidumping duty investigations (*i.e.*, "original" investigations) determine in the first instance whether the elements necessary for the imposition of an antidumping duty exist.  The statute also provides for periodic (typically, annual) administrative reviews of antidumping duty orders (initiated at the request of an interested party), to update the applicable antidumping duty rate. *See generally* Zhaoqing Tifo I, 39 CIT at ____ n.7, 60 F. Supp. 3d at 1334 n.7 (and authorities cited there).  This action contests specific aspects of the results of such an administrative review.

[3]Because this action has been remanded to Commerce twice, three administrative records have been compiled – the initial administrative record (comprised of the information on which the agency's Final Determination was based), the supplemental administrative record compiled during the course of the first remand, and the second supplemental administrative record compiled during the course of the most recent (second) remand.

Each of the three administrative records includes confidential (*i.e.*, business proprietary) information.  Therefore, two versions of each of the records – a public version and a confidential version – were filed with the court.  The public versions of each of the administrative records consist of copies of all public documents in the record, as well as public versions of confidential documents with all confidential information redacted.  The confidential versions consist of complete, un-redacted copies of only those documents that include confidential information.  The numbering of the public versions of documents differs from the numbering of the confidential versions.

All citations to the administrative records herein are to the public versions, which are cited as "Pub. Doc. No. ____," "Supp. Pub. Doc. No. ____," or "Second Supp. Pub. Doc. No. ____," as appropriate.

Zhaoqing Tifo New Fibre Co. v. United States, 39 CIT ____, 60 F. Supp. 3d 1328 (2015)

("Zhaoqing Tifo I"); Zhaoqing Tifo New Fibre Co. v. United States, 41 CIT ____, 256 F. Supp.

3d 1314 (2017) ("Zhaoqing Tifo II").

     In the relevant counts of its Complaint, Zhaoqing Tifo charges that the dumping margin

calculated by Commerce in its Final Determination "double counts" certain energy costs.[4]  The

Complaint states that those costs are reflected in the surrogate financial ratios that Commerce

derived from the financial statements of P.T. Tifico Fiber Indonesia Tbk ("P.T. Tifico") (on which

the Final Determination relied) but then are counted again elsewhere in the agency's calculations

(specifically, in the factors of production database ("FOP database")).  Zhaoqing Tifo contends

that its dumping margin is therefore inflated.  *See* Complaint, Counts I-III; *see also*, *e.g.*, Zhaoqing

Tifo I, 39 CIT at ____, ____ n.16, 60 F. Supp. 3d at 1333, 1339 n.16.  Zhaoqing Tifo does not

contest Commerce's selection of P.T. Tifico's financial statements; in fact, that is the result for

---

[4]The Second Remand Results refer repeatedly to "the Court's concern" about double-counting.  *See* Second Remand Results at 2-3, 5, 6, 9.  However, the issue of double-counting was not raised *sua sponte* by the court.  Double-counting is the very essence of the claim at issue here, as set forth in Zhaoqing Tifo's Complaint.  Moreover, as the Second Remand Results acknowledge, Commerce itself avoids double-counting, as a matter of sound policy.  *See* Second Remand Results at 6 (referring to "the Department's . . . concern for double counting of energy inputs"); *see also* Final Determination, 78 Fed. Reg. at 2367 (stating that Commerce "did not separately value electricity and water in the final margin program because [they] are already captured in the surrogate financial ratios"); Issues & Decision Memorandum at 11 (noting that, "in order to prevent double counting" of water and electricity expenses, the Final Results "placed all electricity and water costs into the [manufacturing/factory] overhead numerator" and removed electricity and water costs from the factors of production database); First Remand Results at 2-3 (noting that proposed use of P.T. Asia's more detailed financial statements allowed Commerce to "avoid any potential double counting"); Zhaoqing Tifo I, 39 CIT at ____ n.6, 60 F. Supp. 3d at 1333 n.6 (and authorities cited there) (surveying caselaw and administrative policy establishing that, as a general rule, double counting is not permitted in antidumping margin calculations); Zhaoqing Tifo II, 41 CIT at ____ n.8, 256 F. Supp. 3d at 1339 n.8 (similar).

which Zhaoqing Tifo advocated at the administrative level.  The gravamen of Zhaoqing Tifo's claim is that – to avoid double-counting – energy expenses must be excluded from the FOP database, because those expenses are already embedded in the financial ratios that Commerce derived from the financial statements of P.T. Tifico.

Because the Final Determination failed to address Zhaoqing Tifo's double counting claim, Zhaoqing Tifo I remanded the matter to Commerce, to permit the agency to analyze whether energy costs are already reflected in the surrogate financial ratios that the agency derived from the financial statements of P.T. Tifico, such that the agency's inclusion of coal in the FOP database results in double-counting.  *See* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1361-65.

In the First Remand Results, filed pursuant to Zhaoqing Tifo I, Commerce reopened the decision that it made in its Final Determination concerning the selection of financial statements, abandoning its selection of the financial statements of P.T. Tifico.  In lieu of the financial statements of P.T. Tifico, Commerce substituted an entirely different set of financial statements – the financial statements of P.T. Asia Pacific – because those statements are more detailed and, in particular, break out energy costs.  In the First Remand Results, using P.T. Asia Pacific's financial statements, Commerce excluded energy costs from the surrogate financial ratios and included them in the FOP database, thus accounting for energy costs but avoiding double counting.  *See generally* Final Results of Redetermination Pursuant to Court Remand at 2, 5-10, 18 (Supp. Pub. Doc. No. 5) ("First Remand Results").

Zhaoqing Tifo II concluded that, because the broad issue of Commerce's selection of financial statements was never appealed to this Court, finality attached to that aspect of Commerce's Final Determination, and that the agency therefore lacked the authority to revisit the

issue and to select a different set of financial statements on remand.  Thus, as <u>Zhaoqing Tifo II</u>

explained, the First Remand Results not only exceeded the scope of the remand ordered in

<u>Zhaoqing Tifo I</u>, but, in addition and even more fundamentally, the First Remand Results were

beyond the scope of Zhaoqing Tifo's Complaint and, as such, beyond the scope of this litigation.

*See generally* <u>Zhaoqing Tifo II</u>, 41 CIT at ____, 256 F. Supp. 3d at 1326-31.

Now pending are Commerce's Second Remand Results, in which Commerce has derived

the surrogate financial ratios using the financial statements of P.T. Tifico.   Commerce

acknowledges that energy costs are embedded in the surrogate financial ratios derived from those

financial statements.  Commerce therefore has excluded the costs of energy (including coal) from

the FOP database, to avoid double-counting energy expenses.  *See generally* Final Results of

Redetermination Pursuant to [Second] Court Remand at 2-3, 6-7, 8-9 (Second Supp. Pub. Doc.

No. 7) ("Second Remand Results").

Although Commerce has filed the Second Remand Results "under protest," no party

contests those results.  *See* Second Remand Results at 2-3, 6, 8-9 (noting that Second Remand

Results are filed under protest); Zhaoqing Tifo Comments on Remand Redetermination II Pursuant

to Slip Op. 17-118 ("Pl.'s Brief"); Defendant-Intervenor's Comments on the Commerce

Department's Second Remand Determination ("Def.-Int.'s Brief"); Defendant's Response to

Comments on the Second Remand Results ("Def.'s Brief").

Jurisdiction lies under 28 U.S.C. § 1581(c) (2006).[5]  For the reasons set forth below,

Commerce's determination in the Second Remand Results must be sustained.

---

[5]All citations to statutes herein are to the 2006 edition of the United States Code.  The pertinent statutory text remained the same at all relevant times.

# I.  **Background**

An overview of the relevant statutory scheme, including citations to the statute and other pertinent authorities, is set forth in <u>Zhaoqing Tifo I</u>.  *See* <u>Zhaoqing Tifo I</u>, 39 CIT at \_\_\_\_, 60 F. Supp. 3d at 1332-33.  That explanation, together with other relevant background information, is summarized below, for the sake of convenience and completeness.

As <u>Zhaoqing Tifo I</u> explained, in calculating dumping margins for respondents in non-market economy countries, Commerce generally determines the normal value of the merchandise at issue based on the value of the factors of production ("FOPs") that are used to produce that merchandise in a surrogate market economy country selected by Commerce ("the surrogate country").  *See* <u>Zhaoqing Tifo I</u>, 39 CIT at \_\_\_\_, 60 F. Supp. 3d at 1332 (and authorities cited there).  Under 19 U.S.C. § 1677b(c)(3), the factors of production to be valued "include, but are not limited to – (A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."

However, valuing the factors of production consumed in producing the merchandise at issue does not capture certain items such as (1) manufacturing/factory overhead, (2) selling, general, and administrative expenses ("SG&A"), and (3) profit.  Commerce calculates surrogate values for those items using ratios – known as "surrogate financial ratios" – that the agency derives from the financial statements of one or more companies that produce identical (or at least comparable) merchandise in the relevant surrogate market economy country.  *See* <u>Zhaoqing Tifo I</u>, 39 CIT at \_\_\_\_, 60 F. Supp. 3d at 1333 (and authorities cited there).  This surrogate value analysis

is designed to determine a producer's costs of production as if the producer operated in a hypothetical market economy. *See id.*, 39 CIT at ____, 60 F. Supp. 3d at 1332-33 (and authorities cited there).

Zhaoqing Tifo's claim here is that there are certain energy costs that are embedded in the surrogate financial ratios that Commerce derived from the financial statements of P.T. Tifico and then used in the agency's Final Determination that are also included elsewhere in the agency's antidumping calculations (specifically, in the FOP database).[6]  Zhaoqing Tifo argues that this results in the "double counting" of energy costs and inflates Zhaoqing Tifo's dumping margin.[7]

---

[6]As Zhaoqing Tifo I noted, Zhaoqing Tifo consumes coal in its production of polyester staple fiber.  However, it appears that P.T. Tifico and P.T. Asia Pacific use natural gas. Accordingly, although some of the parties' papers have referred to the "double counting of coal," it is more accurate (depending on the context) to refer to the double counting of "energy inputs" (or "energy sources" or "energy factors").  *See* Zhaoqing Tifo I, 39 CIT at ____ n.16, 60 F. Supp. 3d at 1339 n.16 (and authorities cited there).

[7]As Zhaoqing Tifo I explained, the case law holds that, as a general rule, double counting is not permitted in antidumping calculations, because it is distortive, rendering dumping margins less accurate.  *See* Zhaoqing Tifo I, 39 CIT at ____ n.6, 60 F. Supp. 3d at 1333 n.6 (and authorities cited there).

Commerce's administrative determinations are to the same general effect.  *See* Zhaoqing Tifo I, 39 CIT at ____ n.6, 60 F. Supp. 3d at 1333 n.6 (citing Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Multilayered Wood Flooring from the People's Republic of China (Oct. 11, 2011) at 20 (Comment 2) (stating that "[i]t is [Commerce's] longstanding practice to avoid double-counting costs where the requisite data are available to do so" (emphasis omitted) (citation omitted))).

No party contends that it would be permissible in this case for Commerce both to use the financial ratios derived from P.T. Tifico's financial statements (in which energy expenses are embedded) and to also include energy expenses in the FOP database.  No party contends that double-counting the cost of energy inputs in calculating Zhaoqing Tifo's dumping margin would be permissible.

As Zhaoqing Tifo I noted, in Commerce's Preliminary Determination here, Commerce selected Indonesia as the surrogate country and, in calculating surrogate financial ratios, relied on the financial statements of P.T. Asia Pacific, an Indonesian producer of polyester staple fiber. Commerce based its selection of P.T. Asia Pacific in part on its understanding at that time that P.T. Asia Pacific "shares the same level of integration as Zhaoqing Tifo." *See* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1336 (quoting Certain Polyester Staple Fiber From the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review, 77 Fed. Reg. 39,990, 39,991-93, 39,995 (July 6, 2012) ("Preliminary Determination")).

In general, Commerce prefers to include in the FOP database the cost of energy inputs consumed in production, when such costs can be identified and excluded from the surrogate financial ratios derived from the financial statements that the agency selected. *See*, *e.g.*, Second Remand Results at 6, 8; Defendant's Response to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record at 18 (and authorities cited there) (summarizing rationale for preference). P.T. Asia Pacific's financial statements are relatively detailed and include separate line items for that company's energy inputs. In Commerce's Preliminary Determination, the agency therefore was able to exclude all energy costs from the surrogate financial ratios that it derived from P.T. Asia Pacific's financial statements, and to value all of Zhaoqing Tifo's energy inputs – coal, electricity, and water – separately, in the FOP database, with no concerns about double counting. *See* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1336 (and authorities cited there).

In the administrative case brief that it filed with Commerce following the Preliminary Determination, Zhaoqing Tifo argued that the operations of P.T. Asia Pacific are much more highly integrated than those of Zhaoqing Tifo, and that it was therefore not appropriate for Commerce to

rely on P.T. Asia Pacific's financial statements in calculating surrogate financial ratios. Zhaoqing Tifo characterized itself as more comparable to P.T. Tifico – an Indonesian producer of polyester fiber which, according to Zhaoqing Tifo, has "less integrated, less complex, production operations." As such, Zhaoqing Tifo argued that Commerce should use the financial statements of P.T. Tifico in the agency's Final Determination. *See generally* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1336-37 (and authorities cited there, including, *inter alia*, Zhaoqing Tifo's Administrative Case Brief (Pub. Doc. No. 94)).

The Domestic Producer filed a rebuttal brief responding to Zhaoqing Tifo's case brief. There, the Domestic Producer argued that, in calculating surrogate financial ratios, Commerce's Final Determination should continue to rely on the financial statements of P.T. Asia Pacific that Commerce had used in the Preliminary Determination. The Domestic Producer argued that Zhaoqing Tifo "ha[d] not demonstrated that [the] difference in integration levels actually exists" and that, in any event, any differences between the levels of integration of Zhaoqing Tifo and P.T. Asia Pacific are "trivial." *See generally* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1337-38 (and authorities cited there, including, *inter alia*, Domestic Producer's Administrative Rebuttal Brief (Pub. Doc. No. 101), quoted above).

In addition, the Domestic Producer's rebuttal brief emphasized that the financial statements of P.T. Tifico are less "complete and detailed" than those of P.T. Asia Pacific – a consideration that the Domestic Producer deemed "more critical" than any differences in the levels of integration of the companies' operations. In particular, the Domestic Producer expressly and specifically cautioned Commerce that, because P.T. Tifico's financial statements "include[] *no separate breakout* of [P.T. Tifico's] energy costs," Commerce's use of P.T. Tifico's financial statements in

the Final Determination would require the agency to "place all potential energy costs into the

[manufacturing/factory] overhead numerator" in the surrogate financial ratios and to "turn off all

company-specific energy and water consumption factors, in order to capture all costs while also

preventing double-counting."   In short, the Domestic Producer told Commerce flatly and

unequivocally that – if Commerce used the financial statements of P.T. Tifico in the Final

Determination to derive surrogate financial ratios – Commerce would have no choice but to

remove coal from the FOP database in order to avoid double counting, because the lack of detail

in P.T. Tifico's financial statements would make it impossible for the agency to identify and

exclude energy expenses from the surrogate financial ratios.  *See generally* Zhaoqing Tifo I, 39

CIT at ____, 60 F. Supp. 3d at 1338 (and authorities cited there, including the Issues & Decision

Memorandum, and Domestic Producer's Administrative Rebuttal Brief, quoted above).

    In its Final Determination, Commerce reversed course.  Rather than relying on P.T. Asia

Pacific's financial statements (as Commerce had in the Preliminary Determination), Commerce

used the financial statements of P.T. Tifico to derive the surrogate financial ratios.  In the words

of the Final Determination, Commerce concluded that P.T. Tifico's "less integrated and less

complex production operations are more comparable to Zhaoqing Tifo's than those of P.T. Asia

Pacific."  *See generally* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1338 (and authorities

cited there, including the Issues & Decision Memorandum, quoted above).

    The Final Determination acknowledged the Domestic Producer's admonition regarding the

lack of detail in P.T. Tifico's financial statements, noting that P.T. Tifico's statements "do[] not

include a separate breakout of [P.T. Tifico's] costs for electricity and water."  Therefore, "in order

to prevent double counting," Commerce in its Final Determination "placed all electricity and water

costs into the [manufacturing/factory] overhead numerator" (*i.e.*, included electricity and water in the surrogate financial ratios) and removed from the FOP database the "electricity and water consumption factors" that the agency had included in the database for purposes of the Preliminary Determination.  *See* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1338-39 (and authorities cited there, including the Issues & Decision Memorandum, and Domestic Producer's Administrative Rebuttal Brief, quoted above).

However, Commerce's Final Determination inexplicably left coal in the FOP database. Commerce gave no rationale as to why concerns about double counting – which led the agency to exclude water and electricity from the FOP database in the Final Determination – did not similarly compel the exclusion of coal.  Nor did Commerce address the Domestic Producer's statement that using P.T. Tifico's financial statements would require Commerce to remove coal from the FOP database, in order to avoid double-counting.  *See* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1339 (and authorities cited there, including the Issues & Decision Memorandum).

Zhaoqing Tifo appealed, alleging, *inter alia*, that Commerce's Final Determination double-counts certain energy expenses.  Specifically, Zhaoqing Tifo contends that Commerce's inclusion of coal in the FOP database in the Final Determination results in double-counting, and is unsupported by substantial evidence, contrary to law, and arbitrary and capricious, because energy costs are already reflected in the surrogate financial ratios that Commerce derived from the financial statements of P.T. Tifico.  *See* Complaint, Counts I-III.

No party sought judicial review of Commerce's selection of financial statements (*i.e.*, Commerce's decision to select the financial statements of P.T. Tifico rather than those of P.T. Asia Pacific) for use in the Final Determination.

Because Zhaoqing Tifo favored, and successfully advocated for, Commerce's use of P.T. Tifico's financial statements in the Final Determination, Zhaoqing Tifo's Complaint does not contest Commerce's selection of financial statements.  Zhaoqing Tifo's double-counting claim is much more narrow, much more specific, and much more refined.  Taking (accepting) Commerce's decision selecting P.T. Tifico's financial statements in the Final Determination as a given, the claim in Zhaoqing Tifo's Complaint is that, if energy expenses cannot be isolated and excluded from the surrogate financial ratios that Commerce derived from P.T. Tifico's statements, then coal expenses must be excluded from the FOP database in order to avoid double counting.  *See* Complaint, Counts I-III.

The Domestic Producer intervened in the instant action.  The Domestic Producer could have filed its own action, to challenge Commerce's selection of financial statements in the Final Determination – *i.e.*, Commerce's decision to use the financial statements of P.T. Tifico, rather than those of P.T. Asia Pacific (which the Domestic Producer had consistently favored).  As summarized above, the Domestic Producer had pressed Commerce to use the more detailed financial statements of P.T. Asia Pacific in the Final Determination.  The Domestic Producer had expressly cautioned Commerce that use of P.T. Tifico's financial statements would require the agency to exclude energy expenses (including coal) from the FOP database in order to avoid double counting, because the agency would find it impossible to isolate and exclude energy expenses from P.T. Tifico's statements.  Commerce failed to heed the Domestic Producer's warnings.  Nevertheless, for whatever reason, the Domestic Producer elected not to seek judicial review of Commerce's selection of financial statements – *i.e.*, Commerce's decision to use the financial statements of P.T. Tifico in the agency's Final Determination, rather than the more

detailed statements of P.T. Asia Pacific.  The Domestic Producer thus waived the issue as Commerce's selection of financial statements went unchallenged.

The briefing by the Government and the Domestic Producer that preceded Zhaoqing Tifo I focused almost exclusively on whether or not Zhaoqing Tifo had exhausted its double-counting claim at the administrative level.  Zhaoqing Tifo I concluded that – for any of a number of different reasons -- the doctrine of exhaustion of administrative remedies does not bar Zhaoqing Tifo's claim.  *See generally* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1343-59.

As to the merits of Zhaoqing Tifo's claim, Zhaoqing Tifo I found no indication in the Final Determination that Commerce had considered whether both using surrogate financial ratios derived from P.T. Tifico's financial statements and separately valuing coal in the FOP database resulted in the double-counting of energy costs.  *See generally* Zhaoqing Tifo I, 39 CIT at ____, 60 F. Supp. 3d at 1361-65.  Nor does the Final Determination offer any explanation as to why Commerce there excluded water and electricity from the FOP database to avoid double-counting, but left coal in the database.  *Id*., 39 CIT at ____, 60 F. Supp. 3d at 1364-65 (stating that "the Issues and Decision Memorandum . . . give[s] no indication whether Commerce ever considered the potential for double counting of energy inputs other than electricity and water, much less the rationale for any determination on that issue.  Commerce's explanation is not merely thin; it is non-existent.").

Zhaoqing Tifo I therefore remanded this matter to Commerce, to allow the agency to determine whether – as Zhaoqing Tifo contends – energy expenses are embedded in the surrogate financial ratios derived from P.T. Tifico's financial statements, such that Commerce's inclusion of coal in the FOP database results in double counting in the Final Determination, and, in addition,

to allow the agency, if appropriate, to explain the disparity in its treatment of water and electricity *versus* coal.   Notably, <u>Zhaoqing Tifo I</u> encouraged Commerce to consider reopening the administrative record on remand, observing that additional information could be placed on the record to illuminate relevant points concerning P.T. Tifico's financial statements.   <u>Zhaoqing Tifo I</u>, 39 CIT at _____, 60 F. Supp. 3d at 1365 (emphasis added).   <u>Zhaoqing Tifo I</u>'s remand instructions said nothing about revisiting the already-settled issue of the selection of financial statements.   Nor did those remand instructions refer to the use of any financial statements other than those of P.T. Tifico.

Notwithstanding the remand instructions in <u>Zhaoqing Tifo I</u>, Commerce's first remand did not address Zhaoqing Tifo's claim, which is confined to the use of P.T. Tifico's financial statements, the inclusion of coal in the FOP database, and the alleged resulting double-counting of energy expenses.   Instead, Commerce reopened the broad issue of the selection of financial statements as a whole – an issue that Commerce had decided in the Final Determination and which was not challenged by any party in this litigation.   Just as Commerce used the financial statements of P.T. Asia Pacific in its Preliminary Determination, but then used P.T. Tifico's statements for the Final Determination, Commerce flip-flopped once again in the First Remand Results.   In the First Remand Results, Commerce reverted back to the financial statements of P.T. Asia Pacific – the same statements on which the agency had relied in its Preliminary Determination.   *See* First Remand Results at 2, 9-10.

In effect, the First Remand Results did not reconsider Commerce's decision in the Final Determination to leave coal in the FOP database notwithstanding the double-counting that allegedly resulted from Commerce's asserted inability to exclude energy expenses from the

financial ratios that the agency derived from P.T. Tifico's financial statements.  Rather, in the First

Remand Results, Commerce reconsidered a different decision from the Final Determination:  *i.e.*,

Commerce's decision to select the financial statements of P.T. Tifico for the surrogate financial

ratios over those of P.T. Asia Pacific.

The First Remand Results did not directly address why Commerce on remand did not focus

specifically on P.T. Tifico's financial statements and related surrogate financial ratios from the

Final Determination, in order to determine whether it is possible to isolate and exclude energy

expenses.  Like the Final Determination, the First Remand Results also ignored the disparate

treatment of water and electricity *versus* coal in the Final Determination, where Commerce relied

on the financial statements of P.T. Tifico and removed water and electricity from the FOP database

for the professed purpose of avoiding double counting, but inexplicably left coal in the database.

Similarly, the First Remand Results gave no indication as to whether Commerce had conducted a

considered analysis of the matter and had concluded that using P.T. Tifico's financial statements

while including coal in the FOP database in fact results in double-counting.

Reopening the issue of the selection of financial statements, the First Remand Results once

again reviewed the pros and cons of all of the financial statements on the administrative record,

and quickly narrowed the field to the statements of P.T. Tifico and those of P.T. Asia Pacific (much

like Commerce's Final Determination).  *See* First Remand Results at 5-6.  As between those two,

the First Remand Results revisited Commerce's earlier analysis of the relative levels of integration

of Zhaoqing Tifo (on the one hand) and P.T. Tifico and P.T. Asia Pacific (on the other) – another

decision made by Commerce in the Final Determination that no party challenged in litigation.  The

First Remand Results attributed Commerce's "about-face" – its selection of the financial

statements of P.T. Asia Pacific, rather than those of P.T. Tifico – to an asserted error on the part

of the agency in the Final Determination's analysis of the broad issue of the selection of financial

statements.  *See generally id.* at 7-9.

According to the First Remand Results, "[u]pon reexamination of both financial

statements," Commerce found that it had "erred [in the Final Determination] in evaluating the

similarities between Zhaoqing Tifo and P.T. Tifico on one hand, and the dissimilarity between

P.T. Tifico and P.T. Asia Pacific on the other hand in terms of the level of integration."  First

Remand Results at 7.  In its Final Determination, Commerce had based its decision to select the

financial statements of P.T. Tifico over those of P.T. Asia Pacific in large measure on Commerce's

conclusion that P.T. Asia Pacific is significantly more highly integrated than P.T. Tifico.  *See*

Issues & Decision Memorandum at 10-11.   However, the First Remand Results stated that

Commerce's re-review of the record evidence in the course of the remand did not support the Final

Determination's finding that "there is a meaningful difference in the level of integration between

these two potential surrogate companies [*i.e.*, P.T. Tifico and P.T. Asia Pacific], such that level of

integration would be the deciding factor in determining which statement represents the best

available information."  First Remand Results at 8-9.[8]

---

[8]For a summary of Commerce's analysis of levels of integration in the First Remand Results, *see* <u>Zhaoqing Tifo II</u>, 41 CIT at ____ & n.10, 256 F. Supp. 3d at 1323-25 & n.10.

As <u>Zhaoqing Tifo II</u> observed, there can be no suggestion that Commerce was misled as to the relevant facts in reaching its Final Determination.  With respect to the errors that the agency alleges it made in the Final Determination concerning the relative levels of integration of Zhaoqing Tifo, P.T. Tifico, and P.T. Asia Pacific, Commerce already had all of the information before it at the time it reached its Final Determination.   No new information was submitted between Commerce's issuance of its Final Determination and its issuance of the First Remand Results.  If Commerce did not know the relevant facts at the time of the Final Determination, it could – and

In the First Remand Results, Commerce further decided that, if the choice between the financial statements of P.T. Tifico and P.T. Asia Pacific was no longer driven by the relative levels of integration of the three companies, the decisive factor would be the level of detail reflected in the financial statements. The First Remand Results noted that P.T. Tifico's financial statements do not include a separate breakout of the company's energy expenses, such that – if the agency were to select P.T. Tifico's statements for purposes of deriving surrogate financial ratios – Commerce would be required to exclude coal from the FOP database in order to avoid double-counting, because energy costs would be embedded in the financial ratios. In the First Remand Results, Commerce therefore selected P.T. Asia Pacific's financial statements, which are more detailed and include line item breakouts for energy expenses (among others). That level of detail allowed Commerce to exclude energy from the surrogate financial ratios and to instead value it separately in the FOP database, without double-counting. *See generally* First Remand Results at 2, 9-10.

Commerce's use of P.T. Asia Pacific's financial statements in the First Remand Results significantly increased Zhaoqing Tifo's dumping margin. The Final Determination calculated Zhaoqing Tifo's dumping margin as 9.98%, using the financial statements of P.T. Tifico to derive surrogate financial ratios and removing water and electricity from the FOP database (because those costs were subsumed in the financial ratios), but leaving coal in the database. Zhaoqing Tifo's dumping margin jumped to 25.56% in the First Remand Results, where Commerce used the financial statements of P.T. Asia Pacific, rather than those of P.T. Tifico.

---

should – have known them. *See generally* <u>Zhaoqing Tifo II</u>, 41 CIT at ____ n.10, 256 F. Supp. 3d at 1325 n.10.

Reviewing the First Remand Results, _Zhaoqing Tifo II_ explained that Commerce was not permitted to use the financial statements of P.T. Asia Pacific, because the agency's decision to use P.T. Tifico's financial statements in the Final Determination became final when no party sought judicial review of that decision. _Zhaoqing Tifo II_ therefore concluded that the First Remand Results exceeded the scope of the remand instructions in _Zhaoqing Tifo I_, and more importantly, the scope of this litigation. _See_ _Zhaoqing Tifo II_, 41 CIT at ____, 256 F. Supp. 3d at 1326-31 (analyzing the First Remand Results in the context of the scope of this litigation, in light of specific claim set forth in Zhaoqing Tifo's Complaint); _see also id._, 41 CIT at ____, 256 F. Supp. 3d at 1331-38 (analyzing the First Remand Results in the context of the scope of the remand instructions in _Zhaoqing Tifo I_). This matter was remanded to Commerce for a second time "to permit the agency to reconsider how the surrogate financial ratios that it derived from P.T. Tifico's financial statements account for energy sources and whether the inclusion of coal in the FOP database results in double-counting." _Id._, 41 CIT at ____, 256 F. Supp. 3d at 1338. Again, Commerce was encouraged to reopen the administrative record to afford the agency and the parties to place relevant evidence on the record that might help break down P.T. Tifico's financial statements as to energy, providing greater detail and at least conceivably permitting Commerce to exclude energy costs from the surrogate financial ratios derived from P.T. Tifico's financial statements, such that energy expenses could be included in the FOP database (as Commerce and the Domestic Producer urge). _Id._, 41 CIT at ____, 256 F. Supp. 3d at 1337-38.

In the pending Second Remand Results, which Commerce has filed "under protest," Commerce has used the financial statements of P.T. Tifico to derive surrogate financial ratios, as it did in the Final Determination. However, because the costs of energy (including coal) are

embedded in the surrogate financial ratios, Commerce has excluded those costs from the FOP

database to avoid double-counting. *See* Second Remand Results at 2-3. Once again, Commerce

elected not to reopen the administrative record. *Id*., *passim*. The Second Remand Results revise

Zhaoqing Tifo's dumping margin to zero. *Id.* at 9.

## II. Standard of Review

In reviewing a remand determination by Commerce in an antidumping duty case, the

agency's determination must be upheld except to the extent that it is found to be "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §

1516a(b)(1)(B)(i); *see also* Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir.

2017); CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1376 (Fed. Cir. 2016).

In addition, the remand determination is reviewed for compliance with the court's remand

order. Yantai Xinke Steel Structure Co. v. United States, 38 CIT ____, ____, 2014 WL 1387529

* 2 (April 9, 2014) (quoting Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT ____,

____, 968 F. Supp. 2d 1255, 1259 (2014) (internal quotation marks omitted)); Since Hardware

(Guangzhou) Co. v. United States, 39 CIT ____, ____, 49 F. Supp. 3d 1268, 1272 (2015) (same);

*see also* Changzhou Wujin Fine Chemical Factory Co. v. United States, 701 F.3d 1367, 1374-75

(Fed. Cir. 2012) (analyzing on review whether Commerce's remand results were "within the scope

of the Court of International Trade's remand order" and sustaining the Court of International

Trade's conclusion on that point).[9]

---

[9]A trial court's determination as to the scope of its own remand order is entitled to great
deference. *See*, *e.g.*, Changzhou, 701 F.3d at 1375 (explaining that "an appellant 'faces a very
high hurdle when it tries to convince us that, despite the remanding Court's satisfaction, we must

## III.   <u>Analysis</u>

Commerce has filed its Second Remand Results "under protest," asserting that the use of

P.T. Tifico's financial statements to derive surrogate financial ratios (rather than those of P.T. Asia

Pacific) renders Zhaoqing Tifo's dumping margin "less accurate," because P.T. Tifico's statements

are not sufficiently detailed to permit the agency to isolate and exclude energy costs from the

financial ratios.  Commerce therefore cannot include energy costs in the FOP database, because

doing so would result in the double-counting of such expenses.  *See* Second Remand Results at 6.

Commerce states that it would "prefer" to derive the financial ratios using the "more complete and

detailed" financial statements of P.T. Asia Pacific, so that energy expenses could be excluded from

the financial ratios and the energy consumed in producing the merchandise at issue could be valued

in the FOP database, without double-counting.  *Id*. at 8; s*ee also id*. at 6 (referring to Commerce's

"preference to value all reported energy inputs in the FOP database").[10]

_____

conclude that the [agency] on remand acted outside the scope of the remand directions'") (quoting
<u>Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB</u>, 975 F.2d 807, 814 (Fed.
Cir. 1992)).

[10]In the Second Remand Results, Commerce states that "the courts have recognized
[Commerce's] discretion when choosing an appropriate company's or companies' financial
statements to calculate . . . surrogate financial ratios."  *See* Second Remand Results at 6.  It is true
that Commerce's decision concerning the selection of financial statements would be entitled to a
measure of deference if the Domestic Producer had timely challenged in this forum the agency's
decision in the Final Determination to select the financial statements of P.T. Tifico over those of
P.T. Asia Pacific.  However, the Domestic Producer did not do so; and Commerce's discretion in
the selection of financial statements does nothing to remedy that fact.

Viewed differently, to the extent that this litigation focuses on the ramifications of
Commerce's decision on the selection of financial statement in its Final Determination, the
litigation is (at least implicitly) acknowledging the discretion that Commerce exercised in selecting
the financial statements of P.T. Tifico.

As explained in <u>Zhaoqing Tifo II</u>, however, and as summarized above and detailed below, Commerce's decision in the Final Determination concerning the selection of financial statements is beyond the scope of this case, as well as the court's jurisdiction.[11]  No party sought judicial review of Commerce's decision to select the financial statements of P.T. Tifico as the basis for surrogate financial ratios.  The Domestic Producer could have challenged that decision by commencing an action in this forum on or before February 11, 2013 – the last day on which the Domestic Producer could have timely filed a summons.  *See* 19 U.S.C. § 1516a(a)(1) (requiring that any action challenging a final determination in an antidumping proceeding be commenced by the filing of a summons within 30 days after Federal Register publication of the determination, followed by a complaint within 30 days thereafter); USCIT Rule 3(a)(2) (same).  But the Domestic Producer chose not to do so.[12]  Accordingly, like all other aspects of the Final Determination that

---

[11]In the Second Remand Results, Commerce twice states that the court ruled that the broad issue of Commerce's selection of financial statements is beyond the scope of the remand.  *See* Second Remand Results at 2, 8.  It is true that <u>Zhaoqing Tifo II</u> held that the remand instructions in <u>Zhaoqing Tifo I</u> did not authorize Commerce to reconsider the decision concerning selection of financial statements that the agency made in its Final Determination and that Commerce's actions in the course of the remand thus exceeded the scope of the remand order.  *See* <u>Zhaoqing Tifo II</u>, 41 CIT at ____, 256 F. Supp. 3d at 1331-37.  However, as explained in <u>Zhaoqing Tifo II</u> and detailed more fully here, the more fundamental point is that the issue of Commerce's selection of financial statement is beyond the scope of Zhaoqing Tifo's Complaint and thus beyond the scope of this litigation.  *See* <u>Zhaoqing Tifo II</u>, 41 CIT at ____, 256 F. Supp. 3d at 1326-31; *see also infra* sections III.A & III.B.

[12]For what it is worth: Zhaoqing Tifo filed its Summons on January 23, 2013 and its Complaint on January 30, 2013.  Thus, the Domestic Producer was on notice of the precise nature and the relatively narrow scope of Zhaoqing Tifo's double-counting claim well before the last day on which the Domestic Producer could have commenced its own action.

were not timely challenged in this forum, Commerce's decision to use the financial statements of

P.T. Tifico – rather than those of P.T. Asia Pacific – became final.

The sole claim at issue is Zhaoqing Tifo's double-counting claim, which *accepts* Commerce's decision to use the financial statements of P.T. Tifico, but makes the point that Commerce's use of those statements requires the agency to exclude energy costs from the FOP database, in order to avoid double-counting.  Moreover, any assertion that the use of P.T. Asia Pacific's financial statements would result in a more accurate dumping margin does not depict the full picture.

### A.  The Narrow Scope of This Litigation, As Defined By the Complaint

In effect, the Domestic Producer – and Commerce – are attempting to convert the discrete "double counting" claim that Zhaoqing Tifo set forth in its Complaint into a more general challenge to Commerce's selection of financial statements in its Final Determination.  Having failed to file its own action asserting such a challenge, the Domestic Producer, with the support of Commerce, now seeks to graft this broader challenge onto Zhaoqing Tifo's claim.  But, regardless of Commerce's support, the Domestic Producer cannot use the back door to do what it should have done through the front door.  There is no alchemy that can be used to transform Zhaoqing Tifo's double counting claim into the much more sweeping claim that the Domestic Producer belatedly seeks to litigate.

As Zhaoqing Tifo II explained, the statute (together with relevant agency regulations and the applicable Rules of the Court) strikes a balance between the significant interests in the accuracy and completeness of Commerce's determinations and the competing, equally compelling, need for

finality.  *See*, *e.g.*, Southern Rambler Sales, Inc. v. American Motors Corp., 375 F.2d 932, 938

(5th Cir. 1967) (underscoring importance of finality, observing that "[a]ll things must end – even

litigation"); *see generally* Zhaoqing Tifo II, 41 CIT at _____, 256 F. Supp. 3d at 1326-28.

      In the interests of finality, Commerce's final determination in any antidumping proceeding

is essentially immune to attack, except to the extent that a party commences a timely challenge of

that final determination in this Court – and, even then, only to the extent of those specific issues

that are raised in the complaint.   In other words, finality attaches to all aspects of a final

determination except those that are challenged in a timely-filed complaint.   Zhaoqing Tifo II, 41

CIT at _____, 256 F. Supp. 3d at 1327 (and authorities cited there).

      A party that does not file its own complaint may be permitted to intervene in a case, to

participate in the briefing and argument on the issues that are raised in the plaintiff's complaint.

*See generally* 28 U.S.C. § 2631(j)(1)(B) (specifying requirements applicable to motions to

intervene in antidumping cases); USCIT Rule 24(a) (setting forth timing and other requirements

applicable to motions to intervene in antidumping cases).   But an intervenor is not permitted to

raise its own challenges to the final determination at issue.   The scope of any litigation is confined

to the issues raised in a properly-filed complaint.   An intervenor must take a case as it lies.  *See*,

*e.g.*, Vinson v. Washington Gas Light Co., 321 U.S. 489, 498 (1944) (explaining that an

intervening party "is admitted to a proceeding as it stands, and in respect of the pending issues, but

is not permitted to enlarge those issues")[13]; *see generally* Zhaoqing Tifo II, 41 CIT at _____, 256

F. Supp. 3d at 1327.

      [13]In Illinois Bell, for example, a trade association was seeking to obtain judicial review of
one specific aspect of FCC order, but "[*r*]*ather than petitioning for* [*judicial*] *review of that aspect*

*of the* [*FCC's*] *order*, . . . [the trade association] sought to intervene in [the pending court case], which was initiated by the [plaintiff] carriers in order to review other parts of the [FCC's] decision." Illinois Bell Telephone Co. v. FCC, 911 F.2d 776, 785-86 (D.C. Cir. 1990) (emphasis added).  As the U.S. Court of Appeals for the D.C. Circuit explained, there (as here), "[t]he issue [the intervenor] tries to serve [the court] is . . . out of bounds." *Id*. Quoting Vinson v. Washington Gas Light Co., the D.C. Circuit elaborated: "An intervening party may join issue only on a matter that has been brought before the court by another party. . . . *Otherwise, the time limitations for filing a petition for* [*judicial*] *review . . .  could easily be circumvented* through the device of intervention." *Id*. (emphases added).  There is even greater cause for concern in a case such as this, where the effect of expanding the issues in litigation to include Commerce's selection of financial statements would be not only to evade "the time limitations for filing a petition for [judicial] review," but – in addition – to circumvent the strict statutory time limits governing Commerce's completion of an administrative review.

        *See generally* Chandler & Price Co. v. Brandtjen & Kluge, Inc., 296 U.S. 53, 59 (1935) (holding that the "purpose for which permission to intervene may be given is that the applicant may be put in position to assert in that suit a right of his in respect of something in dispute between the original parties"); Lamprecht v. FCC, 958 F.2d 382, 389 (D.C. Cir. 1992) (stating general rule that intervenors "may only join issue on a matter that has been brought before the court by another party," and rejecting intervenor's attempt to inject new issues into litigation, emphasizing that "despite having had every incentive to raise its arguments in the proper fashion, [intervenor] not only failed to do so [*i.e.*, by failing to seek judicial review of the agency's action in its own right], but fails now to proffer an excuse"); Edison Elec. Institute v. EPA, 391 F.3d 1267, 1274 (D.C. Cir. 2004) (quoting Illinois Bell for the proposition that "'[a]n intervening party may join issue only on a matter that has been brought before the court by another party'"); *see also, e.g.*, Laizhou Auto Brake Equip. Co. v. United States, 31 CIT 212, 212-15, 477 F. Supp. 2d 1298, 1299-1301 (2007) (quoting Vinson, emphasizing that "an intervening party is admitted to a 'proceeding as it stands, and in respect of the pending issues, but is not permitted to enlarge those issues'"); Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States, 30 CIT 542, 548, 425 F. Supp. 2d 1374, 1380 (2006) (noting that it is "clear beyond cavil" that intervenors "must take a case as they find it"); Siam Food Prods. Public Co. v. United States, 22 CIT 826, 830, 24 F. Supp. 2d 276, 280 (1998) (concluding that movants there were "time barred from bringing their own case and thus even as intervenors . . . [could] not bring their own challenges to [Commerce's] determination") (citation omitted); Torrington Co. v. United States, 14 CIT 56, 56-59, 731 F. Supp. 1073, 1073-76 (1990) (rejecting intervenors' attempt to inject into litigation new claims that were "clearly beyond the scope of the original litigation" between the plaintiff and  Commerce, noting that intervenors could have filed their own independent action raising their claims within the statutory time limitations but failed to do so, and underscoring that "an intervenor cannot circumvent the explicit statutory time limitations for contesting an antidumping duty determination by simply interjecting a claim when the time for commencing an action has expired").

Further, as <u>Zhaoqing Tifo II</u> explained, Commerce is not permitted to attack its own final

determination; nor is a court permitted to *sua sponte* interject issues into litigation.  Issues that are

not the subject of a timely-filed complaint cannot, as a general rule, be entertained by the court.

*See generally* <u>Zhaoqing Tifo II</u>, 41 CIT at ____, 256 F. Supp. 3d at 1327-28; *see also*, *e.g.*,

<u>Georgetown Steel Corp. v. United States</u>, 801 F.2d 1308, 1309-10, 1311-13 (Fed. Cir. 1986)

(holding that Court of International Trade lacked jurisdiction over action where party failed to file

timely appeal); <u>Laizhou Auto Brake Equip. Co. v. United States</u>, 31 CIT 212, 214 n.4, 477 F. Supp.

2d 1298, 1301 n.4 (2007) (observing that "[i]t is well settled that an 'intervening party may not be

permitted to contest an antidumping order in contravention of the [statutory] time limitations . . .

and the jurisdiction of the court'") (quoting <u>Torrington Co. v. United States</u>, 14 CIT 56, 58, 731 F.

Supp. 1073, 1076 (1990)).  As such, "finality" trumps "accuracy/completeness," and the complaint

defines and delimits the scope of litigation and the jurisdiction of the court.  *See generally*

<u>Zhaoqing Tifo II</u>, 41 CIT at ____, 256 F. Supp. 3d at 1327-28; *see generally*, *e.g.*, <u>Civil</u>

<u>Aeronautics Board v. Delta Air Lines, Inc.</u>, 367 U.S. 316, 321-22 & n.5 (1961) (explaining that

"[w]henever a question concerning administrative, or judicial, reconsideration arises, two

opposing policies demand recognition: the desirability of finality, on the one hand, and the public

interest in reaching what, ultimately, appears to be the right result on the other," and noting that

"[s]ince these policies are in tension, it is necessary to reach a compromise"); <u>Federated</u>

<u>Department Stores, Inc. v. Moitie</u>, 452 U.S. 394, 401 (1981) (stating that, in the interests of finality,

"[p]ublic policy dictates that there be an end of litigation; that those who have contested an issue

shall be bound by the result of that contest, and that matters once tried shall be considered forever

settled as between the parties"); <u>Alloy Piping Prods., Inc. v. Kanzen Tetsu Sdn Bhd.</u>, 334 F.3d

1284, 1292 (Fed. Cir. 2003) (recognizing the "strong interest in the finality of Commerce's

decisions"); NTN Bearing Corp. v. United States, 74 F.3d 1204, 1208 (Fed. Cir. 1995)

(acknowledging, on appeal in an antidumping duty case, that "[i]n some instances, a tension may

arise between finality and [a] correct result").[14]

As Zhaoqing Tifo II emphasized, Zhaoqing Tifo's timely-filed Complaint circumscribes

the scope of this action[15]; and that Complaint does not include a challenge to Commerce's selection

of financial statements.  See, e.g., United States v. Gosselin World Wide Moving, 741 F.3d 390,

405-06 (4th Cir. 2013) (explaining that "[t]he primacy of the complaining party [in defining the

scope of an action] is reflected in the legal vernacular," in that "[w]e often speak of the civil

plaintiff being the 'master of his complaint'"; characterizing plaintiff's discretion there as

"virtually unbounded")[16]; see generally Zhaoqing Tifo II, 41 CIT at ____, 256 F. Supp. 3d at 1328.

---

[14]See also, e.g., Comfort v. Lynn School Committee, 560 F.3d 22, 26 (1st Cir. 2009)
(observing that, in the interests of finality, "a case cannot be re-opened simply because some new
development makes it appear, in retrospect, that a judgment on the merits long since settled was
brought about by judicial error"); Oakes v. United States, 400 F.3d 92, 97 (1st Cir. 2005)
(characterizing finality as an "institutional value[] that transcends the litigants' parochial
interests").

[15]Zhaoqing Tifo's Complaint consists of a total of 10 specific counts.  However, as
indicated above, none of those counts contests Commerce's decision to derive the surrogate
financial ratios using the financial statements of P.T. Tifico (rather than those of P.T. Asia Pacific)
in the agency's Final Determination.  Quite to the contrary, the relevant counts of Zhaoqing Tifo's
Complaint specifically rely on Commerce's selection of P.T. Tifico's financial statements, but
allege that – because energy expenses are already embedded in the financial ratios derived from
those statements – Commerce must exclude energy expenses from the FOP database.  See
Zhaoqing Tifo II, 41 CIT at ____ n.15, 256 F. Supp. 3d at 1328 n.15 (summarizing the subjects
and the status of each of the 10 counts of Zhaoqing Tifo's Complaint).

[16]See also, e.g., Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826,
831 (2002) (quoting Caterpillar, noting that "the plaintiff is 'mater of the complaint'"); Caterpillar
Inc. v. Williams, 482 U.S. 386, 394-95 (1987) (noting that, although plaintiff ex-employees could

The issue of the selection of financial statements is thus beyond the scope of this litigation. Significantly, no party contends that Zhaoqing Tifo's Complaint includes a claim challenging Commerce's selection of financial statements – *i.e.*, Commerce's decision to rely on the financial statements of P.T. Tifico for purposes of the agency's Final Determination.  Certainly Zhaoqing Tifo has not sought to amend its Complaint to add such a claim; nor would it be in its interests to do so.  The Domestic Producer could have – and apparently should have – preserved its rights by timely filing its own complaint, so as to challenge Commerce's selection of P.T. Tifico's financial statements over those of P.T. Asia Pacific.[17]  But it is far too late for the Domestic Producer to do

---

have brought claims under collective bargaining agreements, "[a]s masters of the complaint, . . . *they chose not to do so*," and, instead sought relief only under their individual employment contracts) (emphasis added); *id.*, 482 U.S. at 392, 398-99 (referring to well-established rule that "the plaintiff is the master of the complaint"); Horne v. Potter, 392 F. App'x 800, 804 (11th Cir. 2010) (*per curiam*) (observing that "'[t]he plaintiff is the master of the complaint' and '[*t*]*he plaintiff selects the claims that will be alleged in the complaint*'") (quoting Danley v. Allen, 540 F.3d 1298, 1306 (11th Cir. 2008)) (emphasis added); Wells v. City of Alexandria, 178 F. App'x 430, 433 & n.4 (5th Cir. 2006) (*per curiam*) (noting that, in determining scope of litigation, "[t]he allegations in [plaintiff's] complaint control," relying on Podell v. Citicorp Diners Club, Inc., 914 F. Supp. 1025, 1028 n.1 (S.D.N.Y. 1996), *aff'd*, 112 F.3d 98, 100 n.2 (2d Cir. 1997), for proposition that "the complaint 'frames and limits the issues'"); BP Chemicals Ltd. v. Jiangsu Sopo Corp., 285 F.3d 677, 683-84 (8th Cir. 2002) (acknowledging that "[plaintiff] might have chosen to pursue theft-type claims against [defendant], but [plaintiff] elected not to do so and *that strategic, legal choice is well within* [*plaintiff's*] *discretion as the master of plaintiff's complaint*") (emphasis added); Boxer X v. Harris, 459 F.3d 1114, 1120 (11th Cir. 2006) (Barkett, J., dissenting from denial of rehearing *en banc*) (emphasizing that "[i]n our federal system of civil justice, the plaintiff is the 'master of the complaint,' *see* Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc., 535 U.S. 826, 831 (2002)**,** and, under the law [*the plaintiff*] *is entitled to decide which and how many claims he will assert*") (emphasis added).

[17]*See, e.g.*, Torrington Co. v. United States, 14 CIT 56, 58, 731 F. Supp. 1073, 1075 (1990) (rejecting intervenors' attempts to raise new issue in litigation, noting that "[s]ince Commerce resolved [the] issue [that intervenors sought to raise] in its favor, [plaintiff] naturally did not contest [the issue] in the instant action.  [Intervenors], however, [were] not precluded from challenging that aspect of [Commerce's] determination independently," in a timely fashion in accordance with the statute).

_____

The issue of the selection of financial statements – and the respective pros and cons of the financial statements of P.T. Tifico and P.T. Asia Pacific – was hotly contested by the parties before Commerce's Final Determination issued.  In fact, as noted above, in arguing that Commerce should use P.T. Asia Pacific's financial statements, the Domestic Producer specifically warned Commerce that the agency's selection of the statements of P.T. Tifico would preclude the agency from including coal in the FOP database, due to the need to avoid double-counting.  Having thus exhausted the issue at the administrative level, the Domestic Producer was perfectly positioned to challenge Commerce's selection of financial statements in court.

Plaintiffs routinely seek judicial review of Commerce's selection of one set of financial statements over another, just as the Domestic Producer could have done here.  *See*, *e.g.*, Jiaxing Brother Fastener Co. v. United States, 822 F.3d 1289, 1300-01 (Fed. Cir. 2016) (affirming Court of International Trade decision on plaintiff's claim that Commerce erred in considering a particular financial statement); QVD Food Co. v. United States, 658 F.3d 1318, 1322-26 (Fed. Cir. 2011) (affirming Court of International Trade decision on plaintiff's claim that Commerce erred in relying on a particular financial statement); Ad Hoc Shrimp Trade Action Committee v. United States, 618 F.3d 1316, 1320, 1321, 1322-23 (Fed. Cir. 2010) (affirming "Commerce's decision to exclude [the] financial statements [of a non-profitable company] in calculating the surrogate financial ratios, in favor of using financial statements from the two profitable surrogate companies"); Dorbest Ltd. v. United States, 604 F.3d 1363, 1369-70, 1373-75 (Fed. Cir. 2010) (reversing Court of International Trade ruling on Commerce's selection of financial statements).  However, such claims are fundamentally different from the claim that Zhaoqing Tifo presses, which plainly does not challenge Commerce's selection of financial statements – *i.e.*, Commerce's decision to select the financial statements of P.T. Tifico rather than those of P.T. Asia Pacific.  Zhaoqing Tifo is quite content with that decision.

Moreover, as explained in Zhaoqing Tifo II, there is no substance to the notion that the issue of the relative merits of the financial statements of P.T. Tifico and P.T. Asia Pacific (*i.e.*, the issue that the Domestic Producer and Commerce seek to raise) is inextricably intertwined with the specific, narrow issue raised in Zhaoqing Tifo's Complaint – *i.e.*, the extent to which there are energy costs that are already embedded in P.T. Tifico's financial statements (and thus reflected in Commerce's surrogate financial ratios), such that Commerce's inclusion of coal in the FOP database results in double-counting.  Although it is true that the issue that Zhaoqing Tifo has raised is related to the issue of Commerce's selection of financial statements, the two issues are entirely discrete. There is – as a matter of logic – no need for Commerce to reassess the relative merits of the financial statements of P.T. Tifico and P.T. Asia Pacific in order to address the issue that Zhaoqing Tifo has raised, which is specific to, and strictly limited to, the financial statements of P.T. Tifico.  *See generally* Zhaoqing Tifo II, 41 CIT at ____, 256 F. Supp. 3d at 1335-36.

that now.  *See* 19 U.S.C. § 1516a(a)(1); USCIT Rule 3(a)(2); *see generally* <u>Zhaoqing Tifo II</u>, 41

CIT at ____, 256 F. Supp. 3d at 1329.

Notwithstanding three rounds of briefing in this litigation (*i.e.*, the initial briefing, the

briefing on the First Remand Results, and the briefing on the Second Remand Results), neither the

Government nor the Domestic Producer has ever made any serious effort to respond either to

Zhaoqing Tifo's arguments concerning the narrow, precise nature of the claim at issue (including

the role of a complaint in defining the scope of litigation, and a court's jurisdiction) or to its

arguments concerning the strict statutory time limits for filing an action challenging a final

determination.  As Zhaoqing Tifo has maintained, and as has been explained previously and yet

again here), the scope of this action is determined by the claim set forth in Zhaoqing Tifo's

Complaint, which does not contest Commerce's decision in the Final Determination to select the

financial statements of P.T. Tifico (rather than those of P.T. Asia Pacific).  Because the Domestic

Producer elected not to file its own action contesting Commerce's decision on the selection of

financial statements, and because the "double-counting" claim asserted by Zhaoqing Tifo is laser-

focused on *the implications* of Commerce's decision to select the financial statements of P.T.

Tifico – and does not challenge that decision itself – Commerce's selection of the financial

statements of P.T. Tifico was laid to rest long ago and cannot be resurrected in this action.  *See*

*generally* <u>Zhaoqing Tifo II</u>, 41 CIT at ____, 256 F. Supp. 3d at 1328-29.  Unlike Lazarus,

Commerce's selection of financial statements cannot rise from the dead.[18]

---

[18]Absent extraordinary circumstances not present here, Commerce may not reopen aspects of its final determinations that are not properly the subject of litigation – not even by invoking the interests of accuracy.  The legislative mandate to "use the best available information" in calculating dumping margins (*see* 19 U.S.C. § 1677b(c)(1)) is not a license for Commerce to reopen settled

aspects of its antidumping analyses after a final determination has issued merely because the agency concludes that some decision that it made in the course of that final determination was ill-advised or wrong.

In a routine international trade case such as this, accuracy *must* yield to finality for purposes of litigation, except to the extent that an issue is properly preserved for judicial review.  Practicality and common sense compel this result.  If it were otherwise, all of the many scores of decisions, calculations, and judgment calls that go into a final determination by Commerce would remain open to challenge long after the final determination was issued – possibly *ad infinitum*.  Nothing would ever really become final.

Neither Commerce nor the Domestic Producer has pointed to any special circumstances in this case that might even conceivably justify a departure from the general rule on finality.  *See*, *e.g.*, *supra* n.17 (explaining that P.T. Tifico's "double-counting" claim is not inextricably intertwined with the broad issue of Commerce's selection of financial statements).  There is no new evidence or other information that has come to light that Commerce might at least try to use as a basis for revisiting its earlier decision to rely on the financial statements of P.T. Tifico.  *See*, *e.g.*, *supra* n.8 (explaining that, at the time Commerce selected the financial statements of P.T. Tifico for use in the Final Determination, Commerce had before it the same information concerning the relative levels of integration of Zhaoqing Tifo, P.T. Tifico, and P.T. Asia Pacific – the exact same factual information that is on the record now).  And, to be sure, there are no allegations of fraud.  *See generally*, *e.g.*, <u>Zhaoqing Tifo II</u>, 41 CIT at ____, 256 F. Supp. 3d at 1330-31 (and authorities cited there) (noting rare, extraordinary cases involving threats to the fundamental integrity of Commerce proceedings, where – "notwithstanding the (nearly) ironclad rule prizing finality over accuracy/completeness" – Commerce may be permitted to reopen determinations and proceedings).  The remarkable fact is that Commerce wants the equivalent of a "do-over" in a case where it was warned expressly and in no uncertain terms (by the Domestic Producer, no less) that – if Commerce selected P.T. Tifico's financial statements for the Final Determination – Commerce would be forced to exclude coal expenses from the FOP database to avoid double-counting, because all energy expenses are already reflected in (and cannot readily be extracted from) those statements, due to their less detailed nature.

If Commerce were permitted to reopen the issue of the selection of financial statements here, it would be a very slippery slope.  If one begins tugging at the thread, there is no telling where the unraveling will end or what will be left.  The statutory scheme plainly contemplates that Commerce's final determinations will be exactly that – final – except to the extent that one or more aspects of a final determination are properly preserved for judicial review.  The outcome that Commerce and the Domestic Producer seek would set a very dangerous precedent.

B.   Commerce's Decisions Not to Reopen the Administrative Record

In filing the Second Remand Results "under protest," Commerce intimates that the court has forced the agency to use P.T. Tifico's financial statements and asserts that the use of those statements (rather than the statements of P.T. Asia Pacific) results in a dumping margin that is "less accurate." *See*, *e.g.*, Second Remand Results at 2-3 (stating that the Second Remand Results are filed "under protest" and asserting that the use of P.T. Tifico's financial statements is "as instructed by the Court"); *id*. at 6 (asserting that using P.T. Tifico's financial statements makes the dumping margin "less accurate").[19]   Both of these positions miss the mark.

Nothing in Zhaoqing Tifo I or Zhaoqing Tifo II foisted on Commerce the use of P.T. Tifico's financial statements.   It is Commerce itself that chose P.T. Tifico's financial statements in Commerce's own Final Determination, reversing the position that the agency had taken in its Preliminary Determination, which used the statements of P.T. Asia Pacific.   Commerce made that decision over the vehement objections of the Domestic Producer, which expressly and specifically cautioned Commerce that use of P.T. Tifico's less detailed financial statements would require Commerce to exclude the cost of energy sources (including the cost of coal) from the FOP database.

_____

[19]*See also* Second Remand Results at 6 (referring to "the Court's instructions" and stating that the Second Remand Results are filed "under protest"); *id*. at 7 (asserting that use of P.T. Tifico's financial statements is "as directed by the Court" and indicating that Domestic Producer's comments on the draft remand results argued that use of P.T. Tifico's financial statements "result[s] in a less accurate dumping margin"); *id*. at 8 (referring to "the Court's Order," noting that Commerce "respectfully disagrees" with the court's decision and stating that "the Court has ruled" against consideration of the issue of Commerce's selection of financial statements as beyond the scope of litigation).

Similarly, as noted in section III.A above, given Commerce's decision to use the financial statements of P.T. Tifico in the Final Determination (ignoring the Domestic Producer's explicit and unambiguous warnings), the Domestic Producer could have filed its own action challenging Commerce's selection of financial statements (*i.e.*, the selection of P.T. Tifico's statements over those of P.T. Asia Pacific in Commerce's Final Determination).  Had the Domestic Producer done so, the broad issue of Commerce's selection of financial statements (and the relative merits of one statement *versus* the other) would be a proper subject for litigation here and Commerce would have been free to reconsider its selection of financial statements.  As it is, however, the Domestic Producer made an informed, deliberate, intentional decision not to file such an action.  Therefore, like virtually all of the scores of decisions that Commerce made in reaching its Final Determination, Commerce's decision as to its selection of financial statements (*i.e.*, its selection of P.T. Tifico's statements over those of P.T. Asia Pacific) became final when the Domestic Producer failed to commence an action contesting that decision on or before February 11, 2013. The only aspects of Commerce's Final Determination that did not become final at that time are those that were preserved for judicial review in Zhaoqing Tifo's Complaint.

In sum, contrary to the implications in the Second Remand Results, it is not the court that required Commerce to use the financial statements of P.T. Tifico.  The requirement to use P.T. Tifico's financial statements is the product of, and is directly and exclusively attributable to, Commerce's decision to use P.T. Tifico's statements (rather than those of P.T. Asia Pacific) for purposes of the agency's Final Determination, in tandem with the Domestic Producer's failure to seek judicial review of that agency decision.

Further, the filing of the Second Remand Results "under protest" evinces a decision on the part of Commerce to rely on P.T. Tifico's financial statements based solely on the existing administrative record, without exhausting available avenues that might have shed light on P.T. Tifico and matters such as the company's energy consumption and how energy is accounted for in the company's financial statements, and thereby helped resolve any outstanding questions or concerns. Specifically, although the combined actions of Commerce and the Domestic Producer (as outlined above) preclude Commerce from using financial statements other than those of P.T. Tifico, there was nothing that prevented Commerce from reopening the administrative record (on the first remand and/or the most recent remand) to seek to clarify P.T. Tifico's energy costs and accounting practices, or for any other similar purpose.[20]

Commerce could have reopened the record and sought new evidence that might have permitted the agency to break down the energy figures in P.T. Tifico's financial statements so as to allow the agency to extract from those statements values for relevant production-related energy

---

[20]Zhaoqing Tifo I and Zhaoqing Tifo II "essentially gave Commerce unfettered discretion on remand to do whatever the agency deemed appropriate to ascertain how to properly account for water, coal, and electricity using the financial statements of P.T. Tifico, while at the same time avoiding double-counting." *See*, Zhaoqing Tifo II, 41 CIT at ____, 256 F. Supp. 3d at 1334.

To explain its decision not to reopen the administrative record, Commerce notes that, as a matter of policy, it generally limits its consideration of a financial statement to the four corners of the document itself. *See* First Remand Results at 6-7. But that is the agency's own, self-imposed constraint; and, however sound Commerce's policy might be as a general matter, this is a somewhat unusual situation. Because Commerce and the Domestic Producer were concerned about the lack of detail in P.T. Tifico's financial statements (particularly as to energy costs), and because Commerce did not have the option of discarding P.T. Tifico's statements, it stands to reason that Commerce and the Domestic Producer would want to reopen the record and seek new evidence that might assuage their concerns. There is no statute or regulation that prevented Commerce from doing so, particularly in the circumstances of this case.

inputs (as opposed to, for example, values for energy properly accounted for as overhead) and thus

to permit the agency to account for coal separately in the FOP database.  Indeed, <u>Zhaoqing Tifo I</u>

and <u>Zhaoqing Tifo II</u> encouraged Commerce to do exactly that.  *See* <u>Zhaoqing Tifo I</u>, 39 CIT at

____, 60 F. Supp. 3d at 1365; <u>Zhaoqing Tifo II</u>, 41 CIT at ____, 256 F. Supp. 3d at 1333, 1337-

38.

        Because Commerce elected to forego such steps that might have permitted the agency to

clarify the manner in which P.T. Tifico's financial statements account for energy, Commerce's

complaints about the use (and limitations) of those financial statements – and the agency's filing

of the Second Remand Results "under protest" – have a hollow ring.

        For much the same reason, Commerce's assertion that the use of P.T. Tifico's financial

statements result in a "less accurate" dumping margin cannot be taken at face value.[21]  Because

---

        [21]In its comments on Commerce's draft of the most recent remand results, the Domestic Producer assert that "relying on the financial statements of P.T. Tifico and removing coal from the FOP database" means that Commerce's dumping margin calculations "[do] not capture all energy inputs."  *See* Second Remand Results at 7.  But Commerce squarely de-bunks that contention.  The Second Remand Results state that Commerce "disagrees" with the Domestic Producer's contention and explain that, as standard agency practice, Commerce recognizes that, in financial statements, "energy costs are captured in the manufacturing overhead unless the . . . financial statements provide a detailed breakout of specific line items," including a line item for energy expenses.  *Id.* at 8.  Commerce thus concludes that "the [second] remand results fully account for all energy costs."  *Id.*  Including coal in the FOP database – as the Domestic Producer urges, and as Commerce did in the Final Results – would "double-count" energy costs.

        (Early in the Second Remand Results, there is a statement that "[r]elying on P.T. Tifico's financial statements to derive surrogate financial ratios requires [Commerce] to *assume* that all potential energy costs are included in the factory/manufacturing overhead figure."  Second Remand Results at 6 (emphasis added).  Reading the Second Remand Results as a whole, however, it is clear that this early statement does not accurately reflect Commerce's position.  As the Second Remand Results later confirm, all energy costs are captured in the factory/manufacturing overhead figure that Commerce derived from P.T. Tifico's statements.  *See id.* at 8.)

Commerce elected not to reopen the administrative record to seek evidence that might have

clarified the energy values reflected in P.T. Tifico's financial statements (and, for example, might

have allowed Commerce to account for coal separately in the FOP database), any representations

about the relative accuracy of dumping margins relying on the financial statements of P.T. Tifico

*versus* those of P.T. Asia Pacific must necessarily be limited by the caveat "on the *existing*

administrative record."  By choosing not to reopen the record, Commerce precluded any possibility

of enhancing the accuracy of the dumping margin calculated using P.T. Tifico's financial

statements and therefore cannot now be heard to complain.

## IV.   Conclusion

For the foregoing reasons, Commerce's Second Remand Results must be sustained. A

separate order will enter accordingly.

/s/ Delissa A. Ridgway
Delissa A. Ridgway
Judge

Dated:  November 30, 2018
    New York, New York

---

Moreover, although it may be Commerce's preference to include production-related energy costs in the FOP database (*see* Second Remand Results at 6), Zhaoqing Tifo points out that Commerce has excluded energy costs from the FOP database in other cases where, as here, the financial statements that Commerce selected for use in deriving surrogate financial ratios did not separately break out energy costs – the very outcome that Commerce reaches in these Second Remand Results.  *See* Zhaoqing Tifo II, 41 CIT at _____ n.24, 256 F. Supp. 3d at 1336 n.24 (and sources cited there).